CBKLHAMC

1  UNITED STATES DISTRICT COURT
   SOUTHERN DISTRICT OF NEW YORK
2  ------------------------------x

3  UNITED STATES OF AMERICA,

4             v.                          12 CR 185 (LAP)

5  JEREMY HAMMOND,

6             Defendant.

7  ------------------------------x

8                                    New York, N.Y.
                                     November 20, 2012
9                                    11:38 a.m.

10

   Before:
11
                     HON. LORETTA A. PRESKA,
12
                                          District Judge
13

14                         APPEARANCES

15 PREET BHARARA
        United States Attorney for the
16      Southern District of New York
   ROSEMARY NIDIRY
17 THOMAS G.A. BROWN
        Assistant United States Attorneys
18
   ELIZABETH FINK
19 MARGARET RATNER KUNSTLER
   SARAH KUNSTLER
20 REBECCA HEINEGG
        Attorneys for Defendant
21
   ALSO PRESENT:  ADAM JOHNSON, Esq., MCC
22                NICOLE BROWN-MORIN, Pretrial Services

23

24

25

CBKLHAMC

1              (Case called)

2              THE COURT:  How would you like to proceed, Ms. Fink?

3              MS. FINK:  I don't know, Judge.  I want to proceed

4      with removing Mr. Hammond from custody and --

5              THE COURT:  Ms. Fink, this is your application.  How

6      do you want to proceed?

7              MS. FINK:  Okay.  It's my application.  I would like

8      to move for bail for Mr. Hammond.

9              THE COURT:  All right, ma'am.

10             MS. FINK:  And if the Court would like, I will argue.

11             THE COURT:  Yes, ma'am.

12             MS. FINK:  Just up to whatever you want, Judge.  I

13     can, for example, introduce you to where Mr. Hammond will live,

14     right, and I can talk about the circumstances.

15             THE COURT:  I don't think I saw in the papers with

16     whom he proposed to reside.  It said a lawyer.

17             MS. FINK:  Yes, Judge.  Let me -- would you mind, come

18     forward, please.

19             Your Honor, I'd like to introduce to the Court Michael

20     Smith.  Mr. Smith is a member of this court.

21             You are, aren't you?

22             MR. SMITH:  I am.

23             MS. FINK:  Okay.  He's a close friend of mine and all

24     of us.  We have worked together.  I'm a cooperating attorney of

25     the Center for Constitutional Rights.  Mr. Smith is on the

CBKLHAMC

1    board of directors.

2              THE COURT:  Good morning, sir.

3              MR. SMITH:  Good morning, your Honor.

4              THE COURT:  Thank you.  Won't you have a seat.

5              MS. FINK:  And he and his wife live in Battery Park

6    City and his wife has been his paralegal in his law office of

7    Michael Steven Smith and they'd take full custody of him.

8              The fact of the matter is, Judge, and I just want to

9    present the sureties because I don't really know how to proceed

10   here because of course we know it's the government's burden,

11   right, to demonstrate that he should not be released on bail.

12   And we've read the government's memorandum and it exposes the

13   government's problems.

14             First of all you see, Judge, that there are no

15   exhibits attached to this memorandum, for example, having told

16   you about his recidivism and his criminal record.  They don't

17   provide you with the criminal record.

18             THE COURT:  I understood that you had all received

19   copies of the pretrial services report?

20             MS. FINK:  I did that this morning, Judge, just now --

21             THE COURT:  Me too.

22             MS. FINK:  -- minutes ago, and I've gone through it

23   and I can be said to be heard on this record because it's not

24   quite accurate.  And, of course, the government's statements

25   themselves in their paper are totally inaccurate.

4

CBKLHAMC

```
1              For example, they tell you he had two supervised

2    release violations for he was on -- in 2006, the government put

3    Mr. Hammond on their terrorist watch list.  As a result of

4    that, they had a lot of interest in him and in what I consider

5    to be inappropriate action based on their -- his avowed lack of

6    respect for the law or government institutions which --

7              THE COURT:  Excuse, I see Mr. Johnson coming in.

8    Mr. Johnson is counsel at the MCC.  You're welcome to sit at

9    the front table, sir, or anyplace you want.

10             Ms. Fink, go ahead.

11             MS. FINK:  Mr. Johnson and Ms. Kunstler and I are old

12   colleagues.

13             So they informed the Court, for example, that he did

14   have federal charges -- and do we have another copy of this --

15   he did have federal charges, as the Court knows, and he did 18

16   months and he was on supervised release.  And the government

17   while they were on supervised release went and searched his

18   house under their right to do that several times, and twice

19   they arrested him on the supervised release for possession of

20   cannabis.  Well, the cannabis turned out to be sage.

21             And even though they tell you that there were seven

22   instances where violations of supervised release were filed,

23   none of them, Judge, were sustained.  And I have provided the

24   Court with the last court appearance in front of Judge Zabel

25   and there are three pages and you can see that the government
```

CBKLHAMC

1    moves for supervised release to be terminated and you can see

2    the interchange between the Court and Mr. Hammond.

3             THE COURT:  What about the information in the pretrial

4    services report indicating that on several occasions

5    Mr. Hammond failed to appear for various hearings and that

6    warrants were issued?

7             MS. FINK:  Your Honor, I've spoken to Mr. Hammond

8    about that and the Court will notice that there really is one

9    and the date of that is July 21, 2006.  And Mr. Hammond tells

10   me that he failed to appear to see his probation officer.

11            And this was in state court, right?

12            He spaced it, Judge.

13            THE COURT:  He what?

14            MS. FINK:  He spaced it.

15            THE COURT:  What does that mean?

16            MS. FINK:  He didn't go to visit his probation

17   officer.  He then was arrested at another hearing and they said

18   you have a probation warrant.  He went to court, right, and the

19   judge dismissed the warrant and told him to continue on

20   probation.  And he continued on probation and his probation was

21   dismissed four months after that incident.

22            THE COURT:  Top of page 4, following the September 29,

23   '09 conviction of two counts of mob action, etc., this offense

24   occurred while the defendant was on supervised release.

25            MS. FINK:  Yes, Judge.

CBKLHAMC

1          THE COURT:  In addition, during the tenure of this

2     case, warrants were issued for failing to appear in court.

3          MS. FINK:  Judge, if you look at the court appearance,

4     when supervised release was ended, you'll see that the federal

5     government and the state were working together.  What he was

6     convicted of, right --

7          THE COURT:  I'm asking about the warrants at the

8     minute.  Apparently, a warrant was issued on the '06 warrant.

9     Then on --

10          MS. FINK:  And I'm telling you --

11          THE COURT:  -- '09, it says warrants were issued for

12     failing to appear.

13          MS. FINK:  Well, Judge, first of all, on the '06, I'm

14     telling you that that warrant was dismissed.

15          THE COURT:  Okay, but it was issued because he didn't

16     show up.

17          MS. FINK:  Judge, and then he showed up and it was one

18     failure to meet with the probation officer.

19          THE COURT:  Okay.  So that was one.

20          What about the '09 warrants were issued for failing to

21     appear in court, true or false?

22          MS. FINK:  I don't know.

23          THE COURT:  All right.

24          MS. FINK:  I certainly don't have the warrants.  The

25     government didn't provide them with me.  I certainly don't have

CBKLHAMC

1   anything which reflects that those warrants were sustained.

2           THE COURT:  Well, but you don't have anything they

3   weren't either.  This is a pretrial services report.  We rely

4   on these all the time.

5           MS. FINK:  I understand, Judge, but I just saw it.

6           THE COURT:  Yeah, well, so did I, but I read it.

7           MS. FINK:  Right.  So we're both looking at it.

8           And there's no question that he went -- he got

9   convicted in federal court in 2006.  He appeared at all times.

10  He pled guilty, he was sentenced, and he self-surrendered.

11          THE COURT:  Okay.  Nobody is complaining about that.

12  That's not in dispute.

13          MS. FINK:  Then, because he's a radical, Judge,

14  there's no question that he's a dissident.  There's no question

15  that he's a political activist.

16          THE COURT:  That's not an issue either.

17          MS. FINK:  Right.  That's true.

18          When an action took place in Chicago, he was convicted

19  with a whole bunch of other people in what is the Chicago crime

20  which is mob action.  And what he did, Judge, he burned the

21  Olympic flag and he got 18 months' probation.  And together,

22  the federal government, and you can see that the federal

23  government was on top of that probation.

24          THE COURT:  What does that mean?

25          MS. FINK:  Well, read the end of supervised release,

CBKLHAMC

1    the government's statement about --

2            THE COURT:  Is there something you want to tell me?

3    What does it say?

4            MS. FINK:  You see, Judge, on page 2, and this is a

5    violation of supervised release hearing, line 11, Mr. Fox,

6    who's a United States attorney, tells the court that he's on

7    probation, including strict probation, that he's been fully

8    compliant, including dropping clean in his drug test weekly.

9    And the only thing he's tested positive for, Judge, is

10   cannabis, marijuana.

11           THE COURT:  Okay, but that's not fully compliant, and

12   we don't know how long this relates to.

13           Look, Ms. Fink.

14           MS. FINK:  Yeah.

15           THE COURT:  Far as I can tell, there are at least two

16   occasions when warrants were issued for Mr. Hammond's failure

17   to appear.  There seem to be several occasions when crimes were

18   committed while on either probation or supervised release.

19           Am I wrong about those things?

20           MS. FINK:  There's no question that he continued to

21   participate in political activity which resulted in him being

22   arrested.

23           THE COURT:  While on supervised release.

24           MS. FINK:  Yes.

25           THE COURT:  Okay.  So he was arrested while on

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

9

CBKLHAMC

```
 1    supervised release, apparently convicted of certain things,

 2    right, like mob action.

 3              MS. FINK:  The only thing that he was convicted of is

 4    mob action.

 5              THE COURT:  Okay.

 6              MS. FINK:  One time.

 7              THE COURT:  So what I said is correct.  Warrants were

 8    issued for failure to appear and convictions ensued while on

 9    supervised release or probation.  Right?

10              MS. FINK:  Well, Judge, I don't know because I haven't

11    seen the warrant and I don't know what happened when he went to

12    court.

13              THE COURT:  Okay, fine.

14              Anything else on this?

15              MS. FINK:  Based on this, based on the presentence

16    report -- pretrial submission, all of this I would have to

17    check.  I would have to, for example, where it says -- none of

18    this resulted in any sentence.

19              THE COURT:  So what?

20              MS. FINK:  For example, circumstances, warrants were

21    issued for failure to report.

22              And then we have in 2010 a violation, and 17 days

23    later he went into court and what happened was the original

24    terms of probation were ordered to continue.  So that warrant

25    was dismissed.
```

CBKLHAMC

```
 1              In July of 2011, he went into court again on a second

 2      violation of probation and 19 days later, the original terms of

 3      probation were ordered to continue and the warrant was

 4      dismissed.

 5              So you don't know what the circumstances are of the

 6      warrant because the issue here, Judge, is in 2006, based on the

 7      fact that this man is doing computer stuff and is a well-known

 8      activist, the government, which is the participant in this

 9      crime, that's the problem here, Judge.

10              THE COURT:  Ms. Fink, please try to say something that

11      is relevant to what we are here to discuss today.

12              MS. FINK:  Well, it seems to me what we are here to

13      discuss, Judge, is whether there are circumstances and

14      conditions.

15              THE COURT:  Okay.  Then don't talk to me about the

16      government being committing this crime.

17              MS. FINK:  I didn't say that, Judge.  I said they

18      participated in this crime.

19              THE COURT:  Okay, fine.

20              MS. FINK:  You know, I mean, and they're going to

21      admit to you that that's true, Judge.

22              THE COURT:  Ms. Fink, the bail statute tells us very

23      clearly what it is we should be considering in this

24      application.  Let's try to talk about that.

25              MS. FINK:  Okay, Judge.  It is the government's
```

CBKLHAMC

 1    burden, No. 1.

 2              THE COURT:  I already said that.  I'm not arguing with

 3    you.

 4              It's your application.  Is there anything else you

 5    want to tell me before I call on the government?

 6              MS. FINK:  Yeah.

 7              THE COURT:  What do you want to tell me?

 8              MS. FINK:  There's no way I can prepare for this trial

 9    when this man is in prison.  That's what I want to tell you.

10              THE COURT:  Okay.  I understood --

11              MS. FINK:  There is no possibility that we can be

12    given our rights under -- to look at the evidence against us

13    and present evidence in our thing under the constraint.

14              THE COURT:  What do you mean in our thing, what does

15    that mean?

16              MS. FINK:  To present witnesses on our own behalf,

17    right, based on this enormous amount of evidence.

18              THE COURT:  Ms. Fink, the papers seem to say that the

19    government has offered to make available the material in a more

20    easily accessible format and to work with you in talking with

21    the folks at the MCC to try to make it more accessible to the

22    defendant, and the papers certainly seem to say that you didn't

23    take them up on their offer to work with you.

24              Is that true or false?

25              MS. FINK:  False.

CBKLHAMC

1          THE COURT:  Okay.  When did you call them and say what

2   you said?

3          MS. FINK:  I have no interest in doing that, Judge.

4          THE COURT:  Then why is it false?

5          MS. FINK:  Judge, I am the defense lawyer here.

6          THE COURT:  I got that.

7          MS. FINK:  First of all, as the Court knows, I've been

8   ill and I continue to be ill.

9          THE COURT:  I think you have people who work with you

10  who could have called.

11         MS. FINK:  Exactly right.

12         THE COURT:  Did they call?

13         MS. FINK:  Then let me make my point here.  In June of

14  2011, '10 or '11, 2011, right, the government arrested Hector

15  Monsegur, who is the complaining witness -- the cooperating

16  witness in this case.  His name is Sabu.  He then became a

17  government witness and he became a government agent.  He's not

18  a coconspirator in this case, by no means, because at the time

19  that he was creating --

20         THE COURT:  I'm sorry, the question I asked was

21  whether you had or people working with you had reached out to

22  the government -- excuse me.

23         MS. FINK:  Excuse me.

24         THE COURT:  -- in an attempt to accept their offer to

25  work with you in making the material more accessible to

CBKLHAMC

1     Mr. Hammond.

2             MS. FINK:  Your Honor.

3             THE COURT:  That's the question I asked.

4             MS. FINK:  I determined based on my own life as a

5     defense lawyer that there is nothing that the government could

6     do for me that would aid my defense, nothing, because the

7     government --

8             THE COURT:  That's all I wanted to know, that the

9     answer is you didn't call them.

10            MS. FINK:  No, I didn't.  I spoke to them.  I did call

11    Mr. Tritz and I did extensively deal with Emma Greenwood, who

12    is the CJA coordinator on this kind of information.

13            MS. S. KUNSTLER:  Your Honor, what the government

14    offered to do for us is to decompress the data on the drive.

15    That is something that we, in speaking with Access Data, who

16    will help us DeNIST the drive, as discussed in our papers, even

17    uncompressed, it's still a lot of it unintelligible to us and

18    still a lot of it not useful to us.  And separating the wheat

19    from the chaff in what's important to the case and what we need

20    to focus on is part of what Access Data does for defense

21    lawyers in these cases.

22            So it hasn't been a question of needing someone to

23    uncompress the files for us.  It's been a matter of having our

24    client available to us to make intelligible the information.

25            THE COURT:  All right.  Then the question and the same

CBKLHAMC

```
1    question to Ms. Fink was did anyone reach out to someone,

2    either the government as a go-between or to the MCC, to ask

3    about having the material made accessible to Mr. Hammond.

4              MS. S. KUNSTLER:  Separate and apart from being with

5    us -- our understanding under the protective order was that he

6    was not to have it separate and apart from us.

7              We have been working -- I have spoken to Adam Johnson

8    about the types of files, whether the computers in the legal

9    visiting room could access those files.  He sent me a list of

10   what files the machines could open.  We've been endeavoring to

11   go to those visiting rooms and review what we can with him in

12   the time we have.  But beyond that, it was not our

13   understanding that the government could assist us in making the

14   files available to him outside of our presence.  It was our

15   understanding pursuant to the protective order that was all we

16   could do.

17             THE COURT:  On the protective order, counsel.

18             MS. NIDIRY:  Yes.  So the protective order was

19   obviously something that they agreed to and we had some

20   continuous discussions about it.  One of the issues was raised,

21   this was raised about how to review it, and instead of saying

22   just like the attorney could be present, we agreed that the

23   attorney and staff could be present with the defendant.

24             But we also have a provision in there and we have

25   expressed to them that if there are future modifications that
```

CBKLHAMC

1  are needed in order to make this more workable, we are willing

2  to work with you.  And this is the first time, within the last

3  two weeks when we saw these papers that we understood that

4  there was an issue with regard to accessing this volume of data

5  at the MCC and that the issues related to both Mr. Hammond's

6  access to computers at the MCC, which is a different issue

7  which I think we've addressed based on my contacts with

8  Mr. Johnson last week, and based on the way in which the

9  attorneys can work with the defendant in terms of reviewing

10 these materials, which is also something we are happy to work

11 with them.

12        There is no reason as far as we can see that in any

13 case that a defendant who's detained, just because he's

14 detained, should not be able to review the discovery adequately

15 with the attorneys; and it's definitely something that the MCC

16 and the government and defense lawyers have worked on many

17 other cases in the past.  There's a lot of electronic material

18 in a lot of cases, and detained defendants are able to review

19 it with counsel and, you know, the cases proceed.

20        And there is nothing as far as we understand that is

21 particularly unusual about this case except possibly the fact

22 that because the case involves a defendant who was involved in

23 an enormous amount of hacking, there's a lot of electronic

24 material.  But, again, that's obviously something --

25        THE COURT:  Let me just be sure I understand.  So far

CBKLHAMC

1    as you are aware, provision can be made for Mr. Hammond to

2    review discovery material which is electronic at the MCC both

3    in the presence of counsel or staff and by himself.

4            MS. NIDIRY:  By the terms of the protective order --

5            THE COURT:  We can fix the protective order.  I'm

6    asking you what can be done.

7            MS. NIDIRY:  Yes, yes.  As far as I understand, from

8    an equipment and Mr. Hammond's access to computers and all

9    those type of issues, those have been resolved, we think, we

10   hope, and if they haven't been, we'll make sure that they are.

11           MS. S. KUNSTLER:  Can I address that just briefly.

12           We spoke with the government about this immediately

13   prior to the proceeding.  We represent in our papers that

14   Mr. Hammond had no computer access in the jail.  The government

15   contacted I think Adam Johnson of the BOP who told them that he

16   did.  I think there may have been a disconnect between Adam

17   Johnson and BOP staff because Mr. Hammond was never in fact

18   allowed to use computers at MCC.

19           Yesterday when we told him -- this is something he's

20   complained about to his counselors and something, to be honest,

21   that we thought was consistent with the protective order that

22   we agreed to which is that he couldn't have this -- Judge, the

23   whole point of the protective order was that he couldn't have

24   this material in the jail.  To say now they'll work with us to

25   let him have in the jail without us kind of eviscerates the

CBKLHAMC

whole meaning of the protective order in the first place.  The

government represented that these materials, he couldn't have

them on his own in the jail and we shared them with him to the

best of our ability.

          But yesterday when we informed Mr. Hammond the

government's papers stated that the BOP was representing that

he could actually use the computers, he went to his counselor

at the jail and told him, oh, they're trying to fix that now.

There's been a big hullabaloo here the past couple days trying

to get that to start.  And they took him to a computer.  He

attempted to log in.  It still wasn't working as of yesterday.

But the BOP, in the actual functioning BOP where he lives,

hasn't provided him access to computers.

          THE COURT:  Of course, we haven't raised this except

in the last couple days.  So, here we are.

          MS. FINK:  No, no, no.

          THE COURT:  Mr. Johnson, thank you for being present,

sir.

          Is it possible for Mr. Hammond to have access to his

electronic discovery material both -- assuming the protective

order is fixed -- both in the presence of counsel and staff and

for his own review?

          MR. JOHNSON:  Yes, and that's what I wanted to

explain.

          The issue that he was having with the computers was

CBKLHAMC

the electronic law library computer which was tied to True

Links, which is the email computer, which is the one he can't

have access to True Links.  The problem we were having was

getting those two separated.  What he had to log in to was

logging him in for electronic law library access.

There's a wholly separate computer for digital

discovery that is basically just a basic computer not plugged

into anything but the wall for electricity so that you can

review any digital discovery you have.

As Ms. Kunstler represented, we have been going back

and forth trying to discuss what programs we have on our

computers, what programs they have.  They may have some

programs that aren't on our computers, and we're happy to work

with them, with our computer services manager, to determine

whether there's certain software we can put on our discovery

computers.

But, again, there's two separate computers.  There's

no individualized log in for the discovery computer.  So he

shouldn't have any problem with the discovery computers and,

obviously, if he does, he can raise it with the unit and bring

it to me and I'll get it taken care of.

THE COURT:  Thank you, Mr. Johnson.

Anything else on this issue?

MS. FINK:  Yes.  First of all, Judge, Ms. Nidiry,

Mr. Brown and I speak often, so for them to say that I've never

CBKLHAMC

1    informed them that I've had trouble with the discovery.

2              THE COURT:  All right.  Is there anything more to be

3    said about it?  It can be done.  We know how to do it.

4              MS. FINK:  Yes.  Let me make my record here.

5              THE COURT:  You just heard Mr. Johnson.

6              MS. FINK:  I love Mr. Johnson.  He loves me.

7              THE COURT:  Well that's a relevant fact.

8              MS. FINK:  MCC and the Bureau of Prisons' ability,

9    right, to deal with defense counsel is one of the main subjects

10   of CJA lawyer and you know it, Judge.  That prison --

11             THE COURT:  I'm sorry, Ms. Fink, it would be so

12   helpful if you would keep a civil tone of voice.

13             MS. FINK:  I'm sorry, Judge.

14             THE COURT:  Yes, ma'am.

15             MS. FINK:  It's very hard for defense lawyers to exist

16   in this district because of this --

17             THE COURT:  Ms. Fink, that's not relevant to the bail.

18             MS. FINK:  For example, yesterday --

19             THE COURT:  Excuse me, please keep a civil tone of

20   voice.

21             MS. FINK:  Excuse me.  Yesterday, Judge, I sent my

22   paralegal to meet with Mr. Hammond, right.  In order to prepare

23   for this trial, she would have to be in there every day.  She

24   waited to get into the facility for one hour, and when she get

25   up to the third floor, she waited another three-quarters of an

20

CBKLHAMC

1    hour.  So one hour and three-quarters was totally wasted.  It

2    happens all the time.  There are very few spaces up in MCC for

3    people to meet with their lawyers, lawyers continually billing

4    CJA as they do --

5              THE COURT:  Ms. Fink.

6              MS. FINK:  -- sit there.  Judge, you want me to

7    prepare.  I'm telling you we can't prepare while he's in

8    prison.

9              THE COURT:  Anything else on that issue?

10             MS. S. KUNSTLER:  I have one more thing on that issue

11    which is it's not that this hasn't been raised with Adam

12    Johnson either.  Apart from my conversation with him about the

13    types of files that could be reviewed on that computer, our

14    office had conversations with him about the parameters of his

15    computer usage in the visiting room, and we were informed that

16    it would be better that we should be the people operating the

17    computer, that he shouldn't touch the computer but that we

18    should open the discovery and show it to him.

19             All of this, you know, consistent with his denial of

20    computer access outside of our presence, and the computer

21    access outside of our presence is also somewhat irrelevant

22    without his discovery which he hasn't had pursuant to the terms

23    of the protective order.

24             THE COURT:  We just ironed this out.

25             MS. FINK:  No, you didn't, Judge.

CBKLHAMC

1           THE COURT:  What do you want now?  Apparently we can

2       do this.  Because it wasn't raised until recently, it's not all

3       in place.

4           But is there an additional fact on this that you want

5       to tell me about?

6           MS. FINK:  Well, Judge, with all due respect, you're

7       making statements which we oppose.

8           THE COURT:  I'm sorry?

9           MS. FINK:  You have to understand, you say that MCC

10      can do it.  I'm telling you that MCC --

11          THE COURT:  I just heard Mr. Johnson.

12          MS. FINK:  I've heard MCC tell me I can do you can't

13      believe the number of things since it opened in 1975.

14          The fact of the matter is that MCC cannot do it and

15      what's going to happen is they're going to tell you they can.

16      We're going to send people and we cannot be prepared.  What we

17      have here, Judge, is an indictment where the two counts,

18      Arizona -- and excuse my tone, Judge.  You know, I have I'm

19      sorry to tell you a serious medical problem of uncontrolled

20      blood pressure that I'm dealing with.

21          THE COURT:  I'm sorry to hear that, ma'am.

22          MS. FINK:  Lots of doctors on it and I'm in court only

23      by sufferance because I'm supposed to be either at my

24      cardiologist, my nephrologist or my whatever.  So if I sound

25      whatever, I've got a lot of -- I've got a serious, serious

CBKLHAMC

1   medical issue I've got to deal with.

2          But the fact of the matter is here that I can tell you

3   we cannot prepare because what this case is about is the

4   government participating at every stage in what was happening,

5   every stage.

6          THE COURT:  I'm not sure one follows from the other.

7          MS. FINK:  Well, because what is the government

8   doing --

9          THE COURT:  I can't prepare because there was a CW.

10          MS. FINK:  No.  There wasn't a CW.

11          THE COURT:  But it doesn't follow logically unless

12   there are more facts.

13          MS. FINK:  Let me try to explain what I'm trying to

14   say, Judge.

15          If you look at the chat rooms and the amount of

16   information that's going back between these two people, one

17   half of it is the government and the other part of it are the

18   other coconspirators who don't know that they're working with

19   the government.  What the government is doing, how Stratfor got

20   selected, all of the stuff that got done around Stratfor and

21   Arizona, how much is the cooperating witness and how much is

22   Mr. Hammond.  If what you see is just the same thing as the

23   Newburgh case, Judge.

24          THE COURT:  I don't understand why you're telling me

25   this in the -- excuse me.

CBKLHAMC

1           MS. FINK:  Gigabytes.

2           THE COURT:  -- in the context of I can't prepare.  If

3    what you're telling me is you're going to have an entrapment

4    defense, fine.  Go at it.

5           Why does that mean you can't prepare the case?

6           MS. FINK:  Because I can't because there's how much

7    material, a million gigabytes?  How many gigabytes of the

8    chats?

9           MS. S. KUNSTLER:  It's not gigabytes.  It's more about

10   hundreds of thousands of pages of documents.

11          What Ms. Nidiry said about how this is no different

12   than any other case that has thousands of pages of documents is

13   just simply not true here.  We've had lots of cases with

14   thousands upon hundreds of thousands of documents and those are

15   cases, in those cases it's a question of reading wiretaps or

16   reading line sheets and these are documents we know how to

17   read.  We understand how to figure out what's going on.  These

18   files are sophisticated.  This discovery is hard to understand.

19          THE COURT:  And so what are you asking me for?

20          MS. S. KUNSTLER:  What it requires, even if he's

21   reviewing them on his own, what it really requires in more than

22   any other case we've worked on is sitting by his side and

23   having him deconstruct it for us and help us make sense of it.

24   As lawyers, we don't understand it.  We don't have that

25   sophistication.  And when he may be reviewing it on his own, if

CBKLHAMC

1    that does work, which, you know, in the future, but that hasn't

2    been the case up to now, but we actually really need that time

3    together in order to put together a defense.

4            And on top of it being very expensive, it also doesn't

5    work.  Last week, several times colleagues of mine went to the

6    MCC.  There were several days -- maybe Mr. Johnson can speak to

7    this -- where there were morning freezes where people couldn't

8    get in and had to walk away.  Yesterday I went to see someone

9    and had to leave without seeing them.  That facility has lots

10   of very high secure inmates that get moved.  And it's as a

11   practical matter very difficult to get in there and very

12   difficult to get in there to spend the type of time that needs

13   to be spent.

14           THE COURT:  We know all about it.  The nature of the

15   facility is a pretrial facility.  It is in an urban area.  It

16   is overcrowded, but that is because it is convenient to have

17   pretrial detainees here.  It takes no time to get into

18   Otisville compared to this, but you don't want to go to

19   Otisville.  I know that.

20           MS. FINK:  We did.

21           THE COURT:  So what's the deal.

22           All right.  This is not the only factor, right?

23           MS. FINK:  Well, the other factor is there are

24   conditions, right, that can be put on his release which make

25   him -- that he should be released on bail, Judge.

CBKLHAMC

1          THE COURT:  $30,000 probably isn't one of them.

2          MS. FINK:  What?

3          THE COURT:  The government argues in its papers that

4   $30,000 worth of equity is insufficient.

5          MS. S. KUNSTLER:  These are two people's homes that

6   they're willing to put up.  That's the equity amount on them,

7   but it is moral suasion on him that two people may lose their

8   homes if he doesn't show up to court regardless of the equity

9   value.  He has, you know, people that are important to them,

10  his mother and grandmother and relatives that are willing to

11  put their financial security on the line and who believe that

12  he's going to show up.  This is not nothing.

13          MS. FINK:  And this is a person who always has shown

14  up, Judge.  He self-surrendered.

15          THE COURT:  Except for the warrants.

16          MS. FINK:  We don't know what those are, and it's for

17  absolutely minor crimes.  He has no passport.  He has no

18  history of ever fleeing, right.  He's a political person

19  involved in a political fight with the government.  This

20  happens since the beginning of this country.

21          THE COURT:  I'm sorry, what does that have to do with

22  this?

23          MS. FINK:  That's what this case is about.  It's a

24  political case.

25          THE COURT:  I didn't notice that in the factors that

CBKLHAMC

1    the Bail Act says we are to review.

2            MS. FINK:  Well, the factors of the Bail Act is

3    whether there are conditions or conditions that can assure his

4    return to court.

5            THE COURT:  That's the question.  The factors in the

6    Bail Act are the nature and circumstances of the offense, the

7    weight of the evidence, etc., his prior record, danger to the

8    community -- those are the factors in the bail application.

9            MS. FINK:  First of all, if you look at his prior

10   record, it's cannabis and demonstrating.  We're not talking

11   about the usual case that comes in here where I have a client

12   with 20 violent crimes, right, ever since he was 14.  We have

13   no violent crimes there, right.  We have political crimes that

14   you can call violent crimes like mob action, but he didn't do

15   anything, right.  You don't have any allegation of him ever

16   doing anything that has to do with violence, none, right.  You

17   have him returning because politically this is what he does.

18   He made a decision that he doesn't like the United States

19   government.  He doesn't like what they do.

20           THE COURT:  What about the danger to the community

21   that is set out in the government's case about the hacking

22   activities, stealing people's credit cards, identities, billing

23   thousands of dollars, what about that danger to the community?

24           MS. S. KUNSTLER:  Your Honor, I'd like to address that

25   if I may.

CBKLHAMC

1          This is not a presumption case.  There's no

2     presumption of danger for the crime he's charged with.  But

3     more than that, this district all the time lets people out on

4     bail charged with computer crimes, charged with, you know, I

5     spoke with -- I don't know if he's here, but I spoke with John

6     Moscato, who's one of the officers in charge of supervising

7     people who require computer monitoring.  A large number of the

8     people that he monitors are people who have committed alleged

9     sex offenses over the internet.  And these people are regularly

10    let out, allowed to use the computer and have their computer

11    usage monitored.

12          It can be said in those cases that some of these

13    people are people with compulsions, with predilections to

14    continue offending.  It's part of the issue of sex offenses.

15    Yet these people are routinely let out and that condition is

16    applied.  That condition, the condition of computer monitoring,

17    you know, deals with that danger.

18          THE COURT:  I think the government in its papers

19    argued that this case is different because of this defendant's

20    activities in the past in hiding his identity, hiding the

21    source of his computer activity, and various other highly

22    sophisticated activities that are not what we see in the

23    computer sex defendants.  They do it on their own computers in

24    some name, but they're not hiding their identities in the

25    sophisticated manner that this defendant has.

CBKLHAMC

```
1        MS. S. KUNSTLER:  Well, if pretrial services felt that
2   they were unable to effectively monitor his computer usage
3   given the crime he was charged with --
4        THE COURT:  I think it's his past activities rather
5   than the crime he's charged with.
6        MS. S. KUNSTLER:  Sorry, his past activities, your
7   Honor, then he could not use computers.  That could be a
8   condition of his release.  It's much stronger than the
9   condition applied to people charged with computer sex offenses,
10  but it's a condition that would eliminate this danger.
11       MS. FINK:  Judge, he was accused of a computer crime
12  in 2006.  During the entire pendency of that case, which was a
13  year he was on bail, right, there's no any allegations of him
14  doing anything.  He was sentenced.  He was allowed to be out
15  after sentence.  He self-surrendered.  He was then on
16  supervised release.
17       THE COURT:  That was his first computer crime, right?
18       MS. FINK:  That's it, Judge.
19       THE COURT:  We've got that one under our belts and now
20  we have another accusation here.
21       MS. FINK:  Yes, we have another accusation, and I'm
22  saying that we haven't had the ability, right, to analyze all
23  the evidence and to --
24       THE COURT:  I know that.  That's a different issue.
25  We've already done that.
```

1            MS. FINK:  It's the bail.

2            So let me just propose this to your Honor.  In 1988, I

3    was in front of the Honorable William G. Young in the District

4    of Massachusetts on a seditious conspiracy case involving two

5    counts of RICO.  My client had been in prison and Judge Young

6    bailed her to my custody, which is what I'm essentially, bailed

7    her to the lawyers.  So, she had to live in my house.

8            And we are essentially asking the same situation.  I

9    did not come in March when I was assigned to this case and say

10   I need bail, right, because I had no ties.  I had no place to

11   put him.  I had no situation.  I didn't know what the case was

12   about.  I didn't understand how to try it -- all of those.

13           Now I'm in a different situation.  I have assessed all

14   this, Judge, and I'm telling you there's no possibility given

15   MCC that I can prepare this case with this man in prison,

16   right.  I can't do it.  I'm going to do an inadequate job, and

17   I'm going to do a job that would be nothing compared to what I

18   would be to have him in my office at a desk which I have him

19   and he and I sitting down and Ms. Ratner and Ms. Heinegg and

20   Ms. Kunstler and Ms. Kunstler also is my paralegal -- where are

21   you, Emily?  Stand up -- and work with him on this enormous

22   amount of material.

23           THE COURT:  Okay.  Anything else?

24           MS. FINK:  And be able to try this case in front of

25   you in September.  But if I don't get that and he stays in

CBKLHAMC

1    prison, first of all, I'm going to put bills to you of tens of

2    thousands of dollars from whatever it's called.

3              What's it called?

4              THE COURT:  CJA.

5              MS. S. KUNSTLER:  Access Data.

6              MS. FINK:  And all this.  It's going to cost a

7    fortune, Judge.  And every single time that we're made to wait

8    at MCC is another 250 CJA dollars.

9              THE COURT:  I get it.  Anything else before I hear

10   from the government?

11             MS. FINK:  He's not going to go anywhere, Judge.

12   We're going to take custody of him and assure you that we will

13   be in court ready to fight this case politically when you

14   order.  But if you keep him in the jail --

15             THE COURT:  I'm sorry, fight this case politically?

16   We have trials --

17             MS. FINK:  I fight every case politically, Judge.  I

18   do.

19             THE COURT:  That's probably not going to help your

20   cause by telling me that.

21             MS. FINK:  You see me.

22             THE COURT:  We have rules of evidence here.

23             MS. S. KUNSTLER:  Your Honor, I want to speak to the

24   dangerousness issue which is, as this Court is aware, the

25   standard for dangerousness is clear and convincing.

CBKLHAMC

1   Mr. Hammond, I think, under that standard it is relevant that

2   while released on bail the last time, Mr. Hammond fulfilled all

3   of his obligations.  I also think it's relevant that although

4   he may have had sensitive information in his possession, he

5   never used it.

6            THE COURT:  I thought I saw something in the paper

7   about his having charged hundreds of thousands of dollars on

8   other people's credit cards.

9            MS. S. KUNSTLER:  No.

10           Is that other codefendants?  Yeah.

11           So when nobody was watching him, he didn't do it.

12   When he was being watched before in the prior case, he didn't

13   do it.  I don't think that meets the clear and convincing

14   standard.

15           And, furthermore, not having access to a computer

16   while he is outside other than reviewing discovery in our

17   office, you know, militates any possible lingering danger there

18   might be.

19           But I think that there's more than enough evidence

20   here to support that he's never been such a danger in the past,

21   that he's been mindful and followed these conditions in the

22   past and can do so again.

23           THE COURT:  Thank you.

24           MS. FINK:  And, your Honor, I would point out also

25   that we're all officers of the court, all of us, Mr. Smith is,

CBKLHAMC

1    and we have an obligation to the Court as being officers of the

2    court.  We understand that.  I've done this, as I've said, I

3    did this in front of Judge Young.  You can call him and he'll

4    tell you all about it.  Send him my best regards.  And in cases

5    like this, I've done this before.  He's not going anywhere.

6    He's coming with us.  And we're going to have an ability to

7    fight this case.  And there are lots of conditions that will

8    assure his presence in this court, and the government has not

9    given you one piece of paper.

10          THE COURT:  I want to call on them when you people are

11    finished.  Let me know when you're finished.

12          MS. FINK:  Thank you, Judge.  I'm finished for the

13    moment.

14          THE COURT:  Ms. Nidiry, counsel says that the fact

15    that there were a bunch of violations of supervised release and

16    violations of parole filed is insignificant because none of

17    them were ever upheld.  That's one.  I'd also like you to

18    address the warrant question and the dangerousness to the

19    community question.

20          MS. NIDIRY:  Well.

21          THE COURT:  Please.

22          MS. NIDIRY:  First of all, with regard to his repeated

23    violations, I think it's fairly clear from his criminal history

24    that he has a history of violating court directives.  He was

25    sentenced to 18 months' probation in November 2010 for a 2009

CBKLHAMC

1  arrest.  This instant crime was commenced in the spring of

2  2011.  That November 2009 arrest for which he was convicted was

3  a violation of the supervised release that had been imposed in

4  the prior federal conviction.  There's a Cook County probation

5  warrant.  There are parole violation warrants.  There's just

6  extensive record of repeated violations.

7          With regard to --

8          THE COURT:  Ms. Fink says that the parole and

9  probation violations were not substantiated.

10         MS. NIDIRY:  Some of them he's convicted.  He pleads

11  guilty.  Like, for example, the November 2009 arrest, that's a

12  conviction where he pled guilty.

13         THE COURT:  While on?

14         MS. NIDIRY:  Supervised release.

15         THE COURT:  Supervised release for the federal crime?

16         MS. NIDIRY:  Yeah, federal.  Okay.  So, in other

17  words, the conviction itself was sustained because he pled

18  guilty.  He was convicted.  Then he's sentenced to probation.

19         Then there are warrants issued for failing to appear

20  in court, and Ms. Fink actually went through a litany of those

21  where the warrant was issued to a few weeks later he actually

22  does appear and then another warrant and probation is

23  reimposed.  Another warrant is issued a few weeks later.  He

24  appears.  Probation is imposed.

25         But the fact is there's no question that the initial

34

CBKLHAMC

warrant was issued for failure to appear.  The fact that

eventually he appears is still violating the directions of the

court.

          And in the pretrial services report here it says that

in February of 2012, defendant didn't report to probation for

the entire month, that he owed court fines and fees.  And it

says to inform that the defendant is forthcoming with his

affiliation with an anarchist group.

          There's just from 2006, at least, to the present, a

history of being on court supervision and violating it and

violating it either by failures to appear or convictions for

disorderly conduct or mob action.

          Violation of probation was filed on March 1, 2012

because he didn't report to probation for the month of

February 2012.  And then I think that that there was also

another one it looks like that was filed, a warrant issued

March 5 of 2012, maybe in connection with this case.  That I'm

not sure about.  But there's just this history of doing all of

that.

          And here we have what is significantly different from

the prior federal offense which, you know, he basically was

convicted, sentenced to 24 months, spent time in for the exact

same type of conduct that he's charged with here.  And then was

on supervised release, violations of the supervised release, a

conviction.  He's sentenced to probation.  Supervised release

CBKLHAMC

1    is terminated, but then there are a series of probation and

2    probation violations.  So that's between 2006 and the present.

3    So, there is a history of just repeatedly being given

4    directions by the court and disobeying them or not heeding

5    them.

6            There's also a record of drug use that appears to be

7    fairly significant.  I think that counsel, I'm not sure that

8    counsel addressed it or suggested it was minimal, but I think

9    probation reports that he reported he uses marijuana every

10   other day and his last use occurred on the day of his arrest

11   and he's been using it since the age of 16.  If that is the

12   pattern that he has had since 16, he's been doing it while he's

13   been on supervised release and probation.

14           In addition to that, in this case we have a great

15   incentive for him to flee compared to his official federal

16   conviction.  He's facing substantially more time both because

17   of his extensive criminal history but also because of the

18   nature of these charges -- the loss amount, the significant

19   scope of the number of victims, all of that.  So he's facing

20   substantially more time than he was in that case.

21           THE COURT:  What I understood your papers to say was

22   that the statutory maximums were something like 37 years,

23   whereas if one looked at guidelines only we were at 360 to

24   life.

25           MS. NIDIRY:  Yes.

CBKLHAMC

1           THE COURT:  Am I correctly understanding your papers?

2           MS. NIDIRY:  That's correct.

3           Now, with regard to the danger issue, I think that the

4    danger is not simply using credit cards.  The danger is

5    revealing all of these people's credit cards.  And there is no

6    question, I think, even in the prior case, he admitted that he

7    stole credit card information along with other personal

8    information.

9           Now, his mitigating factor that he claims, if you

10   will, is that, well, I didn't actually end up using them as I

11   intended to, which is, you know, great that you didn't use it.

12   But the fact is that you stole it.  And in this case, the

13   violations include that he disseminated it and it leaves it out

14   there for everyone else who's looking on the internet for

15   stolen credit cards to use it.

16          So I don't think it mitigates the danger to say he

17   himself didn't use it the last time when what he has done and

18   what he's charged with doing here is stealing and

19   disseminating, you know, personal information including

20   addresses, personal emails, the identities of people, law

21   enforcement officers, family members, their phone numbers, and

22   their personal credit card information.  I mean that's a lot of

23   confidential information that nobody would want disseminated.

24          And whether or not the person who sends it out there

25   actually makes charges, this case, our evidence shows that

CBKLHAMC

hundreds of thousands of dollars of charges were made and we

have numerous conversations that the defendant and his

coconspirators engaged in which they talked about the charges

that they were making or intending to make.  But even setting

that aside, having the information out there and the ability to

do that and the intent to do that and the history of doing that

is in itself likely dangerous.

Our basic view is that because of his history of

violating court orders, his history of basically committing

crimes and ignoring the directions of the court to -- on

probation -- to obey the law and to show up in court, that his

repeated violations of doing that, the exposure that he faces

in this case, his extremely skillful ability to manipulate his

use of the computers, which has been shown since his hack -- he

is a hacker.  He's a convicted hacker.  That in and of itself

shows an ability to use computers.

In his prior case he hid his identity and hacked into

a website.  It was only discovered through various anonymous

communications that he made with others, and that's the exact

same offense that -- the same skills that he showed in this

case.

That given all of that, that shows that both that he

would have the propensity of flee, has a great incentive to

flee, that he has the ability to flee and to remain a fugitive,

the ability to use a computer and hide himself, but to steal

CBKLHAMC

1    information from others and also to mask his location and to

2    continue the conduct that he's done and that in that context,

3    there is just we don't think there is any set of conditions

4    that will ensure.

5          THE COURT:  What do you say to Ms. Fink's argument

6    that she's not able to prepare adequately if he is detained?

7          MS. NIDIRY:  I think the material is substantial, but

8    it is not, it's not rocket science.  The chats are basically

9    communications that the defendant had with others about this

10   crime.  Then there is electronic material in there that --

11         THE COURT:  Is there something about the discovery

12   that's different from merely going through lots of documents?

13   I understand that the volume is large.  But my question is is

14   there something about the way it's configured or is there

15   something about it that makes it particularly difficult to look

16   at?  I mean I can read a chat room.  I may not understand the

17   words, but.

18         MS. NIDIRY:  I don't think so.  I don't think -- like

19   most computer evidence that we have, it's produced in a

20   forensic format.  So it is data that needs to be -- that's the

21   way we produce it.  It's data that then needs to be

22   transformed, used through special expertise.  It needs to be in

23   order to exploit that data.

24         That said, that's no different than any other case in

25   which we produce a computer hard drive.  So in that sense, it

CBKLHAMC

1    is not, it is not that different.  What needs to be done is

2    that the hard drive that's produced needs to be, through the

3    forensic assistance of an expert, needs to be transformed into

4    something that's readable.

5           And, again, that is, to the extent that they are

6    having difficulties doing that, we are happy to work with them

7    to try and get that done in an expeditious manner.  But I don't

8    think that there is any reason that a defense lawyer should not

9    be able to review this material with the defendant in a

10   reasonable amount of time even if the defendant is detained.  I

11   mean it's not anything unusual in terms of the kind of evidence

12   or the volume of the evidence from our perspective, and we

13   haven't heard anything to make us think that's the case.

14          THE COURT:  Okay.  Anything else?

15          MS. NIDIRY:  No.

16          THE COURT:  Ms. Fink.

17          MS. FINK:  Ms. Kunstler, your Honor.

18          Do you want to start, Sarah?  Okay.

19          Judge, the problem here is it's the government's

20   burden, and the thing about burden is is it's like evidence,

21   right.  So what's happened here is Ms. Nidiry has been talking

22   to you about all the court orders that he violated.  Where are

23   they?  Have you seen them?  I haven't seem them.  What court

24   order?

25          Ms. Nidiry has been informed that I'm going to be

CBKLHAMC

1    seeking bail probably for the last two months.  She made no

2    attempt to go to Chicago and to find out whether there were

3    warrants, whether there were court orders, what judicial

4    directions that he's supposed to have violated.  None of this

5    is before you.  The only thing that's before you, Judge, in

6    terms of any kind of evidence is what she says out of her

7    mouth.

8              THE COURT:  I'm sorry, Ms. Fink.  I have in front of

9    me a pretrial services report and the repository inquiry.  We

10   base bail decisions on these things every day of the week.

11             MS. FINK:  I understand, Judge, but when you make

12   allegations that the person has warrants, you want to see the

13   warrant.  This was handed to us at 11 o'clock.  There's no way

14   we can know anything about this, Judge.  This is all in

15   Chicago.  I would have to go to Chicago courts and pull the

16   files and see whether all of this is, for example --

17             THE COURT:  I know you said that before.  Is there

18   something --

19             MS. FINK:  And it's not my burden.

20             THE COURT:  Is there something that you wanted to say

21   in response --

22             MS. FINK:  Certainly, Judge.

23             THE COURT:  -- to the government's presentation.

24   Excuse me.

25             MS. FINK:  Sorry, Judge.

CBKLHAMC

1          THE COURT:  It makes it very difficult for the court

2     reporter if two people are talking at once.  And I have full

3     confidence that when there are two of us talking, my voice is

4     taken.

5          MS. FINK:  Judge, to ask the government about what we

6     need to do is to me not appropriate.  This is an adversary

7     system.  The government hasn't a clue how to defend cases.

8          THE COURT:  I'm sorry, I don't believe I asked the

9     government how to defend the case.

10          MS. FINK:  Well, you said how would we look at this

11     information.

12          THE COURT:  They looked at the information.

13          MS. FINK:  There's no way Ms. Nidiry can tell you what

14     I do.

15          THE COURT:  That's why I asked you to get up,

16     Ms. Fink.  Tell me if you disagree with what was said.  It is

17     an adversary system.  That's why I called upon you.

18          MS. FINK:  Okay.  Well, here I am, Judge.

19          THE COURT:  Let's hear it.

20          MS. FINK:  I don't want the government to tell you

21     what I have to do.

22          THE COURT:  I'm sorry.  I didn't ask that.  I asked

23     about the factual reading of the evidence.

24          Do you have a response to that that you'd like me to

25     know about?

CBKLHAMC

1          MS. FINK:  Yes.

2          THE COURT:  Yes, ma'am.

3          MS. FINK:  My response to that is that the government

4     is not defense and it's just like the same thing with Jencks

5     Act material.  There's no way for the government to know how I

6     can use discovery.

7          THE COURT:  Ms. Fink, that's not the question.  The

8     question is what about the electronic evidence other than the

9     great quantity of it makes it so difficult to deal with.

10          MS. FINK:  Because it is between people.

11          MS. S. KUNSTLER:  I can speak to that a little bit.

12          MS. FINK:  I'll let Ms. Kunstler.

13          MS. S. KUNSTLER:  In our conversations with Access

14     Data and other computer experts and just in our own experience

15     trying to understand it on our own without the assistance of an

16     expert, basically what one of the experts said to us is that

17     it's kind of like the equivalent of examining hundreds of

18     thousands of pages of documents in different languages.  It's

19     just we don't have the person there to help us understand.

20          THE COURT:  Can I just understand what you're saying.

21     What you're saying is not that it's technically difficult to

22     open it, but that once you see it, the computer language being

23     used or the language among defendants being used is something

24     you don't really understand.

25          MS. S. KUNSTLER:  The difficulty in opening it is

1   resolved by having someone like Access Data set it up and open

2   it for us.

3           THE COURT:  Right.

4           MS. S. KUNSTLER:  We don't need --

5           THE COURT:  It's not technical.

6           MS. S. KUNSTLER:  No.  We don't need Mr. Hammond to

7   open the documents for us.

8           THE COURT:  We need to understand what they're saying.

9           MS. S. KUNSTLER:  And not just how to read the

10  particular type of document, but what it means in the context

11  of other documents and other evidence.

12          THE COURT:  What the language you see in front of you

13  means.

14          MS. S. KUNSTLER:  Yes, and its relevance.

15          THE COURT:  That's all I want to know.  I got it.

16          MS. S. KUNSTLER:  With respect to the government spoke

17  a lot about ability to flee, propensity to flee.  I don't think

18  any of the violations that they made mention of establish that.

19          Mr. Hammond has never fled.  He's always -- he didn't

20  change residence.  He didn't disappear.  He doesn't have a

21  passport.  He doesn't have means to flee and he's never done

22  it.  Missing a probation appointment when he was 21 years old

23  is not propensity to flee.  I think more important is the

24  evidence that he has not fled.  It's not something he's done.

25          With respect to dangerousness, I was a little bit

CBKLHAMC

1    confused by what Ms. Nidiry was saying about the information

2    being out there.  If the information is out there, it's out

3    there whether Mr. Hammond's hand is in it or not or whether

4    he's in custody or not in custody.  But the government really

5    hasn't addressed how a prohibition on computer usage doesn't

6    address this concern with respect to Mr. Hammond's ability or

7    Mr. Hammond's dangerousness in the future.

8         Again, with respect to ability or propensity to flee

9    despite, you know, there's ways to address that.  There's

10   conditions that any lingering fear the Court or the government

11   may have about Mr. Hammond's ability to flee can be addressed

12   by strict supervision.  It can be addressed by electronic

13   monitoring if the Court finds that to be necessary.

14        And if you give me one second, I know there's one more

15   point I wanted to address.

16        MS. FINK:  Judge.

17        MS. S. KUNSTLER:  I wanted to talk about the ability

18   to hide his identity online.  That, again, if he doesn't have

19   computer access, any ability he may have had to hide his

20   identity online is not relevant for purposes of bail.  But I

21   think what the government is alluding to when they talk about

22   ability to hide online is the ability to hide identity in

23   person, to misrepresent who you are in the real world, to be

24   able to produce or create false identity documents or

25   masquerade as another person.  Mr. Hammond has never --

CBKLHAMC

```
 1            THE COURT:  I didn't understand that to be the
 2   argument.  I understood the argument to be that he might well
 3   engage in unauthorized computer usage and that his ability to
 4   hide his identity would limit the probation department's
 5   ability to determine that such unauthorized computer usage had
 6   taken place.  That's what I understood the argument to be.
 7            MS. FINK:  Judge.
 8            THE COURT:  May I ask a question:  Do we have any
 9   other questions for Mr. Johnson or shall we thank him for his
10   attendance and allow him to go back to work?
11            MS. FINK:  We spend a lot of time on the phone with
12   Mr. Johnson, so not in this courtroom.
13            THE COURT:  Mr. Johnson, thank you for coming over.
14   We appreciate your help.
15            MR. JOHNSON:  It's my pleasure, your Honor.  Thank
16   you.
17            THE COURT:  Thank you, sir.
18            MS. S. KUNSTLER:  There's two different issues here
19   which is if he has no access to computers and he's confined to
20   his home save visits to our office, I don't understand how his
21   ability to be online or his ability to hide his identity online
22   is a concern if there's no computer where he is.
23            THE COURT:  I'm no computer expert, but I understand
24   there's such things as internet cafes.
25            MS. S. KUNSTLER:  If he's on home confinement and he
```

CBKLHAMC

1    comes to our office, I don't see the danger of him going to a

2    computer cafe.  And even if he --

3              THE COURT:  There's probably one between your office

4    and home.

5              MS. S. KUNSTLER:  That's something he's never done.

6    We're hypothesizing about possible ways he could get around

7    supervision in ways that he's never demonstrated any propensity

8    to do.  He was allowed to use computers last time he was on

9    supervised release.  He used computers at work.  He was allowed

10   to him use them at work.  He was allowed to go on the internet.

11   This never happened.  So I don't think hypothesizing about, you

12   know, the tiny hole that he might find if there's no propensity

13   to find it.

14             MS. FINK:  Judge, when they arrested him, they seized

15   all his computers, right, and they have everything.  They have

16   not come into court and said to you, here, look what was found

17   on the computer, he has a program that gets him ID.  There's

18   nothing that they have been able to bring to this Court that in

19   any way supports their speculation.

20             He is a political dissident.  He demonstrates.  He

21   tries to tell people what he believes and what the government

22   is doing is not right.

23             THE COURT:  He hacks into computers.

24             MS. FINK:  Yes, absolutely, but they have his computer

25   and they have -- they just seized it and they went through it.

CBKLHAMC

1    They had a deprogrammer do whatever.

2              THE COURT:  Last I heard they sell computers.

3              MS. FINK:  What?  Yeah, but the question is there's

4    nothing that supports this.  There's no evidence that supports

5    that he would do that.

6              He doesn't have any passport.  Where would he go,

7    Judge?  There's nowhere to go.  He has no money.

8              And what he's been doing is he has been sitting and

9    being very confrontational about what he believes.  He's the

10   person -- he's Che.  He's Nat Turner.  He is the nuns who get

11   arrested every year.

12             THE COURT:  I'm sorry, what's the relevance of that to

13   the bail factors?

14             MS. FINK:  It's the First Amendment, Judge.  It's a

15   political belief.

16             THE COURT:  Counsel, what is the relevance of that to

17   the bail factors?

18             MS. FINK:  What's the relevance, Judge?

19             THE COURT:  Yes, ma'am.

20             MS. FINK:  There's no evidence that the government has

21   been ever at this time or can convince, come into court and put

22   in front of this Court that he has ever attempted to flee, that

23   he has no programs that say that.  He has no passport.  He's

24   not going anywhere, Judge.  His job is to represent his

25   politics.  That's why he's in this courtroom.  Whether he's

CBKLHAMC

1    guilty or not, we have to see.  But until we can understand

2    what the evidence and see the relationship about who did what

3    here, what did he do --

4              THE COURT:  Nobody is arguing with that, Ms. Fink.

5              MS. FINK:  I understand, but there's no way --

6              THE COURT:  Excuse me, we've gone on for a while.

7    It's helpful if we talk about the bail factors.

8              MS. FINK:  Okay.  Let me take him home to

9    Thanksgiving.

10             THE COURT:  Thank you.  Anything else?

11             MS. FINK:  All right.  Everybody who is going to

12   assume custody of him as an officer the court will call the

13   marshal service if he goes anywhere, Judge.  He's not going to

14   go anywhere.  We're all officers of the court.

15             THE COURT:  Yes, ma'am.

16             MS. FINK:  Right, and we all have an obligation.  But

17   if he continues to be in jail, I can swear to this Court I

18   can't give him effective assistance of counsel.

19             THE COURT:  Ms. Nidiry, counsel says that limiting

20   computer use is the answer to many of your objections.

21             MS. NIDIRY:  I think that we would say part of the

22   problem is that you can't -- there's no way to confirm that he

23   is not using a computer.  Computers are not just monitors.

24   There are smart phones.  There are computers you can go to

25   Kinko's and use or Starbucks.  It's not a situation where you

CBKLHAMC

can just say you can't use a computer and we can be sure he's
not using a computer.  And given his history of ignoring court
directives in the past, we don't believe there's any reason to
think he would obey the Court's directives not to use a
computer now.

           And beyond that, I think that here, unlike in his
prior conviction, he is facing a -- he has a much greater
incentive to flee.  He is facing a much more substantial amount
of time based on his criminal history and the scope of the
conduct and given that he has a great incentive to violate
court orders and to flee.

           And, in addition, I think that in terms of the danger,
what we were talking about is both his ability to, in terms of
his computer technical know-how, there is both his ability to
mask his location and computer use and, therefore, to hide the
fact that he is using a computer and also to obtain others'
identity information or financial information and were he to
flee to stay hidden.

           THE COURT:  To?

           MS. NIDIRY:  To obtain's other financial information
and personal information that he has already shown that he can
do and that he would use.  So he could use other people's
credit cards or bank accounts, etc., because he can steal
those.

           With regard to Ms. Fink's point about how we haven't

CBKLHAMC

1    shown that he has used any of this, this is not an evidentiary

2    hearing so we haven't.  But we have in fact shared with defense

3    counsel already that -- at the very least the screen shots that

4    were open on his computer at the time of his arrest indicate in

5    addition to stolen information, various personal information,

6    credit cards, etc., the fact that he is using a dot onion, dot

7    Tor on that particular laptop that was his.  That was all

8    revealed in the screen shots that we provided in discovery and

9    met with defense counsel and tried to explain it to a certain

10   extent.

11           It really demonstrates on his own computer, the laptop

12   he was using at the time of his arrest, he was actually using

13   those anonymizing computer mechanisms that he's alleged to have

14   used in the course of the offense generally.  So there is, in

15   fact, and that's just a piece of it, there is a lot more out

16   there, but that's just a piece of what demonstrates that he is

17   somebody who has a repeated history of using computers for ill,

18   for stealing information, for hiding his use of those

19   computers, and violating court orders.  So in a court order not

20   to use a computer, there is no confidence that he would

21   actually follow it.

22           And, in this case, he has a strong incentive to flee

23   given the exposure that he faces.  So, it is materially

24   different than any of his prior encounters with the law.

25           THE COURT:  Thank you.

CBKLHAMC

1          Anything else?  Yes, ma'am.

2          MS. S. KUNSTLER:  Your Honor, Mr. Hammond has never,

3    there's no allegation that he ever violated a court order by

4    using a computer when he was not supposed to.  The masking

5    software that Ms. Nidiry referenced, Tor and onion, are

6    programs that anyone -- they don't take any sophistication to

7    use.  Anyone can download them to hide their identity.  Many

8    people charged with computer sex crimes use them to hide their

9    identity.  Many of the same people are allowed out -- I'm

10   sorry, your Honor -- are allowed out on bail with restricted

11   computer usage.

12         We mentioned before how restricted computer usage is

13   common for sex offenders and others charged with computer

14   crimes.  Any one of those people could conceivably, if they

15   wanted to, duck into an internet cafe.  But yet time and time

16   again, these restrictions are found adequate to mitigate the

17   danger.

18         THE COURT:  I thought the argument was on one hand

19   this defendant possesses the ability to make his use anonymous,

20   which you tell me that that's no great shakes.  What I

21   understood the danger to the community argument to be that what

22   this defendant has that many people, most people do not have is

23   the sophisticated ability to hack into websites or whatever and

24   to find personal information which could then be revealed.  And

25   as I understand what the papers say about the screen shots,

CBKLHAMC

1    that some of this personal information was in fact on this

2    defendant's screen at the time he was arrested.

3          So, I thought it was two-fold.  One, the ability to

4    mask one's use, but the very sophisticated ability to get in

5    and to get other people's information or to do mischief.

6          MS. S. KUNSTLER:  Thank you, your Honor, for

7    clarifying that.

8          If he is on home confinement without a computer in his

9    residence, the idea that he would be able to, you know, hit an

10   internet cafe on the way to our office and do this kind of

11   sophisticated work in the few minutes he has to get from one

12   place to another I think doesn't constitute a danger.

13         I've worked with pretrial services on getting

14   appointments for people to come to our office when they're on

15   home confinement, and what they do is they carefully work out

16   exactly how long it will take for that person to get from point

17   A to point B, our office.  You tell them how long they're going

18   to there, and then they work out how long it would take them to

19   get back.

20         This extra time that Mr. Hammond is going to have to

21   go out there and seek out, mask his identity on a public

22   computer, seek out victims and commit crimes, which he's shown

23   no propensity to commit and never has done in terms of using

24   that, but, I don't think the government meets their burden

25   there.

CBKLHAMC

1          I think that conditions exist.  I think that if he's

2    on home confinement, if he does not have a computer, if he's on

3    monitoring, if pretrial services knows where he is, knows where

4    he's going, and given the lack of any demonstrated propensity

5    to violate in this way ever, I think the conditions exist that

6    will satisfy, that make him not a danger to the community and

7    will satisfy his appearance in court.

8          THE COURT:  Anything else?

9          MS. FINK:  Just, Judge, and us, the members of your

10   court, right.  I'm a member of this court.  I have an

11   obligation.  I'm an officer of the court.  If he were to walk

12   out, I have a moral, I have an ethical obligation based on my

13   oath, right, to call the marshals and tell them he's going.  So

14   does Mr. Smith.  So does everybody around him that we are

15   asking you to bail to.  This was the situation on a seditious

16   conspiracy.

17         THE COURT:  Yes, ma'am.

18         MS. FINK:  And I tell the Court that the government

19   has not provided you with the court orders that he whatever,

20   not provided you with the warrants.  There's nothing, right, of

21   evidence that backs any of this up.

22         And depending on what report, I would at least like to

23   see what the government is basing its statements on, the

24   warrants, court orders, the judicial directives that he didn't

25   violate, the stuff in his computer, evidence, Judge, clear and

CBKLHAMC

1     convincing by a preponderance, what, but not just statements

2     out of their mouths.

3              THE COURT:  Thank you.

4              Anything else?

5              MS. NIDIRY:  No, your Honor.  Thank you.

6              THE COURT:  Very well.

7              Thank you, counsel, for your presentations.  As we all

8     know, the bail factors are set out in 18 United States Code

9     Section 3142(g).

10             Here the first thing to be considered is whether or

11    not the defendant is a flight risk.

12             Contrary to the situation in the other cases in which

13    this defendant was accused, his maximum jail sentence here by

14    statute is 37 and a half years plus a mandatory consecutive

15    two-year term of imprisonment.  If we went by the guidelines,

16    of course, we would be at the very bottom at 360 months to life

17    if the allegations in the indictment are sustained by a jury.

18    So this is materially different from the prior cases in which

19    Mr. Hammond was involved.

20             Another of the factors to be considered is the weight

21    of the evidence against the defendant.  Here, as set out in the

22    complaint, Mr. Hammond engaged in extensive communications with

23    a cooperating witness in which and he and his coconspirators

24    are said to have made numerous detailed admissions about their

25    involvement in conducting and then revealing the fruits of

CBKLHAMC

1    various hacks which they admitted to having undertaken.

2           In addition, as we have been discussing for so long

3    this morning, there is very substantial evidence on the

4    defendant's hard drive which apparently shows what we've been

5    discussing as his ability to mask his identity and location,

6    names and addresses of folks whose information has been

7    obtained, tax returns and the like.

8           In addition, as I understand it, the screen shots that

9    were obtained at the time of Mr. Hammond's arrest showed other

10   individuals' information and the ability to mask, for

11   Mr. Hammond to mask his identity.

12          In addition, on the flight risk issue, even with all

13   of the back and forth today, this defendant has been shown to

14   have a lack of regard for legal authority.  At the very least

15   it is clear -- and let me say this, this is not an evidentiary

16   hearing.  So the fact we do not have warrants and the like is

17   of no moment.  Decisions are made in this court every day based

18   on pretrial services reports and the FBI repository inquiry

19   documents that we all have.

20          At the very least, it has been shown that between 2006

21   and the present, the defendant failed to appear for court

22   appearances on numerous occasions, warrants were issued, more

23   recently failed to show up at probation for an entire month.

24          In addition, during the time the defendant was on some

25   sort of court supervision, whether federal supervised release

CBKLHAMC

1    or state parole, the defendant continued to commit crimes.  The

2    prior offense to which the defendant --

3           MS. FINK:  Are we having an earthquake right now?

4           THE COURT:  I think it's locusts coming next after the

5    hurricane.  We already had an earthquake last year.

6           Following the federal crime that the defendant was

7    convicted of, which is really the same crime as this one only

8    on a smaller scale, again, the defendant continued to commit

9    crimes.

10          Similarly, the defendant's drug use, of course, is a

11   violation of not only the law, but of his various types of

12   supervision.  And apparently he admitted to smoking marijuana

13   every other day, most recently, the day of his arrest.

14          All of this indicates a lack of regard for legal

15   authority and certainly does not indicate any confidence that

16   the defendant will comply with any terms and conditions of

17   supervised release.

18          In addition, I note that the record before us shows a

19   hostility to law enforcement, including posting various types

20   of personal information of law enforcement individuals online,

21   which as we all know could lead to a dangerous situation with

22   respect to those individuals.  There was an exchange or so set

23   forth in the government's papers where it certainly looks like

24   there is hostility to law enforcement being expressed.

25          In addition, because of the defendant's ability to

CBKLHAMC

manipulate computers, he certainly has the ability to flee.
Whether or not he himself in the past used stolen credit card
information isn't really the test.  His ability to access that
information and, according to the complaint in this case, the
discussions of the defendant and the alleged coconspirators
about intent to use that information certainly demonstrates the
defendant's ability to obtain money and other means to flee
while masking his identity and his location.

          In sum, on this factor, I agree with the
recommendation and assessment of the pretrial services officer
that there is a significant danger of nonappearance.

          With respect to the defendant's danger to the
community, as we have discussed at length this morning, the
defendant not only has the ability to hide his computer usage,
which, crediting the defense, is not so special, but he does
have highly sophisticated computer skills that allow him to
hack into various databases to access other folks' information
and certainly to reveal that information.

          At the very least, we know that the screen shots which
were on his computer at the time of his arrest contained
sensitive personal information of other individuals and the
danger to them not only financially, but, in the case of law
enforcement individuals, their personal danger of the
revelation of that information, poses a very severe danger to
the community.

CBKLHAMC

1          With respect to the argument that other individuals

2     who engage in computer crimes are often bailed, the ability

3     that Mr. Hammond has to hack into other computer websites and

4     the like is not something which is common among, for example,

5     the folks who engage in online sex crimes.  It is that unique

6     sophisticated ability that makes Mr. Hammond different from

7     those individuals.  In addition, in most cases, those

8     individuals do not have the history that Mr. Hammond

9     demonstrates of a lack of respect for legal orders.

10          Accordingly, on the issue of the danger to the

11     community, I also agree with the assessment of the pretrial

12     services department that the defendant poses a very substantial

13     danger to the community.

14          With respect to the defendant's due process argument,

15     I note that there is no bright line test in this circuit for

16     the time of pretrial detention.  But more importantly, as to

17     the reason for the period of time that counsel says is required

18     to prepare for trial, that reason is not something that falls

19     on the government's head.  As we I think have discussed here

20     today, it is the inherent complexity of the sophisticated

21     computer crimes that this defendant is accused of committing

22     that necessitates the extensive review that counsel says is

23     going to take a long time.  I think we've established today

24     that there's no technical stumbling block to counsel and the

25     defendant's access to the information.  Rather, it is the

CBKLHAMC

1   manner in which the defendant and the alleged coconspirators

2   are said to have conducted the criminal enterprise that

3   requires the defendant to explain it to counsel.  That's not

4   really on the government's head; that's on the defendant's

5   head.

6          And, thus, so far as I'm able to see now, there is no

7   due process violation in permitting counsel as much time as

8   counsel says is necessary to review the materials and to

9   prepare for trial.

10          Accordingly, I find as the pretrial service officer

11   has recommended that there are no conditions or combination of

12   conditions that will reasonably assure either the defendant's

13   appearance in court or the safety of the community.

14          Accordingly, the application for bail is denied.

15          Counsel, is there anything further today?

16          MS. FINK:  Judge, I'd just like to point out that the

17   pretrial interview took place eight months ago.

18          THE COURT:  What are you telling me that for?

19          MS. FINK:  I'm telling you that his current situation

20   and the current information is not reflected on what you've

21   looked at.

22          THE COURT:  Is there some current information that --

23          MS. FINK:  I don't know, Judge.

24          THE COURT:  Excuse me.  Is there some current

25   information that you wanted to bring to my attention?

CBKLHAMC

1          MS. FINK:  No, Judge.  I brought it all to your

2    attention, all the surety and whatever.  But you're relying on

3    today on November 20, 2012 --

4          THE COURT:  Ms. Fink, I'm inviting you to tell me what

5    else there is out there.

6          MS. FINK:  Well, Judge, I'm probably going to make a

7    motion for reargument based on what the Court has just said and

8    all the information.  And after that is denied, I'm going to go

9    to the Court of Appeals.

10          THE COURT:  Of course, ma'am.  I'm just offering you

11    the opportunity to tell me whatever you think would be revealed

12    in a current pretrial services interview.

13          MS. FINK:  Okay.  I will take that opportunity after

14    I've reviewed what happened today.  I would ask the Court to

15    order the transcript provided to us expedited.

16          THE COURT:  Yes, ma'am.  It is so ordered.

17          MS. FINK:  Thank you.

18          And Sarah is in better shape than me.

19          MS. S. KUNSTLER:  I apologize.  There is one thing

20    that your opinion brought to mind that I just wanted to raise

21    which is that I know in our papers we list a number of

22    defendants, similarly situated defendants in computer hacking

23    cases who were allowed out on bail subject to computer

24    monitoring apart from the people that use computers to commit

25    sex crimes.  And I don't think the government has proven today

CBKLHAMC

1    that his usage of computers is any more sophisticated, although

2    they said his usage is sophisticated, I don't think they've

3    proven it's any more sophisticated than the PayPal defendants

4    or any other people charged with computer hacking crimes.  So I

5    just wanted to put that on the record.

6              THE COURT:  Does the government wish to respond?

7              MR. BROWN:  Briefly, your Honor.

8              MS. S. KUNSTLER:  I'm sorry.  You can respond to me.

9    I'm sorry.

10             And I believe many of his codefendants in this very

11   case have also been released on bail.  And, again, I don't know

12   the sophistication of their computer usage relative to his, but

13   I don't think the government has put forward any proof that

14   there's a difference there.

15             THE COURT:  Is there someone other than Mr. Monsegur?

16             MS. RATNER KUNSTLER:  There are four other, I believe,

17   defendants in this case.  Many of them are not in this

18   jurisdiction, Judge.

19             THE COURT:  Then how were they released?

20             MS. RATNER KUNSTLER:  They were released by the

21   courts.

22             THE COURT:  In --

23             MS. RATNER KUNSTLER:  In their own jurisdictions.

24             THE COURT:  Okay.  Fine.

25             Does the government wish to respond?

CBKLHAMC

1          MR. BROWN:  Just briefly, your Honor.

2          For example, with respect to the PayPal defendants who

3     I think are the bulk of the defendants that defense counsel is

4     referring to, in that case the defendants are alleged to have

5     downloaded a tool that was widely available on the internet

6     called the Low Orbit Ion Cannon, that's what they call it, or

7     the LOIC.  And the LOIC essentially allows a defendant to push

8     a button and participate in what's called a distributed denial

9     of service attack.

10          And essentially what that is, as your Honor I believe

11     already knows, is that's a bunch of computers asking a target

12     computer for information and overwhelming the target computer,

13     and through this you simply download this LOIC.  You hit the

14     button, you automatically participate.  It's not rocket

15     science.  In that case, the defendants didn't even attempt to

16     hide themselves on the internet.  The reason why they were

17     caught is because the LOIC uses their own IP addresses to make

18     these requests.  That's why they were caught so easily.

19          But just in generality, your Honor, the defendants in

20     all the other cases that are referred to did not engage in the

21     wholesale data destruction that Mr. Hammond is alleged to have

22     engaged in here.  As your Honor knows, he is alleged to have

23     deleted massive volumes of data from Stratfor.  He engaged in

24     exponentially more sophisticated computer hacking.

25          I'll leave it at that unless your Honor has any more

CBKLHAMC

1    questions.

2             THE COURT:  Anything else, Ms. Kunstler, on that?

3             MS. S. KUNSTLER:  Nothing other than that I think Tor

4    is also something that you can download and use.  I don't see

5    anything presented that -- I still don't see Mr. Hammond's

6    sophistication relative to the sophistication of the other

7    defendants in these cases.

8             THE COURT:  With all due respect, I do.  The hacks

9    that are alleged here and, in addition, the material that was

10   on the screen shots of his computer at the time of his arrest

11   do indicate a sophistication and sophisticated ability to hack

12   in and to get out other individuals' private information.  So,

13   I disagree.

14             Anything else, counsel?

15             Thank you, ladies and gentlemen.

16             Do we have a conference date, friends?

17             MS. NIDIRY:  I think we need to set a conference date.

18             THE COURT:  When would you like to -- would you confer

19   with counsel and let me know when you'd like to return, please.

20             MS. FINK:  Judge, I think we're going to be returning

21   on a motion to reargue on this.

22             THE COURT:  But we need to set a regular conference

23   date.

24             MS. FINK:  Why don't we say --

25             MS. NIDIRY:  Thirty days about.

CBKLHAMC

1             THE COURT:  Do you want January?

2             Use your off the record voice.

3             MS. FINK:  The 18th of December, Judge?  That's a

4    month.

5             THE DEPUTY CLERK:  How is 11 a.m.

6             MS. FINK:  Have a good Thanksgiving, Judge.

7             MS. NIDIRY:  We would request time be excluded under

8    the Speedy Trial Act between now and December 18 in order to

9    permit --

10            THE COURT:  In order to permit counsel to continue

11   preparing for trial and reviewing the discovery, time between

12   today and December 18 is excluded from calculation under the

13   Speedy Trial Act in the interest of justice.

14            Thank you, counsel.  Good morning or good afternoon by

15   now.

16                              o0o

17

18

19

20

21

22

23

24

25