d2l2hama kjc

1   UNITED STATES DISTRICT COURT
    SOUTHERN DISTRICT OF NEW YORK
2   ------------------------------x

3   UNITED STATES OF AMERICA,              New York, N.Y.

4            v.                           S1 12 Cr. 185(LAP)

5   JEREMY HAMMOND,

6                Defendant.

7   ------------------------------x

8                                         February 21, 2013
                                          10:45 a.m.
9

10  Before:

11                  HON. LORETTA A. PRESKA,

12                                        District Judge

13

14                        APPEARANCES

15
    PREET BHARARA
16       United States Attorney for the
         Southern District of New York
17  BY:  THOMAS G.A. BROWN
         ROSEMARY NIDIRY
18       Assistant United States Attorneys

19
    ELIZABETH FINK
20  SARAH KUNTSLER
    MARGARET RATNER KUNSTLER
21  GRAINNE O'NEILL
    REBECCA HEINEGG
22       Attorneys for Defendant

23

24

25

                SOUTHERN DISTRICT REPORTERS, P.C.
                      (212) 805-0300

d2l2hama kjc

1          THE COURT:  United States v. Jeremy Hammond.

2          Is the government ready?

3          MR. BROWN:  Yes.  Good morning, your Honor.  Thomas

4    Brown for the government.  With me at counsel table is my

5    colleague Rosemary Nidiry.

6          THE COURT:  Good morning.

7          Defense ready?

8          MS. FINK:  Good morning, your Honor.  Elizabeth Fink

9    for Mr. Hammond.

10          And, first of all, in the course of business, I would

11   like to introduce to the court Grainne O'Neill, who is a member

12   of the bar of Louisiana and has an application pending over

13   here and has passed bar and is waiting for certification in New

14   York, but we are still waiting for those two things.  So for

15   the purpose now, I would ask that she be appointed *pro hac vice*

16   in this matter.

17          THE COURT:  Yes, ma'am.

18          MS. O'NEILL:  Thank you, your Honor.

19          THE COURT:  That's quite all right.

20          MS. FINK:  So we have Ms. O'Neill, Ms. Kunstler,

21   Ms. Heinegg, and Ms. Kunstler.  Two Kunstlers, one Heinegg, and

22   an O'Neill.

23          THE COURT:  Good morning.

24          Would you like to present anything?  I think it is

25   your motion, is it not?

d2l2hama kjc

1           MS. FINK:  What?

2           THE COURT:  It's your motion.  Would you like to be

3  heard?

4           MS. FINK:  Judge, I am assuming you received our

5  status letter.

6           THE COURT:  Yes, ma'am.

7           MS. FINK:  So I thought that we laid out

8  essentially -- for the last two days, Mr. Hammond has been --

9           THE COURT:  I'm sorry.  On your motion, ma'am.

10          MS. FINK:  Oh, is that what you would like?

11          THE COURT:  Yes, ma'am.

12          MS. FINK:  Okay.

13          Judge, the issue here is the appearance of partiality.

14  There is no -- once we received Mr. Kavaler's affidavit, we

15  have no -- nothing that refutes that, right, and --

16          THE COURT:  That is the point.

17          MS. FINK:  We accept what he has to say, which he has

18  no memory of doing this and that he didn't himself.  But the

19  problem here is that there is all this discovery out there that

20  we haven't gone through, and we don't know what it is going to

21  show about Cahill, Gordon & Reindel.

22          THE COURT:  Say that again.  You don't know what the

23  discovery you have is going to show?

24          MS. FINK:  What?

25          THE COURT:  I thought I understood you just to say, We

d2l2hama kjc

| 1 | have all this discovery out here and we don't know what it is
| 2 | going to show about Cahill Gordon.  My question to you is you
| 3 | have the discovery?

4        MS. FINK:  Yes.

5        THE COURT:  It shows whatever it shows.  My
6   understanding from reading the papers was that the Web site
7   which listed all of the folks -- would you remind me of the
8   name?  Is that Dazzlepod?  My understanding from the papers was
9   that the Dazzlepod Web site listed the folks whose information
10  was the subject of the hack.

11       MS. FINK:  Yes.

12       THE COURT:  And had "CC" before the name of anyone
13  whose credit card information had been disclosed, and there was
14  no "CC" in front of Mr. Kavaler's name.  So the question is,
15  and he says he never gave them, Stratfor, his credit card or
16  other information, so it seems that that is unchallenged.

17       MS. FINK:  At this moment, Judge, we have no -- if I
18  had further information to support a specific allegations, I
19  would have raised them.  And when we originally had this
20  conversation in -- on the telephone conference, right, I told
21  you that what I had was Fox News calling me up about this and
22  it is there, there is no question, right, and there is no
23  question, we don't know the extent of involvement of Cahill
24  Gordon's clients in the hack.  We will hopefully in some months
25  after we go through all of the discovery.

d2l2hama kjc

1          THE COURT:  Here is the question.  You started your

2     argument this morning by talking to me about the appearance of

3     impropriety.  What is the basis for a finding here of an

4     appearance of impropriety to the well-informed observer?

5          MS. FINK:  Excuse me, I didn't --

6          THE COURT:  To the well-informed observer.

7          As you well know, the cases point out that the basis

8     for a motion for recusal must be a reasonable basis, not a

9     basis based on speculation and the like.

10          MS. FINK:  The basis, Judge, is the involvement of

11     Cahill, Gordon & Reindel, which Mr. Kavaler is the supervisory

12     attorney.

13          THE COURT:  My understanding from the papers is that

14     the involvement you rely on is the reporting by Dazzlepod that

15     certain clients of Cahill Gordon had information disclosed as a

16     result of the hack that we are talking about.  Is that right?

17          MS. FINK:  Well, that's one part of it.

18          THE COURT:  What's the other part?

19          MS. FINK:  The other part of it is we don't know what

20     their involvement is because we haven't gotten through all of

21     the discovery, so we don't know what harm has been caused to

22     them and we don't know --

23          THE COURT:  All right, but I can't rule on what we

24     don't know.  I have to rule on what --

25          MS. FINK:  But if Cahill Gordon are the lawyers

d2l2hama kjc

1    involving in that harm, right, then --

2              THE COURT:  I'm sorry.  Say that again, ma'am?  If

3    Cahill Gordon's lawyers --

4              MS. FINK:  -- are representing the victims, right, and

5    it becomes --

6              THE COURT:  In unrelated matters, right?

7              MS. FINK:  What?  Yes.

8              THE COURT:  In unrelated matters.

9              MS. FINK:  Well --

10             THE COURT:  So I don't know what the harm is.

11             MS. FINK:  I don't know -- yes, of course it is

12    unrelated.  This is a criminal case and those are all civil.

13             THE COURT:  No, I'm sorry.  There is nothing I saw in

14    the papers that indicated, for example, that the Cahill Gordon

15    firm was representing any of those clients named as clients of

16    the firm in connection with any of the hacking activity that is

17    the subject of this case, whether civil or criminal,

18    Ms. Kunstler.

19             MS. S. KUNSTLER:  Yes, that's correct.  We have no

20    information that Cahill Gordon is representing any of those

21    clients in connection with the Stratfor hack or in connection

22    with any civil suit they may have.

23             THE COURT:  Yes, ma'am.

24             MS. FINK:  Our position --

25             THE COURT:  So the question is, what is the appearance

d2l2hama kjc

1   of impropriety?

2          MS. S. KUNSTLER:  For us it is twofold.  With relation

3   to those clients of Cahill Gordon that were compromised by the

4   Stratfor hack, that these are clients that Cahill Gordon has a

5   financial interest in and they were harmed.  So there is --

6          THE COURT:  What's the connection between this case

7   and that?  There is no connection in the papers connecting the

8   clients having been hacked to the Cahill Gordon firm.  There is

9   no allegation that there is any legal work being done or

10  anything whatsoever.  It is merely the coincidence that they

11  were supposedly a subject of the same hack.

12         MS. S. KUNSTLER:  Yes, but these are clients who rely

13  on Cahill Gordon to protect their interests in numerous ways

14  and clients who have paid a lot of money to Cahill Gordon to

15  protect those interests.  So even though Cahill Gordon may not

16  be representing them in connection with the harm that occurred

17  to them as a result of the Stratfor hack --

18         THE COURT:  "Comma, if any."

19         MS. S. KUNSTLER:  If any, and also that we know about

20  so far, is there is still a relationship there, a --

21         THE COURT:  And so what?  You haven't closed the

22  circle so far as I can see.  And may I ask you this:  In

23  connection with those clients, are you relying on the

24  appearance of impropriety or are you relying on financial

25  interest?

d2l2hama kjc

1                    (Pause)

2                    MS. S. KUNSTLER:  I mean, it is really the appearance

3        of impropriety.  We have, you know, the financial interest.  I

4        mean, the statute that deals with financial interest also deals

5        with any other interest; and, from our perspective, you know,

6        Cahill Gordon has an interest in these clients, has an interest

7        in these clients being protected under the law, litigates

8        actively on behalf of these clients to protect their interests

9        and this is -- and --

10                   THE COURT:  So what's the connection with this case?

11                   MS. S. KUNSTLER:  The connection is that they have

12       been harmed here, and whether --

13                   THE COURT:  You don't know that.  There is nothing in

14       the papers indicating that.

15                   MS. S. KUNSTLER:  Well, we know that thousands of

16       their e-mails were compromised and among those credit card

17       information was compromised of those clients.

18                   THE COURT:  I am actually not sure I remember seeing

19       anything factual saying that credit card information was

20       compromised.  But let's say it has been.  What's the connection

21       with this case?  And I remind you, please, of the *Lauerson* case

22       that says that where a judge is accused of having interest in

23       the victim of a crime, "Recusal is required only where the

24       extent of the judge's interest in the crime victim is so

25       substantial or the amount that the victim might recover as

d2l2hama kjc

1    restitution is so substantial that an objective observer would

2    have a reasonable basis to doubt the judge's impartiality."

3           So, again, what is the substantial interest we are

4    talking about here?

5           MS. S. KUNSTLER:  The substantial interest is that

6    these are clients that pay a great deal of money to Cahill

7    Gordon and, as managing partner, that your Honor's husband --

8           THE COURT:  He would be flattered to hear that, but I

9    don't believe that's reflected in the papers either.  Go ahead.

10   Keep going.  I am just saying that's not in the papers, and I

11   happen to know it is not true, the managing partner part.

12          MS. S. KUNSTLER:  Okay.

13          THE COURT:  He would be flattered, though.

14          MS. S. KUNSTLER:  Thank you for correcting me on that

15   point, your Honor.

16          THE COURT:  You said to me that these clients pay a

17   lot of money to the firm and maybe they were damaged by this

18   hack.  Again, though, how does that translate into some

19   financial or other interest by the firm because there is no

20   indication whatsoever of any representation of these clients in

21   connection with these hacking activities.

22          MS. FINK:  The problem here, Judge, is that there is

23   this, as you know, enormous quantity of discovery that we

24   haven't been through.

25          THE COURT:  You can't talk to me about what we don't

d2l2hama kjc

1    know.

2            MS. FINK:  Right.  Well, that is somewhat --

3            THE COURT:  I have to make --

4            MS. FINK:  -- of a problem.

5            THE COURT:  -- the decision -- excuse me.  I was

6    speaking.

7            I have to make the decision based on the papers that

8    are before me now.  So somebody can answer this question.

9            MS. S. KUNSTLER:  Kavaler Gordon has a substantial

10    financial interest in these clients that pay Kavaler Gordon --

11    that --

12            MS. FINK:  Cahill.

13            MS. S. KUNSTLER:  Cahill Gordon.  I'm sorry, your

14    Honor.

15            -- that pay Cahill Gordon money.  We are aware of over

16    20 clients of Cahill Gordon that were impacted by the hack, and

17    I believe over 3,000 separate e-mail addresses that were

18    compromised, although I may -- the correct numbers are in our

19    papers.

20            Given, you know, our position is that that connection,

21    coupled with the fact that Mr. Kavaler's own e-mail address was

22    compromised, is enough to create an appearance of

23    impartiality -- an appearance of partiality.

24            THE COURT:  The connection I do not yet understand is

25    why.  They pay Cahill Gordon money not in connection with this

d2l2hama kjc

1   matter.  Mr. Kavaler's publicly available e-mail was disclosed.

2   So what?

3             MS. S. KUNSTLER:   A harm to those clients --

4             THE COURT:  "Comma, if any."

5             MS. S. KUNSTLER:  Cahill Gordon has an interest in a

6   harm to those clients.

7             THE COURT:  In?

8             MS. S. KUNSTLER:  The connection for us is that it is

9   enough that those clients pay Cahill Gordon a substantial

10  amount of money to protect their interest even if not in

11  connection with this case.  For us it -- it is litigation in

12  connection with the leak of Stratfor information.  For us that

13  connection is sufficient.

14            MS. FINK:  And, well, I know --

15            THE COURT:  I am going to ask one more time:  Tell me

16  why.  I know what you say the facts are.  Why does that create

17  an appearance of impropriety?  And apparently what you are

18  saying is that all victims of the hack and separately you are

19  saying the clients in the past have paid Cahill Gordon money,

20  and we know at least the papers do not reflect any

21  representation in connection with the hack.  So what?

22            MS. S. KUNSTLER:  And continue, your Honor, to pay

23  Cahill Gordon money --

24            THE COURT:  So what?

25            MS. S. KUNSTLER:  -- to protect their interests.

d2l2hama kjc

1          THE COURT:  Not in connection with this so far as

2     these papers indicate.

3          Ms. Fink, anything to add?

4          MS. FINK:  I mean, the real problem here, Judge, is

5     that we can't lay this to rest.  That's what I see to be the

6     problem.

7          THE COURT:  I don't know what that means.

8          MS. FINK:  And let me correct the court.  We are not

9     alleging an appearance of impropriety.  We are alleging an

10    appearance of partiality, and there is a big difference between

11    the two.  One, I am saying the partiality is based on the

12    relationship that the court has to Cahill Gordon, which you

13    discussed during your confirmation hearing, and that exists.

14    It exists.  I mean, even though it is 1992 --

15         THE COURT:  What is the connection under these --

16         MS. FINK:  We don't know.

17         THE COURT:  Okay.  Then I can't rule on what we don't

18    know.

19         MS. FINK:  But -- exactly.  But my only problem here

20    is that in three months, after we get to whatever -- you know,

21    because we really are going through discovery, all of a sudden

22    this comes again, we are in front of the court again on this

23    issue.

24         THE COURT:  Ms. Fink, I have said three times already

25    this morning, I am bound to rule on the record before me.

d2l2hama kjc

There is nothing here that I can see.  You keep telling me there might be something out there.  I can't rule on that. Indeed, it would be wrong of me to recuse on that basis because, as you know, I have a duty to sit unless you carried your burden of demonstrating why I shouldn't.

MS. FINK:  Well, your Honor, I don't have the ability to do that, and I think I was pretty succinct about that in the letter that I wrote, and I didn't come here --

THE COURT:  Let me ask you this:  Are you withdrawing the motion?

MS. FINK:  The only thing is that it is up in the air given the nature of the case.

THE COURT:  Let me ask you this:  Are you withdrawing the motion?

MS. FINK:  Excuse me?

THE COURT:  Are you withdrawing the motion?

MS. FINK:  No.  We would want you to rule on it, Judge, on the facts that exist now.  And then if it should come to pass what I think might happen, which is that there is much more to support it once we go through the discovery, then we will make a motion to renew based upon new facts.

THE COURT:  You could always make a motion, as you know, but you are not withdrawing this one, right?

MS. FINK:  Right, but you know me, Judge.  We have been in front of each other for a decade, and you know that I

d2l2hama kjc

1    am not a big motion -- you know, that I am very succinct and I

2    like to make things -- not clutter the record with what I

3    consider to be nothing that will win.

4              THE COURT:  Yes, ma'am.  Thank you.

5              Shall I hear from the government?  Did you have

6    anything you wished to add?

7              MS. S. KUNSTLER:  I have been standing here trying to

8    think of a way to close this circle for the court, and I am not

9    sure that I will be successful in doing so.  The only, I guess,

10   thing that I can think of is that these are clients and these

11   are also not just financial relationships, but these are

12   personal relationships when you have -- when you have a firm

13   that you deal with over years to protect your interests, and

14   when a client of the firm is compromised in ways, even if you

15   are not representing them on those issues, you care about what

16   happens to them, you care about the release of their financial

17   or otherwise secure information, and you hope that the release

18   of that information doesn't compromise them financially,

19   because anything that compromises them financially may

20   compromise, in turn, your representation of them, your ability

21   to -- their ability to hire you to represent them.  Even though

22   they may not be counsel on that case, there is an interest

23   there, whether it is an interest of caring, whether it is an

24   interest of concern, whether it is an interest of wondering how

25   great this was and whether it will -- whether it compromises

d2l2hama kjc

1   that corporation and its ability to do business in the future.

2   So I don't know if that closes the circle for the court.

3           THE COURT:  All right.  We don't have any singularity

4   involved in the papers that indicates to us that the result of

5   the hack is so financially devastating to any of these clients

6   or indeed injurious at all that they would be compromised in

7   their ability to pay their legal bills, am I right on that?

8           MS. S. KUNSTLER:  Yes, that is correct, your Honor.

9           THE COURT:  Okay.  Thank you.

10          MS. S. KUNSTLER:  Thank you.

11          THE COURT:  Does the government wish to be heard?

12          MR. BROWN:  Briefly, your Honor.

13          As your Honor knows, this motion -- under this motion,

14  it is the defendant's burden to prove or to show that the court

15  is partial in this matter.  And that showing requires -- that

16  showing would cause an objective observer, fully informed of

17  the underlying facts, to entertain significant doubt that

18  justice would be done absent recusal.

19          The court, as your Honor has already noted, must

20  ignore rumors, innuendo, erroneous information, and avoid

21  granting recusal motions for reasons that are remote,

22  contingent, or speculative.  And disqualification is not

23  optional.  It is prohibited where the showing is not made.

24          So in this case, your Honor, the government

25  respectfully submits that the defendant has entirely failed to

d2l2hama kjc

1   meet its burden and the motion should be summarily rejected.

2                First, Mr. Kavaler was not a victim in this case.  His

3   credit card information was not disclosed as a result of the

4   hack.  He was not a member of the class action that was brought

5   in -- that was brought in a collateral --

6                THE COURT:  My recollection of the class action order

7   was that it was a class of individuals whose personal

8   information -- that is to be distinguished from publicly

9   available e-mails -- personal information had been disclosed.

10               MR. BROWN:  That's correct, your Honor.  In this case,

11   as your Honor has also observed, it was only Mr. Kavaler's

12   publicly available work e-mail address that was disclosed.  In

13   that case, your Honor, the government would submit that it is

14   an entirely *de minimis* harm, even if a harm exists, which the

15   government submits there is no harm in this case.

16               And the defendant's argument that Mr. Kavaler and

17   indirectly the court has an interest in the case because of

18   attorney/client relationships with various clients who may have

19   been hacked is so attenuated as to be meaningless.  The

20   defendant --

21               THE COURT:  What do you say, please, to Ms. Kunstler's

22   argument about caring for one's client?

23               MR. BROWN:  That is rank speculation, your Honor, and

24   the fact that you might care about a client in the abstract has

25   no direct relationship with this case in particular.  It is an

d2l2hama kjc

1   entirely attenuated, speculative relationship, and it serves as

2   no basis for recusal in this case, especially in light of the

3   case law.

4               THE COURT:  Thank you.

5               Ms. Fink.

6               MS. FINK:  Your Honor, I just wanted to say it's not

7   Mr. Kavaler's interests, it is everybody's interests that there

8   be a total impartiality; and the fact that Mr. Kavaler's law

9   firm, of which he is the supervisor, is involved within this

10  case is what we are raising here.

11              THE COURT:  What do you say to Mr. Brown's suggestion,

12  which is reflected in the cases, that the interest relied upon

13  cannot be so attenuated or so speculative.

14              MS. FINK:  Well, I agree with that, Judge.  I have

15  dealt with this.  But, you know, the fact of the matter, given

16  the fact that these are victims of the hack, that's -- I don't

17  see the attenuation.  That's -- the fact that the issue was

18  based on what happened in this case doesn't mean --

19              THE COURT:  What is the connection?

20              MS. FINK:  Do you understand what I am trying to say?

21              THE COURT:  No, ma'am, I don't.  What is the

22  connection between --

23              MS. FINK:  For me --

24              THE COURT:  -- the firm --

25              MS. FINK:  -- the connection is that these people were

d2l2hama kjc

1   hurt by what happened in this case.

2          THE COURT:  Okay.  But so what?  How does that make it

3   any kind of an interest of Cahill Gordon?  I suspect the

4   lawyers might feel badly.  So what?

5          MS. FINK:  Because one of the people hurt was

6   Mr. Kavaler because his e-mail was published --

7          THE COURT:  You just heard Mr. Brown say --

8          MS. FINK:  Right, it is not his interest.

9          THE COURT:  I'm sorry.  You just heard Mr. Brown say

10  that the injury to Mr. Kavaler, if any, is *de minimis*.  The

11  record before us indicates that the only disclosure was of his

12  publicly available e-mail.  Is that an interest or a harm that

13  is cognizable on this kind of a motion?

14         MS. S. KUNSTLER:  Your Honor?

15         THE COURT:  Yes, ma'am.

16         MS. S. KUNSTLER:  Thank you.

17         I also believe his encrypted user password was

18  revealed for his Stratfor account.

19         MR. BROWN:  The passwords are stored in an encrypted

20  fashion and they are meaningless if they are still encrypted.

21  An encrypted password was among those many others that were

22  disclosed, but to the general public it is meaningless.

23         In any event, Mr. Kavaler in his affidavit said that

24  he doesn't recall ever having any membership or account in

25  Stratfor.  Stratfor did say that he had a two-week trial

d2l2hama kjc

membership three years ago.  If that's the case, it is still
irrelevant.  Mr. Kavaler doesn't recall using that.  It is
still a meaningless, *de minimis* harm, even to the extent harm
exists.

I would like to add, your Honor, if I may, just to
rewind, that the defense has not articulated what harm was
originally suffered by Mr. Kavaler's firm's clients to begin
with.  That threshold has not even been met at this point.  So
any argument about the firm caring for its clients is premature
given the fact that the defense has failed to articulate any
harm.  It is rank speculation.  The defense is using rank
speculation to close the circle in this case.

THE COURT:  Yes, ma'am.

MS. S. KUNSTLER:  Your Honor, Mr. Hammond is being
prosecuted for causing the harm.  We know there is a harm.
Otherwise this case would be -- there wouldn't be a criminal
case.  There were, you know, in the government's own papers,
they talk of thousands of people compromised and the thousands
of victims who suffered as a result of the defendant's actions.
So we can't say on one side of our mouths there is no real harm
here, no damage was done, and the other prosecute someone
criminally and have them facing --

THE COURT:  I think you might be overstating it just a
little.  I think what the government argued was that there is
no demonstration in these papers that either Mr. Kavaler or any

d2l2hama kjc

1    of the firm's clients suffered any harm, and I think there was

2    probably an exception for *de minimis* harm like disclosing one's

3    publicly available e-mail.

4                MS. S. KUNSTLER:  But --

5                THE COURT:  So I think those are two different things,

6    right?

7                MS. S. KUNSTLER:  Yes, your Honor.

8                THE COURT:  Yes, ma'am.

9                MS. S. KUNSTLER:  But the public -- this is about

10   public confidence, and what we have here is a public that is

11   aware that Mr. Hammond is facing I think a 35-year sentence for

12   causing this harm and that the harm that affected thousands of

13   victims.  The actual affect to Mr. Kavaler, even though it may

14   be *de minimis*, is still an effect that -- that affects public

15   confidence because there is a connection there.

16               THE COURT:  But that's the question.  What's the

17   connection; and, as you know, the standard is the views of the

18   well-informed observer, not thousands of blog pages with

19   incorrect information.  I have to base it on what is in these

20   papers.  So the question, again, and forgive me for keeping

21   asking, but the question again is what's the harm?  The

22   well-informed observer would see that his publicly available

23   e-mail was disclosed.  Probably most would say, so what?

24   Mr. Brown says it more nicely, he says *de minimis*.  Why is that

25   not the answer?

d2l2hama kjc

1          MS. S. KUNSTLER:  I think when you have a defendant

2     who is facing such severe penalties, that any connection is a

3     connection that a cause or concern --

4          THE COURT:  I don't believe I have seen a case to that

5     effect.  I don't think I have seen a case at all that considers

6     the penalty that a criminal defendant is facing as a factor in

7     a recusal motion.  Am I wrong?  Did I miss it?

8          MS. S. KUNSTLER:  No, but I guess for me that figures

9     into both public confidence and the appearance of partiality

10     and what goes into -- what goes into that calculus when a

11     reasonable, well-informed person is looking at these

12     connections and wondering about what's going to happen in the

13     case and will that case be fair.

14          THE COURT:  Okay.  Ms. Fink, did you wish to add

15     anything?

16          MS. FINK:  Just to say, Judge, that, you know, given

17     the nature of this case and the nature of the issue, after all,

18     yesterday the Attorney General spoke on the issue of this kind

19     of case, right?  So --

20          THE COURT:  I thought he spoke on Chinese hacking.

21          MS. FINK:  Oh, no.  I don't think -- that was one part

22     of it, but he was talking about the whole concept of hacking,

23     right?  And there is the issue with Aaron Swartz, and this is a

24     very --

25          THE COURT:  I don't know what you are talking about.

d2l2hama kjc

1    It is not in these papers.

2            MS. FINK:  Okay.  They are not on the papers.

3            What I am saying to you is -- here, Judge, let me just

4    show you what I am referring to.  I am handing up a news

5    article which appeared yesterday based on a press conference

6    held by Eric Holder.

7            THE COURT:  Look, how am I supposed to read a news

8    article?  It is rank hearsay.

9            MS. FINK:  I am just making it part of the record,

10   Judge.  It is not about Chinese hacking.  It is about WikiLeaks

11   and LulzSec and the --

12           THE COURT:  What's the point -- what connection are

13   you making from the article, please?

14           MS. FINK:  That it is an issue that is well considered

15   in the international press.

16           THE COURT:  What is?

17           MS. FINK:  This Anonymous, the dissemination of

18   classified information.

19           MS. S. KUNSTLER:  And, your Honor, just to --

20           THE COURT:  So what?

21           MS. S. KUNSTLER:  -- make the connection a little bit

22   more clear, Mr. Hammond is accused of being a member of

23   LulzSec, one of the organizations that the president is warning

24   about.

25           THE COURT:  And how is that relevant on recusal?

d2l2hama kjc

1          MS. FINK:  Because when there are issues which raise

2     the partiality of the judge in this kind of case, right, they

3     are not led to rest.  That's the problem.

4          THE COURT:  I'm sorry.  I have been reading the cases

5     that talk to me about what considerations I must look at in

6     recusal motions.  I don't see anything that is even close to

7     this.

8          MS. FINK:  It is totally your Honor's call.

9          THE COURT:  Yes, ma'am.  Thank you.

10         MS. FINK:  We are not saying that you will commit

11    reversible error or that you are committing error by refusing

12    to recuse itself on a legal issue.  Because, as the court

13    knows, we don't make frivolous motions; we make stupid

14    statements.

15         This is a very close case.  It has to do with the

16    court and what the court perceives and how the court feels.

17    And if you feel that, because of all of this information and

18    the connection with your husband, that there is an appearance

19    of partiality, you will recuse yourself.  If you don't, you

20    won't.  It is as simple as that.

21         THE COURT:  Yes, ma'am.

22         Mr. Brown.

23         MR. BROWN:  Your Honor, the defense is grasping at

24    straws at this point with, for example, the newspaper article.

25    The case law is clear.  The defense has not met their burden.

d2l2hama kjc

```
 1   The government submits this motion is entirely without merit

 2   and should be summarily rejected.

 3            THE COURT:  All right.  Anybody else want to be heard

 4   on the motion or would we like to talk about status?  Anything

 5   else on the motion, counsel?

 6            MS. FINK:  No.

 7            THE COURT:  All right.  Reserved.

 8            Would you like to talk about status?

 9            MR. BROWN:  Your Honor, we have -- the government has

10   consulted with the defense in this case, and we would propose a

11   conference in approximately 45 days, on April 10, at 4 p.m., at

12   which point the government expects the defense to be able to

13   discuss a motion schedule at that point and set a trial date.

14            THE COURT:  Okay.  Any objection to the date?

15            MS. FINK:  Your Honor, we -- as you know, we have been

16   working very hard to create a place to do this discovery.  We

17   finally got MCC to arrange to give him the computer, and he has

18   been able to use it for two days.  When he gets out, when he --

19            THE COURT:  It's not the MCC's fault that it has been

20   for two days, right?  I understand there was some disciplinary

21   segregation involved here.

22            MS. S. KUNSTLER:  Your Honor --

23            THE COURT:  That's what your letter said, right?

24            MS. S. KUNSTLER:  Yes, but I'm not sure exactly when

25   the computer arrived there, but I think it was some weeks
```

d2l2hama kjc

before the disciplinary segregation went into effect.  But the

government -- my last communication with the government about

sending it was mid January, and the disciplinary didn't come

for some weeks after.  But I know that there was no attempt by

MCC to give him the computer prior to the disciplinary

segregation, but maybe the government knows how many weeks

before.

          MR. BROWN:  Your Honor, in this case, just to provide

a little context, at the last pretrial conference on November

20, we amended the protective order to allow the defendant to

review discovery by himself in prison.  After some backing and

forthing with the defense and consultation with our technical

people in our office and also at the MCC, it was ultimately

decided to provide a laptop and some hard drives to Mr. Hammond

in prison, and there are various technical reasons why that was

done.  There are two different operating systems that were

needed.  There was some forensic software that was needed to

allow --

          THE COURT:  I don't need to know why, counsel.

          MR. BROWN:  Just so that you know, the government was

making a lot of efforts to make sure that Mr. Hammond could

review the discovery in prison.  The laptop and the hard drives

were delivered on the 18th of January.  On the 25th of January,

Mr. Hammond was put into disciplinary segregation for testing

positive for a banned substance, in this case marijuana, in

1   prison, and he was committed for 30 days in the Special Housing

2   Unit.

3          Ms. Fink called the government on February 11 to

4   complain that Mr. Hammond hadn't been able to review his

5   computer in prison.  I spoke to counsel in prison to attempt to

6   intervene on behalf of the defense so that Mr. Hammond could at

7   least try to communicate the defense concerns to the MCC; and

8   what the MCC said they would do is that while Mr. Hammond is in

9   segregation, he should submit a written request every day to

10  look at the laptop and hard drives and also some CDs which the

11  government provided to the defendant.

12         We basically have given him all of the discovery, and

13  he should be able to look at the hard drive, the laptop and the

14  CDs while he is in the SHU for at least a couple of hours a

15  day.  He should also be able to -- he should be able to bring

16  his laptop with him to any legal meetings he has during the day

17  while he is in the Special Housing Unit.

18         When he is out of the Special Housing Unit, the MCC

19  has agreed to increase his time to look at the laptop and hard

20  drives from six to 12 hours -- to six to 12 hours per week and

21  maybe even longer to 16 to 24 hours per week or even more if

22  the defense needs it.  The defendant is free to look at the CDs

23  that we gave him as much as he wants during the day.  And

24  that's basically the state that we are in now in terms of

25  discovery.

d2l2hama kjc

1          So he has the laptop, he has the hard drives, he has

2     the CD ROMs of all the discovery.  He can look at the CDs as

3     much as he wants during the day and we are increasing the time

4     or the MCC is agreeing to increase the time that he can look at

5     the laptop.  Again the laptop was given to him on the 18th of

6     January.  On the 25th he went into segregation.

7          THE COURT:  Yes, ma'am.

8          MS. S. KUNSTLER:  Thank you, your Honor.

9          So I know between the 18th and the 25th he was not

10    given access to the laptop.  We have also been in communication

11    on a very frequent basis, sometimes daily basis, with MCC legal

12    department about access to the computer.  We were informed that

13    and Mr. Hammond was informed that he needed to make a daily

14    request.  He has in fact made daily requests I think for -- I

15    think it is 15 days.  Out of those 15 days, he was granted

16    access twice and for a total three hours.  So we haven't had a

17    very good success rate at his requests being met.  Although I

18    do know that some part of it is that the law library in the MCC

19    is only open from 5 to 9 p.m. in the SHU and that if he makes

20    requests during the day, sometimes they aren't communicated

21    adequately to people that work at night, or that's what I have

22    been told by MCC.  The lieutenant, who is the person who needs

23    to authorize Mr. Hammond's use of the computer, is only on

24    during the day, so he makes -- if he is making a request after

25    hours, it doesn't work out.  But I think at this point we have

d2l2hama kjc

1  been told that those communication issues between the day and

2  night have been resolved, and that's why Mr. Hammond got the

3  three hours' access he got most recently; and we are hopeful

4  that for the further duration of his time in segregation that

5  we won't have those issues and that he will have access.  But

6  if he does not have access, we will let the government know and

7  we will let the court know.

8          THE COURT:  Yes, ma'am.

9          Anything else?  So I am going to see you, counsel, on

10 April 10 at 4:00.

11         MR. BROWN:  Your Honor, the government moves to

12 exclude time under the Speedy Trial Act in the interests of

13 justice to allow the defense to continue to review discovery in

14 this case and prepare for trial.

15         THE COURT:  Any objection, counsel?

16         MS. FINK:  No, your Honor.

17         THE COURT:  Very well.  In order to permit the defense

18 to continue to review the discovery and determine what motions

19 if any are required, time between today and April 10 is

20 excluded from calculation under the Speedy Trial Act in the

21 interests of justice.

22         Anything else today, counsel?

23         MR. BROWN:  No, your Honor.  Thank you.

24         THE COURT:  Good.  So we will look for you on April 10

25 to set a motion schedule and set a trial date.

d2l2hama kjc

1              Thank you, counsel.  Good morning.

2              MS. S. KUNSTLER:  Thank you, your Honor.

3              MR. BROWN:  Thank you.

4                           –  –  –

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25