DBFBHAMS                          Sentence

1   UNITED STATES DISTRICT COURT
    SOUTHERN DISTRICT OF NEW YORK
2   ------------------------------x

3   UNITED STATES OF AMERICA,

4              v.                          12 CR 185 (LAP)

5   JEREMY HAMMOND,

6              Defendant.

7   ------------------------------x

8                                      New York, N.Y.
                                       November 15, 2013
9                                      10:06 a.m.

10

    Before:
11
                      HON. LORETTA A. PRESKA,
12
                                          District Judge
13

14                          APPEARANCES

15  PREET BHARARA
         United States Attorney for the
16       Southern District of New York
    ROSEMARY NIDIRY
17  THOMAS BROWN
         Assistant United States Attorneys
18
    SUSAN KELLMAN
19  SARAH KUNSTLER
         Attorneys for Defendant
20
    ALSO PRESENT:
21       CHRISTOPHER TARBELL,  FBI Special Agent
         EMILY KUNSTLER
22       MARGARET RATNER KUNSTLER

23

24

25

1            (In open court)

2            THE COURT:  United States against Jeremy Hammond.

3            Is the government ready?

4            MS. NIDIRY:  Yes.  Good morning, your Honor.  Rosemary

5    Nidiry for the government.  With me at counsel table is Thomas

6    Brown of the U.S. Attorney's Office and Special Agent

7    Christopher Tarbell of the FBI.

8            THE COURT:  Good morning.

9            Is the defense ready?

10           MS. KELLMAN:  We are, your Honor.  Good morning.

11   Susan Kellman for Jeremy Hammond.  Your Honor, my client is

12   seated to my right, and I'm assisted at counsel table by Sarah

13   Kunstler and Emily Kunstler and Margaret Ratner Kunstler.

14           THE COURT:  Good morning.  Won't you be seated.  Good

15   morning.

16           I think the first item we should take up, please, is

17   the application of the New York Times to have the redacted

18   portions of the sentencing memorandum unsealed.

19           Mr. McCraw.

20           MR. McCRAW:  Yes, your Honor.  Good morning.

21           THE COURT:  Good morning.  Do you wish to be heard

22   further?

23           MR. McCRAW:  Your Honor, I believe my letter lays out

24   what our position is.  I'd like to respond to whatever argument

25   is made for continuing the redaction.

1                THE COURT:  Yes, sir.

2                MR. McCRAW:  Thank you.

3                THE COURT:  Ms. Kellman, Ms. Kunstler.

4                MS. KELLMAN:  Your Honor, I hope that we can dispose

5       of this fairly quickly.  As the Court knows, I came on board

6       fairly late in this matter.  And one of the first things that I

7       had an opportunity to read before I even began to familiarize

8       myself with the case was the Court's protective order in this

9       matter.  And I took that, as I take all orders of this Court,

10      seriously.  I reached out to the government of the United

11      States in an effort to see if there were areas in which we

12      could agree that redactions were not necessary, and I

13      succeeded neither in connecting with them on that issue by

14      phone or by e-mail.  And after several weeks of having no input

15      from the government, I erred on the side of caution and I

16      redacted everything that I thought could potentially cause a

17      problem.

18                From our vantage point, we didn't really have a sense

19      that most of it needed to be redacted and we would, as I always

20      do, defer to the Court on these matters.  If the Court is

21      inclined to release the information, of course we live to

22      serve, Judge.  I did what I thought was appropriate, which

23      was to follow the letter of the Court's instruction.  And if

24      there is somebody in this courtroom who feels that there are

25      areas that don't need to be redacted, I'm happy to be

1    instructed.

2              THE COURT:  Thank you.

3              What's the government's position here?  There seemed

4    to be pretty limited redactions.

5              MS. NIDIRY:  Yes, your Honor.  Since receiving the

6    redacted versions of the defense's submissions, we've had

7    discussions with defense counsel about the areas that we think

8    do not need to be redacted.  And primarily what we think should

9    be redacted are victim names and the entities, the personal

10   information of various individuals, credit card information,

11   things like that, that appear in some of the exhibits, the URL

12   information of websites that may have vulnerabilities.

13             And so we have talked it over with Ms. Kunstler and my

14   understanding is that she is going to-- or they are going to be

15   submitting a submission with more limited redactions that

16   comport, we think, with the protective order.

17             THE COURT:  What is your position as to the material

18   within the four corners of the defense sentencing memorandum in

19   the text?

20             MS. NIDIRY:  Those I think can be unredacted.

21             THE COURT:  Okay.  And then as far as I could tell,

22   the remaining material -- the addresses, the names, et

23   cetera -- those appear in the exhibits.

24             MS. NIDIRY:  I think that's correct.

25             THE COURT:  Okay.  Certainly the material in the text

DBFBHAMS                          Sentence

1    of the sentencing memorandum may be unredacted.

2              Is there anything else that we need to discuss?

3              MS. KELLMAN:  Not that I'm aware of, Judge.

4              THE COURT:  Mr. McCraw, anything else you want to

5    discuss?

6              MR. McCRAW:  Yes, your Honor.  In terms of-- first, we

7    have no problem with personal identifying information of the

8    sort that was in the protective order.  That list which dealt

9    with credit card numbers and the like, no problem, and we

10   appreciate your Honor's unsealing of the memorandum.

11             Primarily what we've been concerned about is what

12   appears to be a supplemental argument, A through H, which is

13   largely redacted, the version, and I think it's the latest,

14   almost completely redacted, other than the introductory

15   paragraph.

16             We know from the government's submission, where they

17   address what's redacted in Footnote 19 on page 19 that

18   essentially it's an argument aimed at your Honor in terms of

19   something you should consider for sentencing.  We believe that

20   other than the personal identifying information, which we

21   discussed, that they should be unredacted.

22             THE COURT:  I'm sorry.  Let me just locate that.

23             The problem is mine isn't redacted so I don't know

24   what the material is.

25             MR. McCRAW:  Your Honor, in --

DBFBHAMS                          Sentence

 1           THE COURT:  I have Exhibit H.

 2           MR. McCRAW:  For ease, the first two paragraphs of the

 3   letter addressed to you are unredacted and then, after that,

 4   other than some "respectfully submitted," everything else is

 5   blank.  Everything that is attached to that letter is blank.

 6           THE COURT:  Okay.  Thank you.

 7           I guess I should be asking Ms. Kellman, first, do you

 8   have any concerns about unredacting that material?

 9   Ms. Kunstler?

10           MS. KUNSTLER:  Your Honor, we don't have any concerns

11   about unredacting that material.

12           MS. KELLMAN:  Judge, when you say do we have any

13   concerns about it, is the Court's concern with respect to your

14   order?

15           THE COURT:  No.

16           MS. KELLMAN:  Then I think that the answer is we don't

17   have any concerns.

18           THE COURT:  Does the government have any objection to

19   unredacting that material?

20           MS. NIDIRY:  To the extent that the-- only to the

21   extent that the names of entities with potential

22   vulnerabilities exist in there.  In other words, everything--

23   we believe that everything should be unredacted except the

24   names of, for example, the countries listed that have potential

25   vulnerabilities.

 1         THE COURT:  Okay.  Mr. McCraw.

 2         MR. McCRAW:  Your Honor, as to the country names, the

 3   government has taken the position that this is untrue.  They

 4   say that in Footnote 19, that essentially having addressed the

 5   argument that was redacted, that we haven't seen, they say this

 6   is untrue.  It seems unlikely to me that there is a privacy

 7   interest or a national security interest in things that aren't

 8   true.  If they are now saying that there are some actual

 9   vulnerabilities and they're willing to make that submission to

10   your Honor, that's a different matter.  At this point what I'm

11   being told by Footnote 19 is that none of this is believable,

12   in which case I don't see the case for redaction.

13         THE COURT:  Ms. Nidiry.

14         MS. NIDIRY:  I think that counsel is misreading our

15   footnote.  We do point out that C.W. and Mr. Hammond did

16   discuss vulnerabilities in foreign websites among other

17   websites.  And so there is a potential that the entities

18   listed herein have website vulnerabilities, and that is our

19   concern.

20         THE COURT:  Then the footnote goes on.  It says, "In

21   fact, the FBI notified foreign governments about this activity

22   and the vulnerability of their websites."  Right?

23         MS. NIDIRY:  Yes, that's correct.

24         THE COURT:  All right.  I'm not sure, Mr. McCraw, that

25   the government is saying that it's untrue.

1          MR. McCRAW:  But it-- and I agree with you, your

2     Honor, that they have said that there was a discussion.  Now, I

3     don't know what's in there, so whether --

4          THE COURT:  It's a list of countries.

5          MR. McCRAW:  Okay.  And my understanding is that if

6     the footnote is accurate, that there's been notification, I

7     would think there would need to be some showing that that

8     vulnerability continues.  I would assume that, having been

9     notified and this list having been developed some time ago,

10    that there should be a fresh case that there is

11    vulnerability.

12         THE COURT:  Ms. Nidiry.

13         MS. NIDIRY:  I don't necessarily-- I don't think that

14    the burden should be put on the victims with the potential

15    vulnerabilities to demonstrate that the vulnerabilities have

16    been taken care of.  I think that the information that is

17    important for the public that is in this document is provided

18    without listing the names of the potential victims.

19         THE COURT:  Anything else, Mr. McCraw?

20         MR. McCRAW:  Just one final point, your Honor.  I'm

21    not asking that the victims do this.  I'm asking that the

22    government do this.  The government is proposing the redaction.

23    The constitutional standard is clear it's their burden, not the

24    burden of anybody in the general public.

25         THE COURT:  All right.  In light of the potential

DBFBHAMS                          Sentence

vulnerabilities of these governments and out of an excess of

caution, I will permit the redacting of the list of countries.

Otherwise, the remainder of the November 1, 2013 addendum to

the defendant's sentencing submission shall be unredacted.

          MS. NIDIRY:  Your Honor, I'm sorry, just to be clear,

the exhibits to that addendum do contain a host of chat logs

within which there are a lot of discussions of websites.  So we

would ask that those --

          THE COURT:  Vulnerable websites.

          MS. NIDIRY:  Yes, exactly.

          THE COURT:  Or deemed to be vulnerable.

          MS. NIDIRY:  Yes, as well as personal credit card

information.

          THE COURT:  Well, we're all on board on the personal

credit card information.  I'll permit the redaction of the

supposedly vulnerable sites.

          MS. NIDIRY:  Yes.  Thank you.

          THE COURT:  Okay.  Sir, anything else?

          MR. McCRAW:  Thank you, your Honor.

          THE COURT:  Yes, sir.  Thank you.

          Ms. Kellman, Ms. Kunstler, have you and your client

had adequate time to review the presentence report?

          MS. KELLMAN:  We have, your Honor.

          THE COURT:  Is there any reason it should not be made

part of the record?

DBFBHAMS                          Sentence

1          MS. KELLMAN:  No, your Honor.

2          THE COURT:  Are there any objections to the

3     presentence report?

4          MS. KELLMAN:  Your Honor, we highlighted the

5     objections in our submission of November 1st.

6          THE COURT:  Are there any that you'd like to discuss

7     today?

8          MS. KELLMAN:  Only to the extent that we'd like the

9     Court to take them into consideration, and that is specifically

10    with respect to the comments in the presentence report with

11    respect to paragraph 61 and 83.

12          THE COURT:  Sixty-one and?

13          MS. KELLMAN:  Eighty-three, your Honor.  With respect

14    to 61, does the Court want me to-- I'm happy to discuss them

15    briefly with the Court.

16          THE COURT:  Sure.

17          MS. KELLMAN:  With respect to paragraph 61, I thought

18    that the report was somewhat harsh with respect to its comment

19    that Mr. Hammond had refused to maintain employment while on

20    bond during the period between his guilty plea and the sentence

21    and his prior federal case.  And from our own research, that

22    didn't appear to be the case.

23          We provided the probation department and the Court

24    with a copy of not one, but two letters from Mr. Hammond's

25    prior employer, Rome & Company.  And Mr. Roman, who had

1    responded to inquiries on this issue, said that not only had he

2    welcomed Jeremy back because of the fine work that he had done,

3    but in his second letter to the Court, he wrote that "The

4    second time following his period of detention, we welcomed him

5    back with enthusiasm and without hesitation."  He described

6    Mr. Hammond as friendly, courteous, polite, and extremely

7    respectful of the business deeds of the company that he

8    served.  And I thought that that was an extraordinary

9    compliment from somebody who recognized that Jeremy had had

10   legal problems, was prepared to welcome him back because of the

11   good work he had done.

12           And what troubled me was that probation appeared to

13   have been aware of that, and the reality was that Mr. Hammond

14   had told probation that he took two weeks off before he had to

15   surrender.  But I thought it was harsh to say that he hadn't

16   worked at all since, one, that's not what he said, and, two,

17   that didn't appear to be what his employer was saying either.

18           I ask the Court to take notice of that and I attach

19   both letters from Mr. Roman.

20           THE COURT:  Is there any objection to deleting the

21   portion, at least as appears in paragraph 62 of my copy of the

22   presentence report, the portion that says "and failed to

23   maintain employment"?

24           MS. NIDIRY:  No, your Honor.

25           THE COURT:  Okay.  That portion is deleted.

1          MS. KELLMAN:  Thank you, Judge.

2          And the second piece, in paragraph 83, the probation

3    department appeared to be concerned that they hadn't had any

4    contact from Mr. Hammond's family, specifically his girlfriend,

5    his mother and his brother.  And our understanding was that

6    those people were not inclined to speak directly to probation,

7    but they had through us communicated a willingness to provide

8    letters, which they did, and we provided those letters to

9    probation.  I'm not sure why they weren't commented upon, but

10   we've attached them to our submissions.

11         So I think it's unfair to say that the family had not

12   been responsive, which suggests to the Court that somehow they

13   might not be supportive.  And of course I think the Court knows

14   well --

15         THE COURT:  We might have-- I wonder if we have

16   different copies.  That portion appears at paragraph 84 in my

17   copy and it says, "However, through counsel the defendant said

18   that those individuals would prefer not to be interviewed and

19   would rather rely on letters they have written on behalf of the

20   defendant," and then the report goes on to summarize those

21   letters.

22         MS. KELLMAN:  I think, Judge, that's the second

23   submission, is what that is.  Our letter went to the first

24   submission and I think after our letter probation --

25         THE COURT:  Got it.  So this is fixed.

DBFBHAMS                          Sentence

1          MS. KELLMAN:  I think that's correct, Judge.

2          THE COURT:  All right then.  No other objections to

3   the presentence report?

4          MS. KELLMAN:  No, your Honor.

5          THE COURT:  Thank you.

6          With respect to the offense level computation, I

7   accept the findings of the presentence report set forth at

8   paragraphs 42 through 56, which conclude that a total offense

9   level of 31 is appropriate.  With respect to the defendant's

10  criminal history, I accept the findings of the presentence

11  report set forth at paragraphs 57 through 77, which conclude

12  that a criminal history category of four is appropriate.

13          I have the sentencing memorandum on behalf of

14  Mr. Hammond.  I have the supplemental letter dated November 1;

15  I have a large binder of letters; I have a letter from Russell

16  Hammond handed up today; I have the letter attached to the

17  November 7 submission; I have the government's submission.

18          Are there any additional written materials I should be

19  looking at, Counsel?

20          MS. NIDIRY:  No, your Honor.

21          MS. KELLMAN:  No, your Honor.

22          THE COURT:  Ms. Kellman, would you like to speak on

23  behalf of Mr. Hammond?

24          MS. KELLMAN:  I would, your Honor.

25          THE COURT:  Or Ms. Kunstler.

DBFBHAMS                          Sentence

1          MS. KELLMAN:  But at the moment I'd like to defer, if

2     I may, to Sarah Kunstler, who has prepared some remarks.  And I

3     would like to yield to my mentee in the Southern District's

4     excellent mentoring program.  I have to say in this case I may

5     well have learned more from my mentee than she from me and I'm

6     very proud of the work she's done in this case.

7          THE COURT:  Yes, ma'am.

8          MS. KELLMAN:  So I'd like to defer to her and then I

9     will speak, Judge.

10          THE COURT:  Yes, ma'am.  Ms. Kunstler.

11          MS. KUNSTLER:  Thank you, your Honor.  Would you

12     mind if I took the podium?  It might be a little bit easier for

13     me.

14          THE COURT:  Of course.  If you actually want to remain

15     seated, that's fine too.

16          MS. KUNSTLER:  Thank you.

17          MS. KELLMAN:  When she gave me the key to her office

18     last night in case I need to get papers, I said, "Not a

19     chance."  She's going to make it through this.

20          MS. KUNSTLER:  Thank you, your Honor.  I'm very happy

21     to be here today.  I wasn't sure if I would make it.

22          In December of 2012, 24,000 geophysicists gathered at

23     a meeting of the American Geophysical Union.  The most

24     well-attended lecture was about the depletion of the earth's

25     resources --

1          THE COURT:  Ms. Kunstler, I'm going to ask you to keep

2     your voice up or perhaps be a little closer to the microphone--

3          MS. KUNSTLER:  Sure.

4          THE COURT:  -- so everyone can hear you.

5          MS. KUNSTLER:  Thank you.

6          A geophysicist named Brad Werner from the University

7     of California walked the crowd through an advanced computer

8     model to show how the rapid depletion of these resources was

9     leading to the destabilization of the earth's ability to

10    sustain human life.

11         When asked what could reverse or stem this tide,

12    Mr. Werner was largely at a loss.  There is one dynamic in the

13    model, however, that offered some hope.  Werner termed it

14    resistance:  Movements of people, or groups of people, who

15    adopt a certain set of dynamics that does not fit within the

16    dominant culture.  According to the abstract for his

17    presentation, this includes protests, blockades, and sabotage

18    by indigenous people, workers and other activist groups.

19         Serious scientific gatherings don't usually feature

20    calls for mass resistance, but in the history of our great

21    nation and in the history of humankind, there have always been

22    moments where resistance has led to important social change.

23    The American Revolution, the Civil War, the Civil Rights

24    Movement and the end of apartheid in South Africa.  And there

25    have always been people who stood up to make that change:  Our

1    founding fathers, Martin Luther King, Nelson Mandela.

2          What these people have in common is how they act in a

3    moment of choice, when confronted with a situation in which

4    they can rise up, often at great personal risk, and take action

5    or quietly sit down and risk nothing.  And in that moment of

6    choice, if they do nothing, no one will be the wiser, but if

7    they act, they will suffer the consequences of that action.

8          These actors and the actions they take are not always

9    understood in the moment.  Sometimes the actors are viewed as

10   criminals; their actions as violations of the established law.

11   Sometimes it takes time -- days, months, a century -- for the

12   context and meaning of those actions to be properly understood.

13   And in some cases, history, rather than vindicating them, will

14   judge them harshly.

15         The development and use of surveillance technologies

16   will be one of the defining issues of our times.  The reach of

17   these capabilities is astonishingly broad.  Governments can

18   listen in on cell phone calls, use voice recognition to scan

19   mobile networks, read e-mails and text messages, sensor web

20   pages, track a citizen's every movement using GPS, and can even

21   change e-mail contents en route to a recipient.  They can

22   secretly turn on webcams built into personal laptops and

23   microphones and cell phones not being used.  And all of this

24   information can be filtered and organized on such a massive

25   scale that it can be used to spy on every person in an entire

1    country.

2            Jeremy Hammond, a gifted computer programmer, decided

3    to use his skills to break the law.  He did so out of a concern

4    that these technologies were enabling governments and

5    corporations to gather information on individuals and

6    organizations without oversight or scrutiny.  He did so as an

7    act of protest.  And as a result of his actions and the actions

8    of others similarly committed to open government, the public

9    has become increasingly aware and increasingly concerned.

10           There are many, like our adversaries in the U.S.

11   Attorney's Office, who do not accept Jeremy's actions as acts

12   of civil disobedience.  Many who see what he did as

13   one-dimensional, criminal and malicious.  In its sentencing

14   submission, the government argues that Jeremy Hammond was

15   motivated by a malicious and callous contempt for those with

16   whom he disagreed and that this goal, demonstrated by

17   statements that he made in chat rooms, was to cause mass mayhem

18   by destroying websites and entities he disliked.

19           Contrary to the government's representations, this

20   wasn't a malicious and unfocused act against an entity with

21   whom Jeremy had a disagreement.  It was an act of protest

22   against the private intelligent industry and its ability to do

23   what the United States in theory is prohibited from doing:

24   Targeting American citizens and other populations worldwide.

25           If Jeremy spent every waking hour on-line hiding

DBFBHAMS                          Sentence

behind a screen, hacking into websites, it would lend credence

to the government's argument.  But this is not the case.  As

the Court knows, Jeremy lived an active, moral and productive

off-line life, as well as a life in which he was devoted to

helping others in a way that many of us imagine we would do if

only we had the time.  In an age where technology and computers

isolate us, where we walk around staring into tiny screens,

using social media to stay in touch with our friends, and send

text messages rather than talk to the people in our lives,

Jeremy connected with people, looked them in the eyes and made

an impact on their -- looked them in the eyes and made an

impact in their lives in extraordinarily positive ways.

          The government discounts these efforts.  In a footnote

buried deep in its submission, the government argues that

Jeremy's contributions to the public good are not worthy of

this Court's consideration because they are substantially

outweighed by the harm he caused.  The government ignores the

letters of support we received; 60 out of a total of 265 from

people who know Jeremy from his positive work in the community

of Chicago-- the communities of Chicago.  People who have

first-hand knowledge of the countless hours he spent

volunteering, teaching, tutoring, creating a community space so

groups could meet, organizing to close down local coal plants

that were poisoning the community, helping people gain skills,

find jobs, and get back on their feet.  Opening the doors of

1    his home to people who were hungry and in need and inspiring

2    others to do those same things.

3            These letters demonstrate a profound accomplishment

4    and a profound commitment to humanity, far greater than any of

5    us at the defense table can lay claim to.  And under 18 U.S.C.

6    3553(a), they are certainly worthy of this Court's

7    consideration.

8            One of the most wonderful letters attached to our

9    submission came from someone who has never met Jeremy, a father

10   of two young people attending college in Chicago, who wrote

11   after his children made him aware of Jeremy's case.  The man's

12   children were not friends of Jeremy's either.  He happened to

13   run into them on the street when they were moving their

14   belongings into a new third-floor apartment.  Jeremy happened

15   by and offered to help.  Later, after his arrest, they saw his

16   picture on the news and realized that the person who had

17   helped them was the person who now awaits sentence in this

18   case.

19           Now, this is by no means the most significant letter

20   in our submission, but I mention it because it highlights the

21   kind of person that Jeremy is.  Not many people would have

22   stopped to help, but Jeremy Hammond is the kind of person who

23   stops everything he's doing to help another human being, a

24   person who has made a tremendous real-world impact and a person

25   who feels the responsibility to make the world a better place

DBFBHAMS                          Sentence

1    in both big ways and small.

2           Jeremy Hammond broke the law.  He knew that he was

3    breaking the law and he acted at his peril.  He accepts the

4    consequences of his actions.  He does not -- and we do not --

5    minimize his actions by addressing his motivation, but his

6    motivation matters.  When Jeremy sat down at his computer and

7    broke the law, he did so with the same set of values and

8    principles that he applied to every other aspect of his life.

9    Nothing that Jeremy did in this case was for personal gain.

10   Had it been otherwise, surely he would have sought to exploit

11   the credit cards available to him, something he has never

12   done.

13          In a recent statement, Sarah Harrison, the British

14   journalist who accompanied Edward Snowden to Russia described

15   actors like Jeremy Hammond as a last line of defense in the

16   fight for transparency.  Ms. Harrison wrote, "In these times of

17   secrecy and abuse of power, when whistleblowers come forward,

18   we need to fight for them so others will be encouraged.  When

19   they are gagged, we must be their voice.  When they are hunted,

20   we must be their shield.  When they are locked away, we must

21   free them.  Giving us the truth is not a crime.  This is our

22   data, our information, our history.  We must fight to own

23   it."

24          The government has a one-dimensional view of this

25   case.  Part of the challenge may be that Jeremy Hammond's

1    actions are a new form of protest, using tactics that are,

2    concededly, violations of our federal criminal law.  But our

3    world is changing quickly as evidenced by the hundreds of

4    letters of support and thousands of people who signed on to the

5    petitions that we submitted to the Court.

6          Your Honor, Jeremy understands that you must sentence

7    him today and that you must apply the laws in force at this

8    moment.  None of us has the benefit of history hindsight or the

9    changes that will no doubt take place as our thinking and our

10   laws evolve to address the seemingly boundless use of

11   surveillance by corporations and governments and the actions of

12   people like Jeremy Hammond, who step forward to grasp truths

13   that are hidden from us.

14         Under 18 U.S.C. 3553(a), we respectfully submit that

15   after looking at all of the sentencing factors, Jeremy

16   Hammond's history and characteristics, the nature and

17   circumstances of the crime, the need to reflect the seriousness

18   of the offense to promote just punishment, to afford adequate

19   deterrents and to avoid unwanted sentencing disparities, that a

20   sentence of time served is sufficient, but not greater, to meet

21   the goals of sentencing.

22         Thank you.

23         THE COURT:  Thank you, Ms. Kunstler.

24         Ms. Kellman, did you wish to add anything?

25         MS. KELLMAN:  Yes, if I may, Judge.  As the Court

DBFBHAMS                          Sentence

1    knows, this is not the kind of case I often handle.  And I am

2    actually in the middle of a trial right now and it is a case in

3    which the government's evidence rests -- I would say virtually

4    exclusively, but I think that would be wrong -- I would have to

5    say exclusively on the words of and the testimony of people who

6    have killed more people than we can count on one hand.

7          And when I was cross-examining one of the witnesses

8    yesterday, one of the cooperators yesterday, I asked him what

9    his hope was.  And essentially he said-- for his cooperation.

10   And what he said essentially was that he hoped that he would do

11   better than other cooperators that had testified in a related

12   case.  And those cooperators had admitted on the stand under

13   oath to killing six people -- one, six; one, eight -- and

14   they were hoping to do better than another cooperator in a

15   related case who had killed 11 people and was sentenced to

16   seven years.  So for their seven and six bodies respectively,

17   they hoped to be sentenced to less than seven years.

18         I asked one of the cooperators, an older -- I thought

19   older fellow, how he felt about the sentence of "Sammy the

20   Bull" Gravano, who had killed 19 people and had the government

21   argue-- I'm sorry, advocate on his behalf for a sentence of

22   time served.  And I was struck at the notion that our

23   government, having had an opportunity to explore all that

24   Jeremy Hammond has done in this case, that the same individuals

25   who seek a ten-year sentence for Jeremy Hammond were hoping and

1   begging, beseeching a federal judge to give the man who said "I

2   looked at friends in the face and blew their heads off," but I

3   think that this man, now that he's testified on our behalf, on

4   behalf of the government, should go home today.

5           Now, I know these words will probably come back to

6   haunt me one day when I stand before the Court arguing as to

7   why my cooperator client should not spend the rest of his life

8   in jail for having looked his friends in the face and blown

9   their heads off.  But when I think about the dynamic, and in a

10  sense the absurdity of the dynamic, the government of the

11  United States arguing to set people free who have killed more

12  people than many people know and the enthusiasm and intensity

13  of their arguments as to why Jeremy Hammond, if they could,

14  should never see the light of day, but certainly spend the next

15  ten years of his life incarcerated, I'm disappointed and to

16  some extent stunned.

17          As I read through the letters that were submitted --

18  and as the Court knows, you have what we perceive to be the

19  cream of the letters -- I was taken as I really never have been

20  in a case by the kinds of things that people who knew Jeremy

21  and who didn't know Jeremy had to say about what I think we

22  can all agree, for better or worse, is an extraordinary young

23  man.

24          When I first heard about Jeremy's case and began to

25  read about it, I have a son not so different in age, just a few

years younger than Jeremy, and I thought, Wow, my son is going

in the right direction and I'm so proud of him.  And I thought,

How am I going to figure out what to say about how to defend

someone who I may not be as proud of from the things that I had

read in the newspaper and in the government's submissions and

in the indictment?

          And as I read about Jeremy, I was floored at the kind

of-- I don't know if there's a better word; I'm sure there is--

than volunteerism.  That this is a young man with an

extraordinary heart.  And the notion that the Court, as the

government suggests, that the extent of his good works pales in

comparison with the extent of his computer hacking, which the

government calls malicious -- and I think the evidence suggests

is far more a form of protest.  Had it been malicious, I think

that there would have been a much better argument for Jeremy

using or abusing the credit cards, for example, to his own

purpose, and even the government concedes that that didn't

happen.

          As I read through the materials -- and Ms. Kunstler,

of course, just highlighted one letter that stood out to her.

I couldn't even pick a letter that stood out to me because one

was more generous about the impact of Jeremy's good works and

Jeremy's good action on so many people, whether they were

children in the Chicago area who needed tutoring, needed

assistance in learning how to use a computer, needed help

getting a job and he helped them learn how to write a resume.
This is a young man who, on a daily basis, all day, every day,
when he could help someone would help that person whether he
knew them or he didn't know them.

     When I first heard that he was an excellent chef and
that he cooked for homeless people in Chicago just because they
were hungry, I thought, Well, where does he get the money for
the food?  And the answer was he didn't have money for the
food.  He found rotting food, he found storekeepers who were
throwing out food, and he collected food and he went to a soup
kitchen and he cooked the food.

     And I think to some extent there are-- one of the
problems certainly in Chicago, as I've read, is that homeless
people don't always go to shelters in order to get aid and
sometimes it's purely mental illness.  Sometimes it's purely a
fear of connecting or an alienation that comes as a part of
homelessness.  But when the people of Chicago, the homeless
people of Chicago, heard that Jeremy was cooking that night, it
was impossible to get into the soup kitchens because of the
person he was, because of the chef he was, and because they
were hungry and because he made the time to do that.

     There are so many days when I say it's a sunny,
beautiful Saturday, I think I'm going to go over to the park
and just rake and volunteer, because there's always something
in the park that needs to be done and there's always a group

that needs to do it.  And I walk my dogs and I see everybody

raking and I say, You know what?  I'm going to bring the dogs

home and I'm going to go back.  And then I start to read

something that I need to read for Monday morning and the next

thing I know it is Monday morning and I haven't gotten out to

the park and I haven't helped rake.  And I say I'm going to go

and help in the city because I can help with resumes.  And I've

signed up to do it a number of times, and then life gets in the

way and I don't do it.

        Jeremy Hammond does do it, your Honor.  As I started

to go through these letters, I have to admit one of the ones

that jumped off the page to me came from a childhood hero of my

own, and that was Daniel Ellsberg, somebody who stood up to the

government then in a way that we weren't accustomed to seeing,

or at least I wasn't.  And in my young life as a college

student, it made an impact on me.

        In his letter to the Court -- which was not solicited

by us, your Honor, but Mr. Ellsberg called us and asked if he

could submit a letter on our behalf.  He wrote to the Court

that "The actions taken by Jeremy Hammond need to be viewed in

a context that considers the profound consequences of private

surveillance of public activists in the United States."  We

create a whistleblower statute to create whistleblowers, but

when people blow their whistles, we don't like it and we don't

like what we hear.

DBFBHAMS                              Sentence

1          I could summarize, and would love to be able to

2    summarize, every letter that we highlighted in our submission

3    to the Court, but I know that your Honor has read them and I

4    know that your Honor will take them to heart.  I've never

5    really seen a collection of letters in which so many people had

6    so many genuine good things to say about the human being and

7    took the time to say it.  Not because they thought it was

8    right.  That, I'm sure, was a piece of it.  But to a large

9    extent, your Honor, I believe they took the time because Jeremy

10   took the time.  Because he made it his life's work to take the

11   time, to make that moment when he could make a positive impact

12   on somebody else's life.

13          I would love to imagine what happens to the young

14   children whose computer skills are improved by Jeremy's

15   tutoring; the young students whose math skills are improved;

16   the kids who don't make it at school and somehow connected with

17   Jeremy; the teachers who wrote to the Court and said his

18   enthusiasm was infectious and other students improved because

19   they wanted to be more like Jeremy because his enthusiasm for

20   learning was infectious.

21          I was told a story early on about Jeremy that I was

22   unclear about how I would respond to it.  And at the moment I

23   thought, well, I was glad he wasn't my child.  And I don't mean

24   that anymore.  But Jeremy went into an Apple computer store one

25   day and was playing on the computers that are spread all over

the store.  And he hacked into their computer system and he put

their financial data on the screen.  All the screens.  And it

took a long time for them to-- not long.  It took a while for

them to figure out that that's what was happening.  By the time

they figured it out, all of the geniuses were at the bar-- and

I use that word literary-- were at the bar in the back trying

to figure out what had gone on.  And the one person sitting

there was Jeremy.  And he said, "You know, your systems are

really, really easily penetrated, but I can show you how to fix

that."  And he spent the rest of the afternoon making their

systems impenetrable.

        Now, is there a maliciousness in this?  I don't think

so.  Is it fair to call it impish?  I don't think so.  On the

other hand, he served a very real purpose to Apple at that

particular time and he did it in a way that was probably more

dramatic than was called for, but at the end of the day,

everybody at Apple was extremely happy that Jeremy Hammond had

been in the store that day.  Not just in that store, but

systemwide.

        And I recount that story for the Court because I think

that it does help us to understand that the government's view

of the malicious nature of Jeremy's hactivism is not real.  As

Ms. Kunstler said, your Honor, motivation matters.  And I think

that here what motivated Jeremy, I think he's made it very

clear in everything he's tried to do that his motivation

1    matters.  He's not motivated by personal financial gain.  He's

2    motivated in one of the more naive ways I've ever seen:  To

3    make this world a better place.  And there are days when his

4    hactivism doesn't really ring true.  On the other hand, there

5    are so many ways that I think at a time when our culture is

6    undergoing extraordinary changes at a pace that I think we

7    can't even appreciate, I think Jeremy Hammond has a handle on

8    that.

9            Your Honor, Jeremy Hammond understands that you must

10   sentence him today and that you must apply the laws that are in

11   force at this moment.  None of us has the benefit of history,

12   hindsight, or changes that will no doubt take place in our

13   thinking.  Jeremy Hammond faces a guidelines sentence of ten

14   years.  He had several co-defendants in this case and the

15   co-defendants have been sentenced to far less time than ten

16   years.  Two, I believe, got 32-month sentences and others got

17   in the two-year range.

18           This Court has tremendous power and tremendous

19   authority when it comes to sentencing.  And I raise those other

20   sentences by way of 3553 and the Court's ability to take into

21   consideration great disparities in sentencing.  But really,

22   Judge, it is not the centerpiece of our argument on behalf of

23   Jeremy Hammond.  The centerpiece of our argument is a young man

24   with high hopes and unbelievably laudable expectations and

25   motivations.  A young man who has made a very, very positive

1   difference in the world around him.

2          And as I just circle back to the individuals on behalf

3   of whom the government advocates on a regular basis in this

4   courthouse, individuals that have killed as many people as they

5   know, there is no hope that when they get out they'll do

6   better, but they will get out.  Jeremy Hammond has

7   extraordinary range.  He is a young man of great brilliance and

8   great potential.  And I think that if the Court were to give

9   him the benefit of the doubt, that he will make a very positive

10   difference in our world one day.  And I commend that as my last

11   thought to the Court.

12          Thank you, Judge.

13          THE COURT:  Thank you, Ms. Kellman.

14          Mr. Hammond, do you wish to speak on your own behalf?

15          THE DEFENDANT:  Yes, ma'am.

16          MS. KUNSTLER:  Could Mr. Hammond stand at the podium.

17          THE COURT:  Yes, ma'am.

18          THE DEFENDANT:  Sorry.  I'm actually sick right now.

19          Good morning.  My name is Jeremy Hammond and I'm here

20   to be sentenced for hacking activities carried out during my

21   involvement with Anonymous.  I have been locked up at MCC for

22   the past 20 months and I have had a lot of time to think about

23   how I will explain my actions today.

24          But before I begin, I want to take a moment to

25   recognize the work of the people who have supported me.  I want

DBFBHAMS                           Sentence

to thank all the lawyers and others who have worked on my case:
Elizabeth Fink, Susan Kellman, Sarah Kunstler, Emily Kunstler,
Margaret Kunstler, Grainne O'Neill, and many others.  I also
want to thank the National Lawyers Guild, the Jeremy Hammond
Defense Committee and Support Network, Free Anons, the
Anonymous Solidarity Network, Anarchist Black Cross, and all
others who have helped me by writing letters of support,
sending me letters, attending my court dates, and spreading the
word about my case.  I also want to shout out all my brothers
and sisters behind bars and those who are still out there
fighting the power.

        The acts of civil disobedience and direct action that
I am being sentenced for today are in line with the principles
of community and equality that have guided my life.  Yes, I
hacked into dozens of high-profile corporations and government
institutions, understanding very clearly that what I was doing
was against the law and that my actions could land me back in
federal prison, but I felt I had an obligation to use my skills
to expose and confront injustice and to bring the truth to
light.

        Now, could I have achieved the same goals through
legal means?  While I have tried everything from voting
petitions to peaceful protests, I have found that those in
power do not want the truth to be exposed.  And that when we
speak truth to power, we are ignored at best and brutally

DBFBHAMS                          Sentence

suppressed at worst.  We are confronting a power structure that
does not respect its own system of checks and balances, never
mind the rights of its own citizens or the international
community.

        My introduction to politics was when George W. Bush
stole the presidential election in 2000.  Then he took
advantage of the waves of racism and patriotism after 9/11 to
launch unprovoked imperialist wars against Iraq and
Afghanistan.  And I took to the streets in protest naively
believing that our voices would be heard in Washington and that
we could stop the war.  Instead, we were labeled as traitors,
we were beaten, and arrested.

        And I have been arrested for numerous acts of civil
disobedience on the streets of Chicago, but it wasn't until
2005 that I started using my computer skills to break the law
as a form of political protest.  I was arrested by the FBI for
hacking into the computer systems of a right-wing, pro-war
group called Protest Warrior, an organization that sold racist
T-shirts on their website and regularly harassed anti-war
groups.  I was charged under the Computer Fraud and Abuse Act,
and the "intended loss" in my case was arbitrarily calculated
by multiplying the five thousand credit cards in Protest
Warrior's database by $500, resulting in a total of $2.5
million lost.  My sentencing guidelines were calculated on the
basis of this "loss" even though not a single credit card was

used or distributed, by me or anyone else.  And for that I was

sentenced to two years in prison.

       And while in prison I have seen for myself the ugly

reality of how the criminal justice system destroys the lives

of the millions of people held captive behind bars.  The

experience solidified my opposition to repressive forms of

power and the importance of standing up for what you believe.

       When I was released, I was eager to continue my

involvement in the struggle for social change.  I didn't want

to go back to prison, so I focused on aboveground community

organizing.  But over time I became frustrated with the

limitations of peaceful protest, seeing it as reformist and

ineffective.  And all the time the Obama administration

continued the wars in Iraq and Afghanistan, escalated the use

of drones, and failed to close Guantanamo Bay.

       Around this time, I was following the work of groups

like WikiLeaks and Anonymous.  It was very inspiring to see the

ideas of hactivism coming to fruition.  I was particularly

moved by the heroic actions of Chelsea Manning, who had exposed

the atrocities committed by U.S. forces in Iraq and

Afghanistan.  She took an enormous personal risk to leak this

information, believing that the public had a right to know and

hoping that her disclosures would be a positive step to end

these abuses.  It is heart-wrenching to hear about her cruel

treatment in military lockup.

DBFBHAMS                              Sentence

1          I thought long and hard about choosing this path

2     again, and I had to ask myself if Chelsea Manning fell into the

3     abysmal nightmare of prison fighting for truth, could I in good

4     conscience do any less if I was able?  I thought the best way

5     to demonstrate solidarity was to continue the work of exposing

6     and confronting corruption.

7          I was drawn to Anonymous because I believed in

8     autonomous, decentralized direct action.  At the time,

9     Anonymous was involved in operations in support of the Arab

10    Spring uprisings against censorship and in defense of

11    WikiLeaks.  I had a lot to contribute, including technical

12    skills and how to better articulate ideas and goals.  It was an

13    exciting time, the birth of a digital dissent movement, where

14    the definitions and capabilities of hactivism were being

15    shaped.

16         I was especially interested in the work of the hackers

17    of LulzSec, who were breaking into some significant targets and

18    becoming increasingly political.  Around this time, I first

19    started talking to Sabu, who was very open about the hacks he

20    supposedly committed, and he was encouraging hackers to unite

21    and attack major government and corporate systems under the

22    banner of Anti Security.  But very early in my involvement, the

23    other LulzSec hackers were arrested, leaving me to break into

24    computer systems and write press releases.  Later, I would

25    learn that Sabu had been the first one arrested, and that the

1   entire time I was talking to him, he was an FBI informant.

2           Anonymous was also involved in the early stages of

3   Occupy Wall Street.  I was regularly participating on the

4   streets of Chicago as part of Occupy Chicago and I was very

5   excited to see a worldwide mass movement against the

6   injustices of capitalism and racism.  In several short months--

7   in several short months, the occupations came to an end, closed

8   by police crackdowns and mass arrests of protestors who were

9   kicked out of their own public parks.  The repression of

10  Anonymous and of the Occupy movement set the tone for AntiSec

11  in the following months.  Indeed, the majority of our hacks

12  against police targets were in retaliation for the arrests of

13  our comrades.

14          I targeted law enforcement systems because of the

15  racism and inequality in which the criminal law is enforced.  I

16  targeted the manufacturers and distributors of military and

17  police equipment who profit from weaponry used to advance U.S.

18  political and economic interests abroad and to repress people

19  at home.  I targeted information security firms because they

20  work in secret to protect government and corporate interests at

21  the expense of individual rights, undermining and discrediting

22  activists, journalists and other truth seekers and spreading

23  disinformation.

24          I had never even heard of Stratfor until Sabu brought

25  it to my attention.  At the time Sabu was encouraging people to

DBFBHAMS                        Sentence

invade systems, and helping to strategize and facilitate

attacks.  He even provided me with vulnerabilities of targets

passed on by other hackers, so it came as a great surprise when

I learned that Sabu had been working for the FBI the entire

time.

On December 4th, 2011, Sabu was approached by another

hacker who had already broken into Stratfor's credit card

database.  Sabu, under the watchful eye of his government

handlers, then brought the hack to AntiSec by inviting this

hacker to our private chat room, where he supplied download

links to the full credit card database as well as the initial

vulnerability access point to Stratfor's systems.

I spent some time researching Stratfor and upon

reviewing the information we were given, decided that their

activities and client base made them a deserving target.  I

find it ironic that Stratfor's wealthy and powerful customer

base had their credit cards used to donate to humanitarian

organizations, but my main role in the attack was to retrieve

Stratfor's private e-mail spools, which is where all the dirty

secrets are typically found.

It took me more than a week to gain further access

into Stratfor's internal systems, but I eventually broke into

their mail server.  There was so much information that we

needed several servers of our own in order to transfer the

e-mails.  Sabu, who was involved with the operation at every

DBFBHAMS                          Sentence

step, offered a server, which was provided and monitored by the

FBI.  Over the next weeks, the e-mails were transferred, the

credit cards were used for donations, and Stratfor's systems

were defaced and destroyed.  But why the FBI introduce us to

the hacker who found the initial vulnerability and allow this

hack to continue remains a mystery.

        As a result of the Stratfor hack, some of the dangers

of the unregulated private intelligence industry are now

known.  It had been revealed through WikiLeaks and other

journalists around the world that Stratfor maintained a

worldwide network of informants that they used to engage in

intrusive and possibly illegal surveillance activities on

behalf of large multi-national corporations.

        After Stratfor, I continued to break into other

targets, using a powerful "zero day exploit" allowing me

administrator access to systems that ran the popular Plesk

web-hosting platform.  Sabu asked me many times for access to

this exploit, which I consistently refused to give him.

Without his own independent access, Sabu supplied me with

lists of these vulnerable targets that he had found on Google.

I broke into numerous websites that he supplied, uploaded the

stolen e-mail accounts and databases onto Sabu's FBI server,

and handed over passwords and back doors that enabled Sabu,

and by extension the FBI handlers, to control these targets.

        These intrusions, all of which were suggested by Sabu

```
 1    while cooperating with the FBI, affected thousands of domain

 2    names and consisted largely of foreign government websites,

 3    including those of Turkey, Brazil, Iran --

 4              THE COURT:  Mr. Hammond, you've just heard that we

 5    have redacted those.  I would appreciate it if you did not read

 6    them out.

 7              THE DEFENDANT:  In one instance, Sabu and I provided

 8    access to hackers who went on to deface and destroy many

 9    websites belonging to the governments of many country names.

10              THE COURT:  Thank you, sir.

11              THE DEFENDANT:  I don't know how other information I

12    provided to him may have been used, but I think the

13    government's collection and use of this data needs to be

14    investigated.

15              The government celebrates my conviction and

16    imprisonment, hoping that it will close the door on the full

17    story.  I took responsibility for my actions by pleading

18    guilty, but when will the government be made to answer for its

19    own crimes?

20              The U.S. hypes the hacker threat in order to justify

21    the multi-billion-dollar cybersecurity industrial complex, but

22    it is also responsible for the same conduct it aggressively

23    prosecutes and claims to work to prevent.  This hypocrisy of

24    law and order and the injustices caused by capitalism cannot be

25    cured by institutional reform, but through civil disobedience
```

1    and direct action.

2              Yes, I broke the law, but I believe that sometimes

3    laws must be broken in order to make room for change.  This is

4    not to say that I do not have any regrets.  I realize that I

5    released the personal information of innocent people who have

6    had nothing to do with the operations of the institutions that

7    I had targeted.  I apologize for the release of data that was

8    harmful to individuals and that were irrelevant to my goals.

9    I believe in the individual right to privacy, from government

10   surveillance and from actors like myself, and I appreciate

11   the irony of my own involvement in the trampling of these

12   rights.

13             But I am committed to working to make this world a

14   better place for all of us.  I still believe in the importance

15   of hactivism as a form of civil disobedience, but it is time

16   for me to move on to other ways of seeking change.  My time in

17   prison has taken a toll on my family, friends and community,

18   and I know that I am needed at home.  I recognize that seven

19   years ago I stood before a different federal judge facing

20   similar charges, but this does not lessen the sincerity of what

21   I have to say to you today.

22             It has taken a lot for me to write this, to explain my

23   actions, knowing that doing so honestly could cost me many more

24   years of life in prison.  And I am aware that I could get as

25   many as ten years, but I hope that I do not as I believe that

1    there is still much work to be done.

2              So stay strong and keep struggling.

3              THE COURT:  Thank you, sir.

4              Does the government wish to be heard?

5              MS. NIDIRY:  Yes.  Thank you, your Honor.

6              Jeremy Hammond was not a whistleblower.  The way the

7    government has-- the reason the government says that is not

8    simply because we don't like what he did.  The reason we say

9    that is because of the evidence.  And the evidence --

10             THE COURT:  Ms. Nidiry, you're going to have to keep

11   your voice up.  You're dropping your voice at the end of the

12   sentences.

13             MS. NIDIRY:  The evidence regarding, in particular,

14   his motivation-- and I'll get to other factors later.  With

15   regard to his motivation, as we set out in our submission, the

16   evidence of his motivation that comes from what he said when he

17   was anonymous, when he thought he wasn't going to get caught,

18   that's when he explained to his co-conspirators why he was

19   doing what he was doing.  And what he said was I want to cause

20   financial mayhem, mass mayhem.  I am really excited because

21   there is a home address of an FBI agent that we can release.

22   Spend those credit cards.  Go buy things on those credit cards.

23   That's what he said when he was anonymous, when he was did not

24   think he was going to get caught.

25             And when we sit here today, when the Court sits here

1    today and tries to judge, to sentence him based on his

2    offenses, 3553 obviously says you have to look at all of the

3    factors, the nature and circumstances of the offense and, in

4    particular, with regard to this defendant, I think the nature

5    and the characteristics of the defendant.

6            Based on what we know he did, based on the evidence at

7    the time, what we can say for sure is Jeremy Hammond was an

8    experienced hacker who used his skills through a variety of

9    different entities, from police retirement systems to the FTC's

10   consumer protection websites to Arizona's State Public Safety

11   website, releasing thousands of credit card information,

12   personal information, home addresses, talking about releasing

13   girlfriend pictures of police officers, personal e-mails, home

14   addresses of retired police officers.

15           There is nothing about any of that that is relevant to

16   political protest.  There is nothing about any of that that is

17   altruistic.  There is nothing about any of that that is related

18   to the injustices that Mr. Hammond sees in this world.  There

19   is no altruism in any of that conduct.

20           Now, when Mr. Hammond and his counsel stand up before

21   this Court and refer to all of the letters of support for him,

22   we don't have any doubt that Mr. Hammond has done some good

23   things in his life.  As the Court sentences people all the

24   time, you know that there are people who come before the Court

25   who do good, who have also committed crimes.  The fact is you

DBFBHAMS                          Sentence

have to pay for the crimes that you commit.  And Mr. Hammond

has stood before this Court and-- well, actually, Mr. Hammond

has stood before this Court before.  He has stood before a

federal court before and he has said the same things.

          And at the time he was given leniency.  He said I did

it for the same reasons.  I did it out of altruism, out of some

idea of political protest, and the Court gave him leniency.

And what Mr. Hammond did with that leniency was to go out and

do it again.  Do it again on an exponentially larger scale.

That was one website; now it is tens of hundreds of websites.

That was five thousand credit cards; now it is thousands, tens

of thousands of credit cards.  That was one political website

he disagreed with; now it's been tens of websites that are

political, that are state and local municipal governments, that

are related to retirement, related to public safety.  I mean,

just across the board creating-- just wreaking havoc, which is

exactly what he said he wanted to do.

          Now, Ms. Kellman compared as part of, obviously, 3553,

the Court has to consider the way in which the sentence that

Mr. Hammond gets compares to others similarly situated.  And

his co-defendants did get lesser sentences in the UK, and there

is a reason for that.  They are in the situation that

Mr. Hammond was in 2006.  No prior convictions.  They hadn't

done this before and they were much younger.

          THE COURT:  And they what?

1          MS. NIDIRY:  They were much younger.  They were

2     basically-- I believe they were in their 19s to early 20s at

3     the time of the offenses.

4          Mr. Hammond now comes before the Court having done--

5     having been in their situation eight years ago and told the

6     Court he had learned a lesson, or told the Court, you know, I

7     did this for this reason and I understand that that was

8     something that I shouldn't have done.  And now he comes before

9     the Court again and there is nothing in what he said to the

10    Court that makes-- that should give the Court any comfort that

11    he will not do this again.  There's nothing that he said

12    before, and particularly given that he said the same thing

13    before, and he just went out and did it again.

14          I think it's unfortunate, that he obviously has a lot

15    of skill that he has chosen repeatedly to use for harm, used to

16    hurt other people, used to hurt thousands of people that he's

17    never met, who did nothing to him.  And with regard to this one

18    question of the fact that he did not do this for personal gain,

19    I think that that's true.  I think that that only gets you so

20    far.  If you steal a lot of credit cards and you don't use them

21    yourself, it's still a crime if you tell other people to use

22    them.  It's still a crime if you release them out in the public

23    and you don't care who uses them.

24          And so the fact that he didn't do these crimes for

25    personal gain is-- you know, it basically just means that-- it

DBFBHAMS                        Sentence

only means that:  He didn't do it for personal gain.  It

doesn't mean that these crimes weren't harmful.  It doesn't

mean that these crimes he committed didn't hurt people, didn't

hurt the public, didn't endanger the public safety of people,

particularly in the state of Arizona, did not hurt consumers,

did not hurt retired police officers and just vast logs of

people whom he harmed.

        I think, also, that Mr. Hammond has made an effort to

try and deflect responsibility for his role in particular in

the Stratfor hack.  He says he accepts responsibility because

he pled, but now in his submission and today he talks a lot

about how it was essentially the FBI cooperator who set him up

to do it.

        The fact is that Mr. Hammond came to the conspiracy

six months earlier with the Arizona Department of Public Safety

hack, which he himself had done and he brought it eagerly.  And

when, in the course of the conspiracy, obviously as they're

investigating it, they need to try and figure out who these

various people are.  And Mr. Hammond was there and as the

evidence shows, once he learned about the Stratfor hack, he was

the one who delved into it and who perfected it.  He was the

one who was directing the co-conspirators in the chat room

about what to do with the credit cards.  Go buy onion servers,

go donate to this.  He was the one who basically spent hours,

in his own words, before he was arrested, he was the one who

1    was explaining what they have and what they could do with it.

2            So he was not a mere bystander who released e-mail

3    spools.  He was the person who was in the middle of this hack,

4    who collected all of the information and released it, including

5    the credit card numbers and all of the other personal

6    information.

7            I think that based on all of the harm that this

8    defendant did to the thousands of people, to the public, the

9    cost to the states, the cost to public safety, based on his own

10   statements about his motivations before he was arrested, based

11   on his role in the offense and based on the fact that he stands

12   before this Court, having stood before another federal court

13   before, there is no reason to think that 120 months is not a

14   sufficient-- is not warranted in this case.  Under 3553, I

15   think the evidence shows that 120 months is sufficient-- is

16   an appropriate sentence that is not more than what is

17   warranted.

18           Thank you.

19           THE COURT:  Ms. Kunstler, Ms. Kellman, did you wish to

20   add anything?

21           MS. KELLMAN:  If I may, Judge, just briefly.

22           THE COURT:  Yes, ma'am.

23           MS. KELLMAN:  I want to be clear about just a few

24   things that I think it's fair to say that will come into the

25   Court's consideration, I imagine.  And the first is at no time

do I perceive anything that Mr. Hammond has said or anything in

our submission meant to suggest -- and I think the Court knows

that it doesn't suggest -- that in any way, manner, shape or

form Jeremy Hammond is suggesting that he is somehow

deflecting responsibility and claiming that he was set up.  He

has never said anything like that.  He does not feel that way,

nor do I think either of his counsel has said anything that

way.

        What Mr. Hammond has said, and has stood by, is that

the government's cooperator who was being supervised by the FBI

certainly helped him focus on the kinds of targets the FBI was

interested in having him focus on.  Did he go along willingly?

He certainly did.  Was he intrigued at his ability to

accomplish these hacks?  He was.  But the notion that he

somehow seeks to deflect his responsibility I think is

completely erroneous.

        He was in the moment certainly happy to cooperate with

the government's cooperator, clearly having no idea that he was

just that, a government's cooperator, but that is not to

suggest at all that he doesn't understand that what he did, he

did of his own choice, of his own free will.  And I think that

that's an unfair suggestion on the part of the government.

        I do think, as Mr. Hammond said, that he recognizes

the irony in the use of the credit cards having been used for

good works in its own twisted way.  I don't suggest for a

moment, nor does he, that it justifies what happened with those

credit cards.  And he recognizes and has apologized for the use

of anybody's private personal-- personal credit cards on the

one hand.  On the other hand, as the government concedes,

nothing that was acquired in this way was used in any way to

line his pockets or to in any way increase his financial

position.

        I think it's important to also point out, Judge, that

in our view it's unfair for the government to say that he's

been in this situation before and he's not learned his lesson.

Jeremy Hammond has spent 20 months in prison.  The government

argues that our request for a nonguidelines sentence should be

ignored because Jeremy has already had leniency.  I think that

that's an unfair statement.

        In 2006, your Honor, Jeremy Hammond, 19 years old,

received a two-year sentence for hacking a website of an

organization that targeted war protestors.  This offense, his

first felony, was committed, as I said, as a teenager and

resulted in his prior sentence.  But while the sentence was, in

fact, a departure from the guidelines, which the government

highlights in its own papers, the reality is that the loss

numbers, which drove the sentencing guidelines in the first

instance, were extraordinarily and artificially inflated.  They

were based on fictional losses, which of course we all

recognize the guidelines has the ability to do, but we also

1   recognize the unfairness in that sort of calculation because in

2   that case the credit cards were never used.  The probation

3   department assigned an arbitrary average amount that could have

4   been abused to every card and multiplied and came up with an

5   astronomical potential loss figure, notwithstanding that there

6   was no loss in that case at all.  And so I think that while the

7   sentence itself constituted a departure, the reality is that it

8   was a departure based on a fiction to begin with.

9           Mr. Hammond stands before the Court, your Honor, fully

10  accepting of his role in this case and of his responsibilities,

11  understanding what his hacks have caused in terms of the harm

12  that the government sees and points out to the Court, but also

13  understanding that the work that he did has, to some extent,

14  opened all of our eyes to what's been happening behind closed

15  doors in a corporate America that is less transparent than our

16  government ought to be to us.

17          I just want to read, if I may, Judge, in closing --

18          THE COURT:  Before you finish, Ms. Kellman, I didn't

19  understand your second point where you were talking about the

20  government's position that Mr. Hammond had been in this

21  situation before and hasn't learned his lesson.  I'm not sure

22  how you're distinguishing the other situation.

23          MS. KELLMAN:  Your Honor --

24          THE COURT:  I take your point on the loss amount.

25          MS. KELLMAN:  Yes, ma'am.

1    THE COURT:  But I'm not understanding the "didn't

2    learn your lesson" part.

3         MS. KELLMAN:  Well, I think that-- fair enough, Judge.

4    I think that the learning the lesson piece is an important

5    factor here, Judge, because I think that --

6         THE COURT:  I do, too.  That's why I'm asking.

7         MS. KELLMAN:  I know.  I think that Mr. Hammond has

8    tried his best, your Honor, to explain to you that from the

9    time he was released from prison on that sentence until the

10   time he was arrested here, he did what he thought was

11   everything he could to try to open up what he thought were

12   abuses and tried to air abuses that he thought were going on

13   behind closed doors.

14        And he lost his way and thought that the only way he

15   could make the impact was with the skill that he has, and that

16   is hactivism.  And in a sense it's one of the reasons, Judge,

17   that I did want to read, if I may, from-- and then I'll get

18   back to the Court's point because I do know how important it

19   is.

20        But Professor Peter Ludlow from Northwestern

21   University speaks, I think to a large extent -- he's, I think,

22   a professor of philosophy at Northwestern, and he took the time

23   to write a very thoughtful letter to your Honor.  And I think

24   that he helps-- he helped me to understand what it was that

25   Jeremy's goals were here and what Jeremy's work has meant in

terms of its impact on our culture.  And, yes, he has done

what he did before, but he believes that he did it with a

higher purpose.  It wasn't a purpose to hurt, but a purpose to

expand everybody's understanding of what's been going on

vis-a-vis the public security-- public intelligence community

and the private connections that its made, the private

corporate connections that it's made, and the way that that

masks what our government is doing to the average person.

Professor Ludlow writes that "Jeremy Hammond's

exploratory hacks helped expose the scope and nature of the

private intelligence industry.  Along the way he exposed a

well-organized and well-funded system of deception and

targeting American citizens and other populations worldwide.

He showed that the deceptions were systematic, sometimes

illegal, and oftentimes nothing more than extraordinarily

disturbing.

"Few people realize that in addition to the familiar

U.S. government intelligence agencies-- the FBI, the NSA and

the CIA-- and military intelligence operations, there are also

a number of private intelligence corporations, a sector of the

intelligence community that was not well known, but was massive

in its scope.

"Tim Shorrock, author of *Spies for Hire:  The Secret*

*World of Intelligence Outsourcing*, cites government estimates

that by 2006 $42 billion of the $60 billion spent annually by

DBFBHAMS                          Sentence

1    the United States government on foreign and domestic

2    intelligence was going to private intelligence firms, meaning

3    that about 70 percent of the money spent on intelligence was

4    being outsourced to entities over which the American public had

5    no ability to learn.  This also means that most of the

6    intelligence activities take place outside of the oversight

7    that governments have put in place lo these many years,

8    oversights that apply to the CIA, the NSA and the FBI.  And

9    of course the American U.S. government is far from the only

10   customer of these services.  They also provide intelligence

11   services to multi-national corporations and lobbying

12   groups."

13            I know that the Court has read our submissions with

14   respect to some of the specific good that Jeremy's work has

15   accomplished.  And specifically, just for examples, I speak

16   about the exposure of some of the e-mails that had to do with

17   People for the Ethical Treatment of Animals, the PETA

18   litigation, and also the Bhopal situation.

19            And I think that those things on balance, your Honor,

20   those kinds of disclosures and those kinds of-- and I don't

21   mean the specific disclosures, but the notion that those things

22   have been able to be kept under the radar and under the wire by

23   systems that were designed to make them unavailable to the

24   public are far more-- are far more of an irritant -- I think is

25   just so not strong enough a word -- but far more of an irritant

1    than a young man, 19 years old, making what the government

2    views as the same mistake, but what he views -- and it is what

3    it is, Judge.  He views what he does as extraordinary-- as

4    having an extraordinarily positive impact.  He understands it

5    breaks the law.  He has urged the Court in writing, through our

6    papers and in his own words, that this is his form of civil

7    disobedience and that he hopes it will bring about a change

8    that we need to have in the way our government outsources the

9    works that it doesn't want its citizens to know about.

10            You know, when the settlers in the 1600s decided that

11   they didn't want to be a part of the British Empire, their

12   work, their good work, became known as the Revolutionary War.

13   And had they not stood up to the king and said, We don't want

14   to live this way anymore, we want to be able to make our own

15   rules -- I don't suggest that Jeremy Hammond ought to be able

16   to make the rules for this country.  I do suggest that it is a

17   very extraordinary step for a young man to take to not be

18   afraid of the consequences; to be able to say I think what our

19   government is doing ought to be exposed to the light, without

20   making a judgment it's right or it's wrong, but it needs to be

21   exposed to the light.

22            And I think that to make the analogy in the sense that

23   the government does, that he did it wrong once and he's doing

24   it again and it's criminal once and it's criminal again, in

25   some respects -- and I certainly don't mean to be

disrespectful -- is in some respects to not recognize what he

hoped to accomplish, and that is to open everybody's eyes to

what it is our government is doing.

You know, I was fascinated by listening to

congressional hearings, as I have in the last few months, about

the impact of disclosures like WikiLeaks and Anonymous and the

like.  And the members of Congress saying, well, I had no idea.

I had no idea.  I didn't know this was going on.  I doubt

that's accurate, and I think we know to some extent it's not

accurate.

But I do think that a tremendous amount of pressure is

now being put on government to say-- to reevaluate what it is

that we, as a government, ought to be able to keep secret,

ought to be able to make public.  And it is the beginning, I

believe, of this debate and not the end of it.  Because we are

as a culture, as a digital culture, moving so-- moving quickly,

moving forward so quickly, and maybe faster than some of us

move.  Maybe faster than institutions move.

But I think that it is in a way sophomoric to suggest

that the only thing that Jeremy did here had bad impact on our

country and was bad because it broke the law.  He recognizes

that what he did broke the law.  And I think that-- and I hope

that he recognizes that he can be an incredibly positive

influence without breaking the law from outside a prison cell;

that he can accomplish a lot more within the framework of our

DBFBHAMS                    Sentence

1    government than he can by being locked in a prison cell where

2    he has no access to the people he'd like to touch and the lives

3    he'd like to reach.

4           And I hope that that-- I think that that resonates

5    inside of him.  I hope that it was communicated to the Court in

6    his statements.  He recognizes what he did violated the law.

7    He hopes that somebody can see, that the Court can see, that

8    there is a higher purpose.  And whether that higher purpose,

9    Judge, is enough to -- certainly I recognize this Court's not

10   going to say, Oh, yeah, great idea and, you know, no

11   punishment.  That isn't to say that a sentence of time served

12   with a humongous community service component, which is

13   something that this young man excels at and something that

14   comes from inside what is very, very good about Jeremy Hammond,

15   will make a substantial difference in his world and also in our

16   world.

17          Thank you, Judge.

18          THE COURT:  Thank you.

19          MS. KUNSTLER:  Your Honor, if I may.

20          THE COURT:  Counselor.

21          MS. KUNSTLER:  I just want to speak a little bit to

22   the piece of Mr. Hammond having-- this being Mr. Hammond's

23   second offense, second similar offense.

24          Your Honor, I've read, and I'm sure the Court has the

25   transcript the government provided from the first-- from his

DBFBHAMS                      Sentence

first sentencing from the hacking offense when he was 19.   And
I've worked with Mr. Hammond on his statement today and talked
to him and listened to what he finally came to in terms of what
his insight is and what he plans to do and what his future
holds for him.

         You know, over the past two years that I've known him
in this case, we've spent a lot of time talking about that.
And I don't think it's fair for the government to say he's
saying the same thing again, because I don't think he's saying
the same thing again.   I think that Jeremy Hammond at 28 is
different from Jeremy Hammond at 19.   I think-- and I was
looking at the text of what he read to the Court several
minutes earlier.   You know, I think after the first two
years he spent in prison, and the almost two years he spent
now, have had an impact on him.   We've spoken about this
impact.

         Jeremy Hammond told the Court that he's committed to
making this world a better place.   That he still believes in
the importance of hactivism as a form of civil disobedience,
but that he recognizes that it's time for him to move on to
other ways of seeking change.

         He also has the insight to recognize the toll that his
time in prison has taken on his friends, family and community,
and that he's needed at home.   These are the words of a
28-year-old person who thinks differently about the world and

DBFBHAMS                         Sentence

```
1    his role in it than the 19-year-old person who did the

2    Protest Warrior hack and the person who spoke at his prior

3    sentencing.  I think there is a substantive difference in what

4    he's saying and how he feels about what he plans to do with his

5    future.

6              Thank you.

7              THE COURT:  Thank you.

8              Anything else from the government?

9              MS. NIDIRY:  No, your Honor.  Thank you.

10             THE COURT:  Are there any victims here who wish to be

11   heard?

12             MR. SUKER:  I'm a victim.

13             THE COURT:  Thank you.  Yes, sir.  Come forward,

14   please.

15             And, sir, the second man who put his hand up, if you

16   come forward so you're up here when it's time.  Come and have a

17   seat here in front of the rail, sir.

18             Sir, would you come up and tell us your name,

19   please.

20             MR. SUKER:  David Suker.

21             THE COURT:  Excuse me, sir.  Won't you sit right there

22   by the rail.  Yes, sir.  Thank you.

23             Yes, sir.

24             MR. SUKER:  David Suker.

25             THE COURT:  Spell it, please, sir.
```

1           MR. SUKER:  S-u-k-e-r.

2           THE COURT:  Yes, sir.

3           MR. SUKER:  I'm a victim because of the FBI

4    repression.

5           THE COURT:  Are you a victim of the crime?

6           THE DEFENDANT:  Yes.

7           THE COURT:  Okay.

8           THE DEFENDANT:  I've been repressed --

9           THE COURT:  Ladies and gentlemen, it makes it very

10   difficult for me to hear and very difficult for the court

11   reporter to take it down if there's noise.

12          How are you a victim of this crime, sir?

13          MR. SUKER:  I've been under surveillance by the FBI

14   and the United States --

15          THE COURT:  You're not a victim of Mr. Hammond's

16   crime, sir.

17          MR. SUKER:  Okay.  All right.

18          THE COURT:  You may be seated, sir.

19          MR. SUKER:  No, no, no, no.  I'm going to finish.

20          THE MARSHAL:  Sir, have a seat.

21          MR. SUKER:  My son is being taken away from me.

22          THE MARSHAL:  Have a seat.

23          MR. SUKER:  All power to the people.

24          THE MARSHAL:  Have a seat.

25          MR. SUKER:  All power to the people.

DBFBHAMS                    Sentence

1              THE COURT:  Is there another victim of Mr. Hammond's

2      crime?

3              Come right up, sir.  Tell me your name, sir.

4              MR. TOCCE:  My name is Vincent Louis Tocce.

5              THE COURT:  Spell your last name, please, sir.

6              MR. TOCCE:  T-o-c-c-e.  It's Italian.

7              THE COURT:  Thank you.

8              MR. TOCCE:  It's pronounced Tocce in Italian.

9              THE COURT:  Thank you.  How are you have a victim of

10     Mr. Hammond's crime?

11             MR. TOCCE:  Well, Mr. Hammond's friends have been

12     harassing me on-line ever since he's been in jail.

13             THE COURT:  Talk to me.

14             MR. TOCCE:  Okay.  All right.  I'm sorry.

15             THE COURT:  It's very hard to hear if you're not in

16     the microphone.

17             MR. TOCCE:  Got you.  Thank you.

18             I-- first of all, I'm a victim of the CFAA myself.  I

19     was convicted of a federal crime.  I pleaded -- pled guilty to

20     unauthorized access to protect a computer.  So I'm kind of

21     familiar with --

22             THE COURT:  Okay.  But tell me how Mr. Hammond's crime

23     affected you, sir.

24             MR. TOCCE:  Okay.  Okay.  No problem.  I'll make it

25     brief.  Over the past year, I've gotten to know some of

DBFBHAMS                    Sentence

1   Jeremy's friends, and I've had to change my home phone number.

2   I don't have a home phone number anymore.  I don't have a home

3   address.  You can look me up on the internet.  Try to find

4   where I live.  I don't have a house anymore.

5           THE COURT:  How did Mr. Hammond's crime affect you,

6   sir?

7           MR. TOCCE:  His sympathizers -- his sympathizers have

8   been hounding me for over a year.  I have had my parents' house

9   swatted.  Do you know what swatting is?

10          THE COURT:  I don't, sir.  Sir.  Sir.  Sir, if you

11  want me to understand you --

12          MR. TOCCE:  I'm a victim.

13          THE COURT:  Okay.  Sir, if you want me to understand

14  you, talk to me.

15          MR. TOCCE:  You got it.

16          THE COURT:  All right.

17          MR. TOCCE:  Just me and you.

18          THE COURT:  Yes.

19          MR. TOCCE:  I apologize.  I apologize.  Okay.

20          THE COURT:  Now, remember, Mr. Hammond's crime was

21  hacking and distributing information.

22          MR. TOCCE:  Yes.

23          THE COURT:  How did that injure you?

24          MR. TOCCE:  I was in contact with his colleague, his

25  direct comrade, Hector Xavier Monsegur.  And Hector-- I spoke

DBFBHAMS                      Sentence

1   with Hector on several occasions.  Hector found out where I was

2   living.  He found out my-- he had a-- he had a woman come to my

3   house and live in my house with me.  I had sex with this woman.

4   He-- I can't even tell you all the stuff that's happened, but

5   let's just say I've had to change my cell phone number five

6   times.  Now I don't have a cell phone number because I'm tired

7   of changing it.  Okay?

8           These Anonymous people-- I'm sorry.  I'm sorry.

9   These Anonymous kids are misguided.  They-- I understand

10  their-- I understand their frustration.  I get it.  But I don't

11  think they have-- I don't think they know the right way to get

12  their message across.  And it's obvious that they have to

13  resort to harassment to do that, and I don't think that's cool

14  at all.

15          I've got-- I've gotten to-- after I found out about

16  Jeremy and Hector -- I never knew-- never knew that Jeremy was

17  one of the people who was harassing me.  And I certainly didn't

18  know Hector was.  Hector was very friendly to me.  He was very

19  friendly to me.

20          THE COURT:  All right.  Have we about covered the

21  damage, sir?

22          MR. TOCCE:  Okay.  Oh, sorry.  Damage.  I'll stay on

23  the damages.  You're right.  Sorry.  Okay.  So I no longer have

24  a cell phone.

25          THE COURT:  I got that.

DBFBHAMS                        Sentence

1              MR. TOCCE:  I no longer have a home.  I have a family

2    who Anonymous posted-- Anonymous posted-- Anonymous posted my

3    parents' home address and Social Security numbers on a website

4    called DocSpin.  Have you heard of DocSpin?

5              THE COURT:  Oh, sure.

6              MR. TOCCE:  No, it's a serious question.

7              THE COURT:  I haven't.

8              MR. TOCCE:  You have not?

9              THE COURT:  No.

10             MR. TOCCE:  I would suggest you look into it.

11             THE COURT:  All right, sir.

12             MR. TOCCE:  Please.  Because I'm on DocSpin --

13             THE COURT:  And what else, sir?  I take it-- sir, I

14   take it that exposes it to the world.

15             MR. TOCCE:  Exactly.

16             THE COURT:  All right.

17             MR. TOCCE:  And it's essentially like a repository for

18   hackers and ne'er-do-wellers to find people, match their nicks,

19   their nicknames, with who they are and then harass them, their

20   family --

21             THE COURT:  All right.  And that happened to your

22   parents, sir.

23             MR. TOCCE:  My parents were swatted.  My parents live

24   in San Jose, California.  I'll give you their address if you

25   want.

1          THE COURT:  That's not necessary, sir.

2          MR. TOCCE:  Okay.  Oh, by the way, it's on DocSpin if

3    you want to see it.

4          So one night-- I do a pod cast.  And my podcast --

5    since I'm a cybercriminal, I do a podcast that caters to

6    hackers, internet trolls, all those assholes.  Excuse my

7    French.  Some of these people are friendly actually, believe it

8    or not.

9          THE COURT:  Damage.

10         MR. TOCCE:  Damage.  Okay, damage.  I've had-- I've

11   had three computers rooted.  Do you know what rooted is?

12         THE COURT:  Yes, sir.

13         MR. TOCCE:  Yes.

14         THE COURT:  Ladies and gentlemen, this is not funny.

15         MR. TOCCE:  It's not funny.  I'm not trying --

16         THE COURT:  Shh.  This is a serious proceeding.  I am

17   required to ask for victims to speak and I would appreciate a

18   little quiet in here.

19         Sir, damage.

20         MR. TOCCE:  Where was-- where did I leave off?

21         THE COURT:  Rooted.

22         MR. TOCCE:  Rooted.  Okay.  I've had --

23         THE COURT:  Three.

24         MR. TOCCE:  -- at least three.

25         THE COURT:  Got it.

1        MR. TOCCE:  At least three computers rooted.  I'm

2   now-- my cell phone is downstairs.  The last cell phone I had

3   was a Nokia Brick.  You ever heard of that?

4        THE COURT:  Yes, sir.

5        MR. TOCCE:  That was my cell phone.

6        THE COURT:  Okay.

7        MR. TOCCE:  Because I didn't want anybody to-- any of

8   these assholes -- excuse my French -- to get into that

9   because --

10        THE COURT:  Okay.  So we've --

11        MR. TOCCE:  Because cell phones are vulnerable too,

12   right?

13        THE COURT:  Yes, sir.  We've pretty much covered the

14   damage though, right?

15        MR. TOCCE:  No, we haven't.

16        THE COURT:  All right.  What else?

17        MR. TOCCE:  Emotional damage.

18        THE COURT:  Yes, sir.

19        MR. TOCCE:  I spoke with Hector Xavier Monsegur at

20   least five times on the phone through his-- through his

21   e-girlfriend who went by Kieshu Zykova.  Do you know Kieshu

22   Zykova?

23        THE COURT:  Yes, sir.

24        MR. TOCCE:  Okay.  Kieshu Zykova is the one who I

25   fucked.

1          THE COURT:  Sir--

2          MR. TOCCE:  And--

3          THE COURT:  -- I want to know the damage.

4          MR. TOCCE:  This is--

5          THE COURT:  You're telling me --

6          MR. TOCCE:  This is the emotional damage.

7          THE COURT:  Let's hear it.

8          MR. TOCCE:  Okay?  These people played with my mind.

9   Hector-- okay.  Hector never told me-- he never said anything

10  like what he said to Jeremy, like tried to get me to do

11  anything.  In fact, I think Hector was actually trying to warn

12  me.  He said --

13         THE COURT:  Okay.  But that's not damage.

14         MR. TOCCE:  No -- well, let me get to this.

15         THE COURT:  All right.  Let's get to it now.

16         MR. TOCCE:  Okay.  All right.  Let's just put it this

17  way:  Hector spooked me.  Bad.  When all of the LulzSec people

18  were gone, I was starting to fear for my life.  I didn't know

19  who I was dealing with.  I was-- I was-- I was very -- I was

20  very scared.  At the same time this is when I'm getting prank

21  calls, I'm getting text bombed.  You ever --

22         THE COURT:  Yes.

23         MR. TOCCE:  -- been text bombed?

24         THE COURT:  Yes, sir.

25         MR. TOCCE:  You ever been pizza bombed?  I was pizza

1   bombed several times.  You ever been Chinese food bombed?

2            THE COURT:  I think I've got the picture.

3            MR. TOCCE:  Okay.

4            THE COURT:  Anything else, sir, that you wish to add

5   that you haven't said to me?

6            MR. TOCCE:  I think the emotional damage is -- was the

7   most-- the most hurtful because I eventually left the internet.

8   Once I saw that all of Hector's friends were gone and put in

9   jail, I decided I needed to get out.

10           THE COURT:  All right, sir.

11           MR. TOCCE:  And-- okay.  So I went dark on the

12  internet and then I went into a deep depression.  I have

13  medical records, I have doctors' notes, I have prescriptions.

14  I have proof if you want it.

15           THE COURT:  All right, sir.

16           MR. TOCCE:  I can send it to you.

17           THE COURT:  That's not necessary.  I believe you, sir.

18           MR. TOCCE:  Okay.  All right.  I went into at least a

19  30-day deep, dark depression.  A lot of the feelings that I

20  had-- have you heard of Aaron Swartz?

21           THE COURT:  Yes, sir.  I think we probably have this

22  down.

23           MR. TOCCE:  Okay.  I had the same feelings as Aaron

24  Swartz.  I wanted to kill myself.  Literally.  I literally

25  wanted to kill myself.

1          THE COURT:  Yes, sir, I heard you.

2          MR. TOCCE:  I wanted to throw myself in front of a

3   train several times -- I almost did -- because of Anonymous.

4   Because of fucking Anonymous.

5          THE COURT:  I think I have the picture.  I thank you

6   for letting me know, sir.

7          MR. TOCCE:  Thank you, Judge.

8          THE COURT:  Won't you be seated, sir.

9          MS. KELLMAN:  Your Honor.

10          THE COURT:  Yes, Ms. Kellman.

11          MS. KELLMAN:  If I may, Judge, and I know that the

12   Court has the submissions, but the Court did ask to hear from

13   victims.  And in our submission, your Honor, we did cite two

14   letters from victims.  And if I may just read our comments.

15   The letters are attached to our submission.

16          THE COURT:  I did see them, but if you would like to

17   read it, you're welcome to do so.

18          MS. KELLMAN:  Thank you, Judge.

19          Among the letters, your Honor, that we submitted

20   seeking leniency on behalf of Mr. Hammond's motivations are two

21   letters from former clients and subscribers of Stratfor,

22   victims of Mr. Hammond's conduct.  In one letter, Anthony C.

23   Arthur, a radio operator living in Canada and former Stratfor

24   subscriber, cites Mr. Hammond's political motivations as what

25   he believes the Court should-- and thus believes that the Court

1    should be lenient in Mr. Hammond's case.  He wrote,

2    "Mr. Hammond's break-in of the Stratfor computers was clearly

3    a political protest that ultimately showed that he had no

4    intent to profit from the data uncovered by these hacks," And

5    that letter is attached, your Honor, to our submission as

6    C-21.  Mr. Arthur expressed his opinion that he views the hack

7    "as a catalyst for Stratfor, its customers" -- including

8    himself -- "to utilize better computer security practices.

9              Similarly, Nigel Parry, Stratfor client and freelance

10   journalist and web designer from St. Paul, Minnesota, has asked

11   the Court for leniency on behalf of Mr. Hammond.

12             THE COURT:  Thank you, Ms. Kellman.

13             MS. KELLMAN:  Thank you, Judge.

14             THE COURT:  Counsel, as you've heard, I have

15   calculated the guidelines and taken them into account.  In my

16   view, the guidelines accurately reflect the nature and

17   circumstances of the offense, but probably more needs to be

18   said on that.

19             As we've heard today, Mr. Hammond claims that he

20   committed this crime with the best of intentions and sought

21   only to disclose information the public deserved to know and to

22   steal from the rich and give to the poor.  But this ignores

23   Mr. Hammond's own words concerning his true motivations -- and

24   I do believe with counsel that motivations count -- and it

25   ignores the widespread harm suffered by countless individuals

1    and organizations as a result of Mr. Hammond's hacks.

2            It is, in fact, clear that his aim was to break into

3    critical computer systems, steal data, deface websites, destroy

4    files, and dump on-line the sensitive personal and financial

5    information of thousands of individuals, all with the objective

6    of creating -- in Mr. Hammond's words -- "maximum mayhem."

7            These are not the actions of Martin Luther King,

8    Nelson Mandela, John Adams, or even Daniel Ellsberg.  In the

9    Stratfor hack, Mr. Hammond disclosed an enormous amount of

10   confidential information, not even remotely in the public

11   interest.  He disclosed account information for some 860,000

12   Stratfor clients and about 60,000 credit card numbers belonging

13   to Stratfor clients.  He also defaced the Stratfor website and

14   deleted all of the data on the company's computer servers,

15   effectively shutting down the company's operations for weeks,

16   costing it millions in lost business and in recovery costs.

17           He talks about using credit card information to create

18   "financial mayhem" and said that "an equally important part is

19   destroying their servers and dumping their user address list

20   and private e-mails with the goal of destroying the target,

21   hoping for bankruptcy, collapse."

22           With respect to the Stratfor hack, Mr. Hammond also

23   said "The sheer amount of destruction we wreaked on Stratfor's

24   servers is the digital equivalent of a nuclear bomb, leveling

25   their systems in such a way that they will never be able to

1    recover....for weeks we used and abused their customer credit

2    card information....and if dumping everything on their

3    employees and clients weren't enough to guarantee their

4    bankruptcy, we laid waste to their web server, their mail

5    server, their development server, their clear space and SRM

6    Intranet portal and backup archives in such a way that ensures

7    they won't be coming back on-line any time soon."

8            In addition to the Stratfor hack, Mr. Hammond admits

9    to attacking several other entities, ranging from state and

10   federal governmental agencies to police officers' associations

11   to private corporations, all of which suffered significant

12   financial and reputational harm.  Those hacks harmed many

13   individuals and entities with little or no connection to

14   Mr. Hammond's supposed political motivation for the crimes.

15           Mr. Hammond admits that he hacked the Arizona

16   Department of Public Safety website and claims that he did it

17   to expose certain law enforcement policies that he opposes.

18   But his attack went far beyond that.  For example, he published

19   the personal information about Arizona law enforcement agents

20   and their families.  Among other individuals harmed, a retired

21   police officer and his wife, whose unlisted home phone number

22   was released as a result of that hack, received hundreds of

23   harassing phone calls for weeks and threats, including threats

24   of physical violence.

25           Similarly, in the Boston Police Patrolmen's

DBFBHAMS                           Sentence

1    Association hack, Mr. Hammond said "We gotta target the

2    officers individually."

3           In addition, in the Arizona hack, that hack forced the

4    Public Safety Department to shut down vital computer systems,

5    including Arizona's sex offender website, fingerprint

6    identification system, and Amber alert system, which, as you

7    know, allows the state to notify the public of missing or

8    abducted children.

9           Even one of Mr. Hammond's colleagues, Jake Davis, was

10   disturbed by the invasiveness and purposelessness of the

11   Arizona attack.  He said, "I thought this hack has gone way too

12   far.  There's no point to this thing.  It's just harming police

13   officers....this doesn't entertain anybody or help anybody

14   anywhere."

15          Mr. Hammond seems to think of himself as a modern-day

16   Robin Hood because he says he did not use the credit card

17   information he stole for personal gain but, rather, directed

18   that the credit cards be used to make donations to charities

19   and organizations he supports.  But as it turns out, it's very

20   likely that these organizations did not benefit from these

21   transactions.  Instead, Mr. Hammond's actions forced the

22   organizations to expend their scarce and valuable resources

23   identifying and returning the fraudulent donations.

24          Mr. Hammond might claim that these were regrettable,

25   but unintended, consequences of his actions.  In reality,

71

1    however, Mr. Hammond's own words indicate that this is exactly

2    what he set out to accomplish when he engaged in his crimes.

3    While planning one of his hacks, Mr. Hammond stated that he not

4    only would publish confidential documents, but would also

5    disclose "personal e-mail accounts, girlfriends' pics, dirt and

6    scandals."

7           As I noted, Mr. Hammond stated on several occasions

8    while plotting his hacks that his ultimate goal was to cause

9    mayhem.  There is nothing, as one of Mr. Hammond's supporters

10   characterized his hacking, "playfully clever" about his

11   hacking, and there's certainly nothing high-minded or

12   public-spirited about causing mayhem.  Accordingly, I take into

13   account the very serious nature and circumstances of this

14   crime.

15          With respect to the history and characteristics of

16   this defendant, I do take into account what Ms. Kellman and

17   what Ms. Kunstler have said about Mr. Hammond's charitable

18   acts.  He certainly did many charitable acts in his Chicago

19   community, including working in food kitchens, tutoring, and

20   the like.  And I also note that he spent time giving GED

21   classes while incarcerated.  And I do take that into

22   account.

23          The most striking fact, however, about Mr. Hammond's

24   history is his unrepentant recidivism.  He has an

25   almost-unbroken record of criminal offenses that demonstrates a

1    total lack of respect for the law.  As the PSR sets out,

2    Mr. Hammond's prior criminal history includes, among other

3    things, a plea of guilty to criminal damage to property in

4    2003; convictions for battery in 2004; disorderly conduct in

5    2006; mob action in 2009; as well as multiple violations of

6    supervised release, parole, and probation; and other arrests

7    for disorderly conduct, contempt of court, and criminal

8    trespass.

9            Perhaps most significantly, however, Mr. Hammond's

10   prior criminal history includes a federal conviction in 2006

11   for the very same offense conduct that was the offense of

12   conviction here, where the defendant hacked into a website of

13   an organization he disagreed with politically and obtained

14   information -- such as credit card numbers, home addresses and

15   other identifying information -- about the members and

16   customers of that organization.

17           In fact, Mr. Hammond began engaging in the conduct

18   that serves as the basis for this conviction just after he

19   finished his probationary term in the prior conviction in

20   Chicago.  I do note that Mr. Hammond said the same thing at

21   the time of that conviction.  At 19 he said he had altruistic

22   motives, and now, at 28, he says he has altruistic motives.

23           I note that the probation office -- in my view,

24   correctly -- notes Mr. Hammond's propensity to continue to

25   commit crime.  And the probation office notes that "There is no

1    information in his record that would suggest that he will not

2    continue to recidivate."

3            With respect to Mr. Hammond's charitable works, as I

4    said, I take those into account, but I also note his lack of

5    charity and extraordinary harmful activities to folks he does

6    not agree with, including, for example, that retired Arizona

7    police officer.

8            Moving to the paragraph two factors, there is

9    obviously a desperate need here to promote respect for the law.

10   As I noted, Mr. Hammond has, over the course of his young life,

11   demonstrated no respect for the law.  There is a need here for

12   adequate public deterrents.  And based on Mr. Hammond's record,

13   there is certainly a need here to protect the public from

14   further crimes of this defendant.

15           As to paragraph D, that factor -- that is, needed

16   education or vocational training -- is not applicable here.

17   Indeed, I note Mr. Hammond's extraordinary educational

18   background and his extraordinary skill with computers and

19   apparently his skill at tutoring.

20           I've taken into account the paragraph 3, 4 and 5

21   factors with respect to the need to avoid unwarranted

22   sentencing disparities.  I do note the prior sentences given

23   out in this case and the related cases.  As we all know, of

24   course, this view of disparity is supposed to be more broadly

25   ranging than just the defendants in this case.  But given

1  Mr. Hammond's history, I do not think there will be any

2  unwarranted sentencing disparity.

3          And the need to provide restitution is of lesser

4  import here.

5          Accordingly, Counsel, it's my intention, weighing all

6  of those factors, to impose a sentence of 120 months'

7  incarceration followed by a period of three years of supervised

8  release.  It is my intention to adopt the recommended special

9  terms and conditions of supervised release:  That is, of

10 providing access to requested financial information; not

11 incurring any new credit charges without approval unless in

12 compliance with payment obligations; participating in a

13 substance abuse program; not having any involvement with

14 hacking-related or electronic civil disobedience websites or

15 organizations; participating in the probation department's

16 computer/internet monitoring program; submission to a search;

17 not using any means to hide his identity on-line; not using any

18 means to encrypt his communications on-line; and not encrypting

19 stored data.  The last two except as required by any

20 employment.

21         It is not my intention to impose a fine on the finding

22 that Mr. Hammond is not able to address a fine.

23         As to restitution, I understand the parties are still

24 gathering that material and will present it in due course.

25         And it is my intention to impose the mandatory $100

DBFBHAMS                          Sentence

1    special assessment.

2              Is there any reason, Counsel, why such a sentence

3    should not be imposed?

4              MS. NIDIRY:  No, your Honor.

5              MS. KELLMAN:  No, your Honor.

6              THE COURT:  Thank you.

7              Mr. Hammond, you're sentenced, sir, to a period of 120

8    months' incarceration.  Following that time, you'll spend a

9    period of three years on supervised release.  During the period

10   of supervised release, you'll comply with all of the standard

11   terms and conditions of supervised release.  Among them are

12   that you not commit another federal, state or local crime; you

13   not illegally possess a controlled substance; and you not

14   possess a firearm or other destructive device.

15             In addition to those and all of the other standard

16   terms and conditions of supervised release, you will provide

17   the probation officer with access to any requested financial

18   information.  You will not incur any new credit charges or open

19   any additional lines of credit without the approval of the

20   probation officer unless you are in compliance with the

21   installment payment schedule for financial penalties.

22             In addition, you'll participate in a program approved

23   by the probation officer for substance abuse, and that program

24   will include testing to determine whether you've returned to

25   the use of drugs or alcohol.

DBFBHAMS                         Sentence

1          The Court authorizes the release of available drug

2     treatment evaluations and reports to the substance abuse

3     treatment provider as approved by the probation officer.

4          Mr. Hammond, you might be required to contribute some

5     or all of the costs of that program depending on your ability

6     to pay and the availability of third-party payment.

7          In addition, sir, you shall have no involvement with

8     any hacking-related or electronic civil disobedience websites

9     or organizations, and shall have no involvement or contact with

10    any civil disobedience organizations.

11         In addition, you will participate in the

12    computer/internet monitoring program administered by the

13    probation office.  You must provide the probation office

14    advanced notification of any computer, automated service or

15    connected device that will be used during the term of your

16    supervision and that can access the internet.

17         The probation office is authorized to install any

18    application as necessary to survey all activity on computers or

19    connected devices owned or operated by you.  You may be

20    required to pay the cost of the monitoring services at the

21    monthly rate provided by the probation office.  The rate and

22    payment schedule are subject to periodic adjustments by the

23    probation office.

24         The probation office shall be notified via electronic

25    transmission of impermissible or suspicious activity or

DBFBHAMS                        Sentence

communications occurring on such computer or connected device

consistent with the computer monitoring policy in effect by the

probation office.  As triggered by impermissible or suspicious

activity, you shall consent to and cooperate with unannounced

examinations of any computer equipment owned or used by you.

This examination shall include, but is not limited to,

retrieval and copying of all data from the computer, connected

device, storage media, and any internal or external peripherals

and may involve removal of such equipment for the purpose of

conducting a more thorough inspection.

        You shall also submit your person and any property,

house, residence, vehicle, papers, computer or other electronic

communication or data storage devices or media and your effects

to a search at any time, with or without a warrant, by any law

enforcement or probation officer with reasonable suspicion

concerning a violation of the conditions of your supervised

release or any unlawful conduct by you and by any probation

officer in the lawful discharge of the officer's supervision

functions.

        In addition, you shall not use any means to hide your

identity on-line, including, for example, the TOR network or

proxy servers.  You also shall not use any means to encrypt

your communications on-line except as required by employment.

And you shall not encrypt stored data except as required by

employment.

1          As I mentioned, sir, I do not impose a fine.  And I

2     will await restitution information within 90 days from

3     counsel.

4          And as I mentioned, I must impose, and do impose,

5     the $100 special assessment, and that should be paid

6     promptly.

7          Sir, it's my duty to inform you that unless you've

8     waived it, you have the right to appeal this sentence and you

9     might have the right to appeal in forma pauperis, which means

10    as a poor person, with the waiver of certain fees and

11    expenses.

12         Ms. Kellman, did you wish a designation or request?

13         MS. KELLMAN:  Yes, your Honor, as close as the Bureau

14    of Prisons can get Mr. Hammond to the Chicago area would be his

15    request.

16         THE COURT:  It's the Court's recommendation that

17    Mr. Hammond be designated to a facility as close as possible to

18    the Chicago metropolitan area so that his family is able to

19    visit him.

20         Is there anything else today, Counsel?

21         MS. NIDIRY:  Yes, your Honor.  The government would

22    move to have the underlying indictments dismissed against

23    Mr. Hammond.

24         THE COURT:  So ordered.

25         Anything else?

DBFBHAMS                        Sentence

1          MS. KELLMAN:  Your Honor, just one inquiry, if I may.

2     The Court ordered specifically searches of Mr. Hammond's

3     computers -- which, of course, I understand -- and extended

4     that to retrieval or defined it further as retrieval and

5     copying.  The Court also excluded in some of the later

6     restrictions any work-related computers, which I think also

7     appropriate and understandable.

8          But with respect to the searches, I would ask the

9     Court to consider language as well that permits the same level

10    of privacy with respect to searching work-related computers.  I

11    wouldn't want Mr. Hammond to not be employable because a

12    company he might work for, that their computers might be

13    subject to those --

14         THE COURT:  I'm sorry, I don't know what you're asking

15    me for.  What language do you want?

16         MS. KELLMAN:  With respect to the-- I think it's the

17    third from last condition, your Honor, which was search of

18    computers to also exclude any computers that are work related,

19    that are owned by his employer or connected with his

20    employment.

21         THE COURT:  Counsel.

22         MS. NIDIRY:  Okay.  That's fine.

23         THE COURT:  Agreed.  Anything else?

24         MS. KELLMAN:  No, nothing.  Thank you, Judge.

25         THE COURT:  Thank you, ladies and gentlemen.  You've

DBFBHAMS                          Sentence

1    been very helpful.  Good morning.

2              Thank you, Mr. Marshal.

3              (Adjourned)

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25