**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**
**---------------------------------------------------------**

**UNITED STATES OF AMERICA,**

          **-against-**                  **Case No. 12 Cr. 185 (LAP)**

**JEREMY HAMMOND,**

              **Defendant.**
**---------------------------------------------------------**

**<u>SENTENCING MEMORANDUM</u>**
**<u>ON BEHALF OF JEREMY HAMMOND</u>**

                                     **Susan G. Kellman**
                                     **Sarah Kunstler**
                                     **Attorneys for Jeremy Hammond**
                                     **25 Eighth Avenue**
                                     **Brooklyn, NY 11217**
                                     **(718) 783-8200**
                                     **kellmanesq@aol.com**

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**
--------------------------------------------------------

**UNITED STATES OF AMERICA,**

          **-against-**                 **Case No. 12 Cr. 185 (LAP)**

**JEREMY HAMMOND,**

              **Defendant.**
----------------------------------------------------------

### SENTENCING MEMORANDUM ON BEHALF OF JEREMY HAMMOND

### INTRODUCTION

On May 28, 2013, JEREMY HAMMOND pled guilty to a one-count superseding

information charging him with a conspiracy to engage in computer hacking in violation of

18 U.S.C. Sections 1030(a)(2)(C), 1030(c)(2)(B)(iii), and 1030(c)(2)(C).  As described in

the information,

> From at least in or about December 2011, up to and including in or about
> March 2012, HAMMOND and his co-conspirators mounted a cyber assault
> on the website and computer systems of Strategic Forecasting, Inc.
> ("Stratfor"), an information analysis company based in Austin, Texas, which
> maintained the website "www.stratfor.com."

Mr. Hammond is to be sentenced by this Court on November 15, 2013. We respectfully

submit this letter and the attached appendix of exhibits[1] for the Court's consideration

prior to sentencing.

This is not the typical federal criminal case, and Jeremy Hammond is not the

---

[1]     The appendix, which consists primarily of letters of support (see Exhibits A-E)
also includes two petitions, containing over 5000 signatures, for time served (Exhibits
F and G) and a submission (Exhibit H) pertaining to additional conduct by Mr.
Hammond. In an excess of caution, Exhibit H has been redacted, in light of the
protective order.

typical federal criminal defendant. Whether one agrees with his motivation or tactics, the fact remains that his violation of the federal criminal law was undertaken as an act of civil disobedience. Mr. Hammond has been very clear that he participated in the hack of Strategic Forecasting and other websites because he questioned the government's use of private security firms to gather intelligence at home and abroad, and the free reign afforded to these companies to operate without public scrutiny or government oversight. And he is not alone; many people, from average U.S. citizens, to the heads of state of countries including France, Germany and Brazil, have become concerned as a result of recent revelations about government and corporate spying. But unlike many, Mr. Hammond has technical skills that enabled him to peel back this veil of secrecy, publicly revealing information about how states and private companies like Stratfor, gather intelligence. And he did was he believed was right.

The appendix of exhibits included with this submission includes over 250 letters of support. A number of these letters are from people who do not know Mr. Hammond, but share his concerns about how intelligence is gathered, surveillance is carried out, and how operatives infiltrate groups engaged in legally protected activities. Some of the letters are from activists and journalists whose lives have been directly impacted by the information he revealed. But perhaps the most significant letters – over 60 in total – come from people who know Mr. Hammond personally, and who have observed his dedication to social justice. They include people who have learned from him, volunteered with him, and stood beside him as he made a contribution to his community and his hometown of Chicago. These letters demonstrate that Jeremy Hammond is a person who lives his principles in all aspects of his life; a person who, at the very core of his being, believes that he has a personal responsibility to give of his time and his

abilities to make his community, his country and the world a better place.

Below, we have included an analysis, under 18 U.S.C Section 3553(a)(1), of Mr. Hammond's history and characteristics, and the nature and circumstances of the offense. After careful consideration of these factors, as well as factors relating to the need for the sentence imposed as outlined in 18 U.S.C. Section 3553(a)(2), we respectfully submit that the appropriate sentence in this case is a non-guidelines sentence of time served.

## THE PRE-SENTENCE INVESTIGATION REPORT

Our objections to the Pre-Sentence Report are provided under separate cover. We have no objections to Probation's recitation of the offense conduct or criminal history, or its calculation of the applicable guidelines range.

## THE PLEA AGREEMENT

The plea agreement assumes, and Mr. Hammond does not challenge, the following Guidelines calculation:

| | |
|---|---|
| Base Offense Level (2B1.1(a)(2)) | 6 |
| Loss Amount (2B1.1(b)(1)(I)) | +16 |
| (for loss between $1 million and $2.5 million) | |
| # of Victims (2B1.1(b)(2)(C)) | +6 |
| (for 250 or more victims) | |
| Sophisticated Means (2B1.1(b)(10)(C)) | +2 |
| Offense under 18 U.S.C 1030 | +2 |
| (unauthorized dissemination of personal information) | |
| Involved government computer system (2B1.1(b)(17)(A) | +2 |
| (used in furtherance of the administration of justice) | |
| Adjustment for Acceptance of Responsibility | -3 |
| Adjusted Offense Level | 31 |

Because Mr. Hammond has seven criminal history points, he is placed in Criminal History Category IV.  Thus, his sentencing range is 151-188 months. However, because the statutory maximum is 10 years, Mr. Hammond's stipulated guidelines sentence is

120 months. Pursuant to the plea agreement, the parties are free to make arguments for a non-guidelines sentence under the factors outlined in 18 U.S.C Section 3553(a).

## THE APPROPRIATE SENTENCE

Title 18, United States Code, Section 3553(a) directs a sentencing court to impose a reasonable sentence that is "sufficient, but not greater than necessary" to achieve the purposes of sentencing. This statutory mandate has taken on new meaning in light of the Supreme Court's decisions in *United States v. Booker*, 543 U.S. 220 (2005), *Gall v. United States*, 128 S.Ct. 586 (2007), and *Rita v. United States*, 551 U.S. 338 (2007), as well as the Second Circuit's decision in *United States v. Crosby*, 307 F.3d 103 (2d Cir. 2005), and its progeny.

In *Gall*, the United States Supreme Court held that while the Guidelines should be "the starting point and the initial benchmark" of a reasonable sentence, the sentencing judge "may not presume that the Guideline range is reasonable" and "must make an individualized assessment based on the facts presented." *Gall*, 128 S.Ct. at 587. The Supreme Court also "reject[ed] an appellate rule that requires 'extraordinary' circumstances to justify a sentence outside the Guidelines range." *Id.* Thus, a sentencing court, after considering the advisory Guidelines, is now free to fashion a reasonable sentence that it deems appropriate based upon all of the sentencing factors set forth in 18 U.S.C. §3553(a).

## 1. Jeremy Hammond's History and Characteristics

Jeremy Hammond is 28 years old. He and his brother Jason, identical twins, were born on January 8, 1985 in Hindsdale, Illinois, a suburb of Chicago to Rosanne "Rose" Collins (nee Anderson) and John "Jack" Hammond. Rose, who is now 49 years old, was a server at a Chinese restaurant and Jack, who is 57, was a musician and guitar

teacher. Rose, a high school graduate, dropped out of college when she learned she was pregnant. Jack left high school without graduating, with dreams of making it in the music industry. Jeremy's brother Jason inherited his father's passion for music and works as a music teacher, giving lessons at two Chicago-area music schools.

Rose and Jack never married, and separated when the boys were three years old.  In 1991, Rose married James Collins and they left Chicago, but she stayed on good terms with Jack and remained a part of her children's lives. Raising two boys alone, Jack struggled financially, but Rose provided financial support. The family always had a roof over their heads and food to eat. In his letter to the Court, Jason Hammond recalled that "most of our childhood I remember my father working two jobs to sustain me and Jeremy." (*See* Letter from Jason Hammond at A3-A6.)

In 2000, Rose and her husband moved to Austin, Texas. Since marrying James Collins, Rose has volunteered at her church and at the schools that her younger sons attended. Currently, she is a food service manager at a 7-Eleven store near her home. James Collins is a technical manager at Cisco Systems, where he has worked since 2000. Rose and James Collins have two children together  — Randy and Michael. Randy, age 21, is a cancer survivor and high school graduate. He works two jobs — as a manager of a pizza place, and a cook at a restaurant. Michael is 18 years old and recently graduated high school. He works part-time at a Subway restaurant, and is applying to college.  Randy and Michael live with their parents in Austin, along with Rose's godson Mark, who is 21 and a construction worker and has lived with the family since he was 15 years old.

Education was very important to Jack Hammond. In his letter, Jason Hammond recalled that "even though our father did not graduate high school, he raised us to be

creative, intelligent, hard-working critical thinkers." (A3.) Jack taught his sons to read and do arithmetic before kindergarten, and they both excelled in school. As a child, Jeremy loved chess, origami, computers, and baseball.  As a Little League pitcher, he developed a virtually un-hittable arcing pitch that confounded batters and thrilled the team's coach. And as early as nine years old, he was playing with computer programming and designing simple computer games. At age 11, Jeremy developed a computer database to track Little League player statistics, a project for which he won a prize at the school science fair. As an adolescent, Jeremy, an avid reader, devoured his father's extensive library, which included classics such as "Animal Farm" and "The Jungle" and books by Abbie Hoffman and other sixties activist heroes of his father's. From his father, and his father's books, Jeremy learned about the history of civil disobedience and street protest in the United States.

As a high school student, Jeremy started to identify as a "hacker," and attended "2600" meetings , where participants gathered to teach, learn, and discuss technology.[2] At these meetings, Jeremy met people who, like him, were interested in systems and how they worked. At age 15, he got his first job as a Mac specialist at a local computer service store.  When he was 18, he hacked the computers at a local Apple retailer, demonstrating the system's vulnerability on every screen in the store. Thereafter, he met with Apple employees and explained how to better protect their information. And just as his interest in understanding computer systems and hacking deepened, so did his sense of social responsibility, and his desire to stand up for his beliefs. For Jeremy, the words of Mohandas Gandhi captured his belief that individuals must join with others in collective action to "be the change you wish to see in the world."

---

2  These meetings, which are open to the public, and welcome technologists of all skill levels, are held across the U.S. and around the world. For more information, visit http://www.2600.com/meetings/guidelines.html

In high school, Jeremy was a wholly engaged student who cared deeply about world events. Chris Van Der Berg, who taught Jeremy in his 10th grade Contemporary World History Honors course, wrote" You can imagine my excitement as a teacher to have someone in my class who could speak intelligently about the Israeli-Palestinian conflict, the effects of the Cold War, and the impact of European colonialism on the development of African political structures." (*See* Letter from Chris Van Der Berg, at B84-85.)  Mr. Van Der Berg was impressed, not just by Jeremy's enthusiasm, but how he helped to motivate and engage his classmates. He wrote:

> Jeremy's eagerness to learn was a characteristic he used as a tool to bring people together. Unquestionably, his passion for contemporary history increased the interest of his classmates in gaining a deeper understanding of the world and in seeking answers that went beyond the scope of the course.

(*Id.*)

Jeremy's interest in politics grew after the 2000 presidential election, the Supreme Court's *Bush v. Gore* decision, and the election of a United States President who had failed to win the popular vote. He was further politicized by the attacks of 9/11, the enactment of the Patriot Act, and the wars in Iraq and Afghanistan. During his senior year at Glenbard East High School, on the first day of the Iraq invasion in the Spring of 2003, Jeremy led a walkout of more than 100 students to an anti-war rally in downtown Chicago. He also founded a student newspaper that encouraged students to ask questions about current political events.  In his letter of support, Michael Pitula, a GED and adult literacy instructor, who is a long-time acquaintance of Jeremy's, wrote about meeting him through the distribution of this newspaper. "It was impressive to see a young person engaging in civic discourse on matters of such global import at an age when many youth are caught up in the latest passing gossip or fad." (*See* Letter from

Michael Pitula, at B62-63.)

In September of 2003, Jeremy enrolled as a freshman at the University of Illinois at Chicago ("UIC"). He was an outspoken voice on campus, organizing against university tuition hikes and protesting United States involvement in Afghanistan. Jeremy was involved in the Political Discussion and Action group, the Campus Anti-war Network, and Free Society, which Jason Hammond described as "groups where people met to discuss current events, examine history, and study social justice movements." (*See* A4.) He was also active in the Association for Computing Machinery, a computer science club with a chapter at UIC. During the spring of his freshman year, he hacked into the website of the UIC's computer science department as a security test, alerting the webmaster of the site's vulnerability, which he offered to fix. Instead, his actions led to a school disciplinary hearing and a letter from school administrators stating that he would not be returning to UIC in the spring.

After leaving school, Jeremy devoted himself to progressive politics and the uniqueness of his commitment to the human condition began to shine. He attended protests on the streets of Chicago, which included demonstrations against United States involvement in Iraq and Afghanistan; those expressing opposition to racism, sexism, police brutality and income inequality, and others showing support for marriage equality and the rights of immigrants, workers and the poor.  In his letter to the Court, Jerome Boyle, a Chicago lawyer who served as a volunteer legal observer for the Chicago Chapter of the National Lawyers Guild, recalled meeting Jeremy at this time. "While first only another face in the crowd, over time Jeremy distinguished himself as a person willing to risk his liberty with acts of civil disobedience." (*See* Letter from Jerome Boyle, at B7-8.)  Mr. Boyle, who was also Mr. Hammond's neighbor, further imparts his strong

impression of Jeremy's character, viewing him as "a political person driven by an

overwhelming love of humanity." (*Id*.) "As someone who was present at many of the

events leading to his arrest or present at the police lock-ups afterward," Mr. Boyle wrote,

> I can assure you that Jeremy was always driven, not by any selfish motive, but rather by an exceedingly altruistic commitment to the causes for which he advocated. And everything I saw of Jeremy's behavior in my community confirms this. Jeremy lived an ascetic life, scraping by on barely enough resources to survive. Instead of looking out for himself, he saw it as his duty to look out for others, and to help others when they needed it. He could always be counted on to help a friend or neighbor in need, frequently at the cost of substantial personal sacrifice. And his self-sacrifice extended even to what is, to him, his most precious possession, i.e., his personal liberty.

(*Id*.)

Jeremy also dedicated himself to volunteering in his community. We have

received 58 letters of support from friends, colleagues, and acquaintances that speak to

this commitment. Mr. Pitula, the GED instructor quoted above, later got to know Jeremy

through his own work as an organizer for a local environmental justice organization in

the Latino neighborhoods in Southwest Chicago. As he wrote in his letter,

> I would encounter Jeremy in the course of my outreach and he was always open to learning of and supporting the efforts of the community to secure equal access to clean air and public transit to travel to work and school. Hammond showed solidarity, in spite of the fact that he was not originally from the community. He became involved in supporting various public campaigns, speaking at transit board hearings and picketing with neighbors to draw attention to the public health threats posed by violations of clean air law and regulations on the part of nearby plants and factories. His demeanor was always one of humility and genuine interest to serve.

(*See* B62.) Mr. Pitula also recalled that Jeremy "shared his wealth of computer

knowledge free of charge", and that he would "regularly conduct research, help set up

websites or provide other technical assistance to non-profit organizations or community

groups dedicated to social justice." (*Id*.) Like Mr. Pitula, Brad Thomson, a paralegal at a

Chicago law firm, wrote that Jeremy "would regularly set up websites or provide other

technical assistance free of charge to non-profit organizations or community groups committed to social causes." (*See* Letter from Brad Thomson, at B81-82.)

From 2005-2006, Jeremy volunteered at a public computer lab called Dai5ychain, spending three days a week teaching computer skills to the underserved youth of Chicago. One of his students was Eric Conrad, who wrote a letter to the Court explaining that, "Jeremy Hammond took the time to help create the foundation of my programming knowledge…(f)rom this kind gesture I was able to create my own web design business while I was still in high school and gain over 15 clients." (*See* Letter from Eric Conrad, at B14.)

From 2008-2012, Jeremy was active with "Food Not Bombs,"[3] an organization that cooks and distributes free weekly meals to the homeless and hungry in Chicago. A number of the letters provided for Your Honor's review highlight Jeremy's commitment to this group, as well as his work with "Midwest Books to Prisoners," a grassroots organization that, as its name suggests, collects and mails books to people behind bars. For example, Chris Howard, who met Jeremy through the book distribution project, described Jeremy's dedication as nothing short of contagious. He recalled that Jeremy played the "biggest part" in the group, and detailed his role as follows:

> Every week he would show up early and get everything set up and would often prepare food for everyone once they arrived. His selflessness could never be surpassed, I remember on several occasions when we had run out of funding for that week (as all funds we have to send out books are

---

3  Jeremy was also active with Food Not Bombs from 2004-2005. Max Suchan, a law student at De Paul University College of Law, who was a member of the group along with Jeremy during this time, noted: "We often cooked in Jeremy's apartment and he was always busy gathering food donations, cooking, sharing food.  I witnessed his generosity countless time, and I was always touched with his ability to deeply connect to the homeless people who came to eat, and treat them with the utmost respect. On one occasion, Jeremy spent the better part of the week gathering hundreds of winter jackets, scarves, hats and gloves to distribute during the food serving.  I believe Jeremy is motivated with a sense of care and compassion rarely found to such degrees, especially in out generation." (*See* Letter of Max Suchan, at B79)

donated to us), and Jeremy would pay all of the expenses out of pocket
and never asked to be reimbursed.

(*See* Letter from Chris Howard, at B35.) Mr. Howard was impressed at the generosity

that Mr. Hammond showed to the recipients of the books, people he had never met and

had no obligation to provide for. Jeremy, he explained was motivated by a belief in the

importance of education "and how nobody deserves to be denied a proper education in

life. His selfless actions have inspired countless people in our community and have set a

standard for how we should treat one another." (*Id*.)

Similarly, Sidoni Gonzalez, a 25-year-old Chicago resident who grew up in the

Pilsen neighborhood, recounted meeting him through her participation in neighborhood

food distribution with "Food Not Bombs." She wrote that Jeremy was "always friendly

and helpful in teaching me how Food not Bombs worked and eager to pass on any other

useful knowledge." (*See* Letter from Sidoni Gonzalez, at B27-28.) She was astonished

by Jeremy's "ability to connect with people and his peaceful and fun-loving energy." And

perhaps most significantly, she described Jeremy's positive influence on her life. After

describing the neighborhood's persistent problems with gang violence, she wrote,

> Jeremy's enthusiasm for social work inspired me to get more involved with
> the youth in my community. While working together we had plenty of
> conversations about our duties and responsibilities to those around us; and
> the impact we could have on those we interact with. Since then I have been
> able to volunteer my time at Mujeres Latinas en Accion, a non-profit
> organization dedicated to helping and supporting domestic abuse survivors
> and their families. The specific project I am involved with is Proyecto
> Juventud (Project Youth) a sex-education, after-school program for women
> 12-17 years of age. We provide them with a safe space to do homework,
> twice a week we engage them in outdoor activities that promote physical
> health and create workshops that teach them leadership skills. Jeremy has
> been a big influence for me to get involved with such programs.

(*Id*.)

Both Food Not Bombs and Midwest Books to Prisoners operated out of

"Biblioteca Popular", a storefront community center and art space in the Pilsen

neighborhood of Chicago. According to Brad Thomson, the paralegal quoted above, the

center "had a kitchen, hosted a lending library, held events, and provided free tutoring

and classes." (*See* B82.) In addition to his involvement with Food Not Bombs and the

Books to Prisoners project, Jeremy was one of the center's caretakers for three years,

from 2008 to 2011.  As caretaker, he was responsible for opening, closing, and cleaning

up. He also taught math classes and maintained the center's lending library.

Mr. Thomson came to know Jeremy through his involvement with Biblioteca

Popular. On one occasion, Mr. Thomson recalls "working with a group that was

responding to the financial crisis," and had decided to "prepare a large meal that would

be shared publicly in the downtown area." He wrote,

> Jeremy ensured we would be able to use the community center's kitchen
> and went out of his way to open the center early on a Sunday morning. He
> even went above and beyond, by staying at the center to help us cook and
> running errands to help us get supplies.

(*Id*.) On another occasion, Mr. Thompson recalled that Jeremy stayed late to

accommodate his schedule when he was trying to donate a box of books to the center.

He continued,

> I ended up showing up later than we had scheduled and I found Jeremy
> alone, doing clerical tasks. His response was not frustration or annoyance
> that I had inconvenienced him, but genuine appreciation that I was donating
> books. He seemed sincerely happy to know that by donating his time, a
> handful of people would be able to have access to resources they wouldn't
> otherwise have had.

(*Id*.)

Lisa Fithian, a long-time community organizer who is a member of the "Alliance of

Community Trainers," which conducts training sessions for community groups, wrote

about Jeremy's generosity in connection with the community center. As he did with Brad

Thompson, Jeremy permitted Ms. Fithian to use the community center kitchen for an event she was organizing. (*See* Letter from Lisa Fithian, at B23-24.) Ms. Fithian also related Jeremy's involvement with efforts to close down coal plants near the community center, in Pilsen, which were compromising the health of neighborhood residents. She wrote,

> For years the Little Village Environmental Justice Organization (LVEJO) had been educating and organizing to close these plants. Jeremy was very interested in nonviolent social change and he invited me to come there and do an organizing and nonviolence training at the center for the community to learn more about it in their struggle against the coal plant. In 2009 the community came together to support the first of several nonviolent civil disobedience protests outside the coal plant that ultimately lead to the decision to close both of the coal plants in Chicago, which was a major victory for the community. Jeremy helped make this happen.

(*Id.*) Like Ms. Fithian, Debra Michaud worked with Jeremy Hammond on environmental issues, including the coal plant closings.[4] Ms. Michaud, the founder of the Chicago Chapter of the Rainforest Action Network, described Jeremy as "an extremely hard worker" who "never sought the spotlight or recognition" and "always someone who could be counted on to meet his commitments and complete promised work," which included building the group's website, designing promotional materials, and contributing "at every level to build a cohesive group and successful campaigns." (*See* Letter from Debra Michaud, at B48-49.)

A number of supporters mentioned their experience of Jeremy's kindness and generosity on a personal level, which seemed to go hand in hand with his broader commitment to social justice and community work. For example, Robert Boyle, a 43-year-old Chicago business owner and acquaintance, recalled Jeremy as a "smart,

---

4       Debra Michaud noted in her letter that "These plants were shown by a Harvard University study to cause 40 deaths annually, in part because they were in the most densely populated areas of all coal fired power plants in the nation. (*See* Letter from Debra Michaud, at B48-49.)

articulate young man with passionate beliefs about making the world a better place."
(*See* Letter from Robert Boyle, at B9.) Mr. Boyle met Jeremy "through our mutual
involvement in various grassroots social justice causes." (*Id*.) "Though I am older and do
not regularly socialize with the younger activist community," Mr. Boyle noted, "Jeremy
would always take the time to stop and talk whenever we ran into each other...He often
had questions for me, showing both that he recognized my past experience and had a
desire to learn." (*Id*.) Brian Murray, another acquaintance and former neighbor of Mr.
Hammond's in Chicago, met Jeremy and his brother Jason when they were providing
childcare for the single mother who ran one of the only fresh food stores in the
neighborhood.  Mr. Murray observed that Jeremy and his brother were "providing her
with the flexibility in her personal life that she required as an independent small business
owner, and also with store operation." (*See* Letter from Brian Murray, at B58-59.) Mr.
Murray related that Jeremy and Jason also provided him with childcare, and "quickly
became a support to my young family in a vital way." (*Id*.)  At he end of his letter, Brian
Murray noted, "There is a hole here in this city with Jeremy gone." (*Id*.) Sarah Aubry, a
Chicago resident and employee of CharityWatch, a philanthropic watchdog organization,
remembered how Jeremy "encouraged an older out-of-work friend to practice
typing...and tutored him to learn basic computer skills to help him become more
employable." (*See* Letter from Sarah Aubry, at B2-3.)  Ben Goodman, a friend and
Chicago resident, described how Jeremy took him in when he was "on the verge of
homelessness," providing him with the support he needed "to turn things around and get
back on my feet." (*See* Letter from Ben Goodman, at B29.) Tim Welch, a self-employed
contractor in Arizona who has never met Mr. Hammond, wrote about Jeremy's kindness
when his children, attended college in the Chicago area:

> Mr. Hammond's case was brought to my attention by my children,
> and I have been following it ever since because of what he has done
> for my children. My son and daughter were moving from one
> apartment to another, on the 3rd floor, and while in the process of
> carrying furniture and belongings up 3 flights of stairs, Mr. Hammond
> happened by and volunteered to help them with their move. He spent
> 2 hours of his time lugging complete strangers personnel (sic) items
> up 3 flights of stairs. My children did not know him or who he was
> other than Jeremy, until later, when they recognized his picture
> through public media reports.

(*See* Letter of Support from Tim Welch, at 87.) And Debra Michaud highlighted Jeremy's

"deep compassion", which she wrote "was most obvious in public events when it was…

invariably Jeremy who straggled behind the crowd to help carry or push his disabled

friend in a wheelchair. It was always Jeremy who made sure that no one was left

behind." (*See* B49.)

## 2. The Nature and Circumstances of the Offense

Jeremy was always looking for ways to integrate his computer skills with his

activism. Although the words "hacking" and  "hacker" are often used pejoratively to

describe criminal or intrusive behavior, the technical community has always used the

terms to describe creative computer use – taking things apart in order to figure out how

they work. For example, Richard M. Stallman, a technologist who was the lead

developer of the GNU operating system and a MacArthur Fellow, defines hacking as

"playful cleverness." He wrote in his letter to the Court:

> "I have been proud to call myself a hacker since 1971. That's when I was
> hired by MIT Artificial Intelligence Lab to join that team that developed the
> lab's operating system – for which the unofficial job title was "system
> hacker."

(*See* Letter from Richard Stallman, at C14.) Similarly, "hacktivism" is defined as "the use

of computers and computer networks to promote political ends, chiefly free speech,

human rights, and information ethics... carried out under the premise that proper use of

technology can produce results similar to those of conventional acts of protest, activism, and civil disobedience." [5]

Sometime in 2003, Jeremy founded an organization called Hulla-Bulloo, which was "created to engage its users in understanding hacking, hacktivism, and all technologies and politics in between." (*See* Letter from HackThisSite.org Staff, at B30-33.) Hulla-Bulloo became HackThisSite.org (hereinafter "HTS"), a self-described "a free, safe and legal training ground for hackers to test and expand their hacking skills."[6] The name was a direct reference Abbie Hoffman's "Steal this Book," a counterculture guide for youth published in 1971.

According to the current staff, HTS has "remained a bastion of ethical hacking and hacktivism, a series of principles originating from Mr. Hammond, serving its community of over 1.8 million worldwide users." (*See* B30.) In their letter to the Court, HTS staff further explains that "Mr. Hammond, in his years of running HTS, built the idea that users can become hackers and hacktivists to not only make a change in information technology security, but indeed in the world itself as well." (*See* B31.) Mr. Hammond continues to inspire young programmers who want to use their skills to contribute to social change. Noah Ollersmith, an autistic 14-year-old from Indianapolis, is one such person. Mr. Ollersmith, who identifies as a "programmer trainee" and "cyber activist," and who has never met Mr. Hammond, wrote that "Jeremy has truly inspired me. I have been learning to program, because of people like Jeremy." (*See* Letter from Noah Ollersmith, at D108.)

In December of 2006, Jeremy Hammond was sentenced to twenty-four months in federal prison for breaking into the computer system of Protest Warrior, a Texas-based

---

5   For more information, visit http://en.wikipedia.org/wiki/Hacktivism
6   For more information, visit https://www.hackthissite.org/

pro-war organization that aggressively targeted anti-war activists. He surrendered on January 3, 2007, and after serving his term of incarceration at the Federal Correctional Institution in Greenville, Illinois. He was released in the summer of 2008.

After his release from federal prison, Jeremy avoided online activism and began to re-create himself as an environmentalist and a web developer. Many of the letters quoted above attest to the community work he accomplished between 2008 and his March 2012 arrest in this case. During this period, Jeremy was welcomed back to the job he held prior to his federal sentence, as a Web Programmer with Rome & Company ("Rome"), a mainstream Chicago-based advertising agency and brand consultancy company. In a 2006 letter, Jerry Roman, the company president, wrote that he re-hired Jeremy "with enthusiasm and without hesitation." Mr. Roman further wrote that Jeremy's "behavior in our offices is exemplary," that he was "focused and productive," and that his programming skills were "exceptional." While Rome had many corporate clients, and Mr. Roman suspected that Jeremy "had a low tolerance for corporate posturing," he noted that Jeremy "never demonstrated any contempt for business in the workplace; rather, he has always been extremely respectful of the business needs of Rome & Company and its clients."[7] (*See* Letters from Jerry Roman, at B69-B70.)

During this time, Jeremy began thinking seriously about re-involving himself in the world of political hacktivism. In 2008, while in prison, he had learned about the protest group Anonymous, a loosely associated group of activists and hacktivists around the world.  In December of 2010, after PayPal, Visa, MasterCard and other financial institutions stopped processing donations to WikiLeaks, Anonymous launched "Operation Avenge Assange," encouraging countless people to download an online tool

---

[7]     In a 2013 letter written to show his support in this case, Mr. Roman calls Jeremy a "social treasure" whose "potential for doing good works is nearly limitless." (*See* B69.)

that was used to overload the companies' websites. This action was not only a catalyst for Jeremy, but the start of a new activist movement. Dr. Gabriella Coleman, the Wolfe Chair in Scientific and Technological Literacy at McGill University, and whose teaching, research and writing focus on computer hacking and electronic dissent, has called the action "one of the first large-scale demonstrations conducted on the internet...providing a paradigm for online protest."[8]

In her letter to the Court[9], Professor Coleman wrote,

> Hammond was attracted to Anonymous for how it has become a wide-open platform for very different types of people around the world to collectively work toward the goal of exposing corruption and lend a helping hand to existing movements, such as the Arab Spring of 2011. He was particularly keen to work with hackers to disclose corporate and government wrongdoing.

(See Letter from Professor Gabriella Coleman, at C3-6.) WikiLeaks had come under fire for publishing the diplomatic cables leaked by Chelsea (formerly Bradley) Manning. Jeremy supported the public release of this information, which included the "Collateral Murder"[10] video that exposed the killing of unarmed civilians and two Reuter's journalists, by a United States Apache helicopter crew in Iraq. He saw Chelsea Manning as a selfless hero, an individual whose actions were effectively changing the world. These revelations shook the world and caused Jeremy to wonder if he had a greater responsibility to use his technological skills to make his contribution to a growing movement aimed at opening the cloistered world of cyberspace to the people.

On June 7, 2011, federal agents arrested Hector Monsegur. Monsegur, known by

---

8   Janet Reitman, *The Rise and Fall of Jeremy Hammond: Enemy of the State*, published by Rolling Stone on December 7, 2012 and accessed online at http://www.rollingstone.com/culture/news/the-rise-and-fall-of-jeremy-hammond-enemy-of-the-state-20121207

9   Dr. Coleman interviewed Jeremy for her upcoming book on Anonymous, and has met him online and recently, in person at the MCC.

10  For more information visit http://www.nytimes.com/2010/04/06/world/middleeast/06baghdad.html?_r=0

the online pseudonym "Sabu," was widely recognized and respected as an Anonymous leader. As a government cooperator, he continued to operate online as Sabu, inviting attacks on government and corporate websites. On June 19, 2011, twelve days after his arrest, he promoted, via Twitter, the formation of Operation Anti-Security, or Antisec, "the biggest, unified cooperation amongst hackers in history."[11] Sabu continued to encourage his followers to join the #antisec channel on Anonops IRC channel[12] and participate in the group.[13]

Jeremy Hammond's prosecution for the instant offense arises out of his participation in Antisec. Having decided that he wanted to be a part of the digital activism spearheaded by Anonymous, Jeremy was impressed by Sabu, and wanted to work with him. But more than that, Jeremy saw working with Anonymous and Antisec as an opportunity to be like Chelsea Manning – to do his part to access information that needed to be shared with the people.

**The Stratfor Hack**

On December 4, 2011, Sabu sent out a message via Twitter inviting hackers to focus on specific surveillance companies as targets.[14]  The same day, a participant known only by the online pseudonym "hyrriya"[15] brought the Strategic Forecasting ("Stratfor") hack to Sabu. (BS[16] 63691.) Hyrriya had already compromised the company's

---

11  See https://twitter.com/anonymousabu/status/82679591596072960

12    Internet Relay Chat (IRC) is a protocol for live interactive Internet text messaging (chat) or synchronous conferencing. It is mainly designed for group communication in discussion forums, called channels. For more information, visit http://en.wikipedia.org/wiki/Internet_Relay_Chat

13    See e.g. https://twitter.com/anonymousabu/status/84765521953828864, https://twitter.com/anonymousabu/status/85101356494487552, and https://twitter.com/anonymousabu/status/85919437261242369

14    See https://twitter.com/anonymousabu/status/143060921059778560

15    Defense counsel received an email from a person identified as hyrriya and describing his/her role in the hack. That letter is attached to this submission as ___.

16    Sites to bate stamped discovery pages are included as "BS"

computer system and accessed confidential credit card data.  Sabu then invited hyrriya into the same chat room as Jeremy so they could discuss hyrriya's findings. (BS 62384.) With this information, Jeremy, Sabu[17], and others participated in the hack of Stratfor's website and computer servers. The Stratfor email spools were downloaded on or about December 14 (BS 67405), and Jeremy subsequently sent the data to WikiLeaks, which began to selectively release the Stratfor emails under the name "Global Intelligence Files."

While the PSR focuses on the theft of the credit card data of Stratfor's customers, and documents posted on file-sharing websites announcing the release of this information (See PSR §§ 17-26), the government has confirmed there is no evidence that Mr. Hammond personally used the credit cards divulged by the Stratfor leak, or that he was motivated by financial gain.

In addition to the Stratfor hack, Jeremy has taken responsibility[18] for hacking computer systems used by: (1) the Arizona Department of Public Safety; (2) the FBI's Virtual Academy; (3) Brooks-Jeffrey Marketing, Inc.; (4) Special Forces Gear; (5) Vanguard Defense Industries; (6) the Jefferson County, Alabama Sheriff's Office; (7) the Boston Police Patrolmen's Association; and (8) Combined System, Inc. All of these hacks took place between June 2011 and February 2012. These targets were significant to Jeremy as a way of protesting police brutality, overly aggressive and militaristic anti-immigration laws and practices, and the governments' use of drones, tear gas and other weapons abroad.

---

17    Sabu's participation included providing servers for the storage of information and creating chatrooms to facilitate discussions.

18   These additional hacks were listed in the parties' plea agreement and acknowledged by Mr. Hammond at his plea.

### 3.  Mr. Hammonds Actions in a Broader Context

On May 14, 2007, at a presentation to a Defense Intelligence Agency conference in Colorado, Terri Everett, an Officer of the Director of National Intelligence senior procurement executive, revealed that 70% of the total government intelligence budget is spent on private contractors. This figure was initially reported by Tim Shorrock on Salon.com.[19] Mr. Shorrock wrote, "Because of the cloak of secrecy thrown over the intelligence budgets, there is no way for the American public, or even much of Congress, to know how those contractors are getting the money, what they are doing with it, or how effectively they are using it."[20] Recently, the United States government's use of private contractors became a top news story and issue of public concern, following the leak of details of government surveillance programs from a former NSA contractor.

Peter Ludlow, the John Evans Professor in the Department of Philosophy at Northwestern University in Evanston, Illinois, views Jeremy's actions in the context of these revelations, describing the significance of the Stratfor hack as follows:

> Jeremy's work as a hacktivist was revelatory. He didn't break into corporate systems to embarrass their corporate owners. And he didn't do it to merely expose secrets (although he did expose plenty). Jeremy Hammond is important because his exploratory hacking helped expose the scope and nature of the private intelligence industry. Along the way he exposed an organized and well-funded system of deception targeting American citizens and other populations worldwide. He showed that the deception was systematic, sometimes illegal, and often exceptionally disturbing.

(*See* Letter from Peter J. Ludlow, at C7-C10.) Professor Ludlow further noted that

---

19  *See* Tim Shorrock, *The Corporate Takeover of U.S. Intelligence*,  published on June 1, 2007 at Salon.com , available at http://www.salon.com/2007/06/01/intel_contractors/. See also Everett's PowerPoint presentation, available at http://www.fas.org/irp/dni/everett.ppt

20  Id.

Jeremy's "hack of Stratfor provided a remarkable insight into how the private security

and intelligence companies view themselves *vis a vis* government security agencies like

the C.I.A.," 

(Id.) In his letter to the Court, and in an article published by the New York Times,[22]

Professor Ludlow outlined a number of questionable, if not criminal, activities revealed

by the leaked Stratfor emails, including:

•       Surveillance activities conducted in cooperation with the Texas Department of
Public Safety to monitor protestors in Occupy Austin as well as Occupy's relation to the
environmental group Deep Green Resistance.

•       Surveillance, on behalf of Dow Chemical, of activists who were seeking
reparations for victims of a chemical plant disaster in Bhopal, India.

•       A 2009 insider trading scheme between Goldman Sachs and Stratfor in which
Stratfor proposed to use the intelligence gathered on behalf of clients by creating an
investment fund to make trading decisions.

        The information revealed by the Stratfor hack has been used by journalists across

the United States and around the world.  In a letter signed by sixteen editors and

journalists representing international media outlets in fifteen countries about the

importance and far-reaching effects of the information that Mr. Hammond revealed. They

wrote:

                We are a group of concerned editors and journalists from around the
                globe. Together we represent newspapers, TV networks, and

---

21  All references to information derived from Stratfor emails will be redacted in the
    submission filed on the public docket, per the protective order. An unredacted
    submission will be provided to Chambers and government counsel.

22  Peter Ludlow, *The Real War on Reality*, published by The New York Times on June
    14, 2013, available at http://opinionator.blogs.nytimes.com/2013/06/14/the-real-war-
    on-reality/

magazines with a combined audience of 500 million. In 2011 our news outlets published articles using documents allegedly obtained by Mr. Jeremy Hammond. We are aware that Mr. Hammond has pled guilty to a violation of the Computer Fraud and Abuse Act in relation to information from the company Strategic Forecasting Inc, or "Stratfor." The information allegedly disclosed has helped to keep the public informed about serious wrongdoings of corporations and corrupt governmental officers in more than fifteen countries. In literally hundreds of articles based on these documents, we demonstrated corrupt and unethical behavior by a wide range of entities including Stratfor and its clients. These publications have led to important public interest outcomes.

(*See* Letter from International Media, at C11.)

We have also received letters describing some of the individual effects of the released information.  Azzurra Crispino, an Associate Professor of Philosophy at a Texas community college who was involved in Occupy Austin, and has corresponded with Jeremy at the Metropolitan Correctional Center, noted that a Stratfor email indicated that she and other peaceful protestors were being infiltrated by an undercover agent from the Texas department of Public safety who was reporting to Stratfor. (*See* Letter from Azzurra Crispino, at C23-24.) Rakia Raven, an American journalist living and working in Bhopal India and covering the Bhopal disaster in which a deadly gas leak from an American-owned factory led to thousands of deaths, discovered from the leaked Stratfor emails that Dow Chemical had been hiring people to spy on individuals who were working to get the victims of this disaster compensation.  She believes the spying was an attempt to subvert the efforts of these individuals.  (*See* Letter from Rakia Raven, at C27-28.) The Stratfor emails also revealed that Dow Chemical hired Stratfor to follow the activities of the Yes Men, Andy Bichlbaum and Mike Bonanno, a team of filmmakers interested in documenting the Bhopal struggle. These emails, collected over several years, described everything the filmmakers did in connection with the Bhopal disaster. (*See* Letter from the Yes Men, at C22.)

Another American journalist, Alexa O'Brien, wrote about her discovery, by way of the Stratfor emails, "that private security contractors with ties to the US government were 'specifically asked to connect' a campaign finance reform group that I helped found 'to any Saudi or other fundamentalist Islamic movements.'" Ms. O'Brien was so chilled by the information, that she made it a part of her submission to Judge Katherine B. Forrest in <u>Hedges v. Obama</u>, 12 Cv. 331(KBF) a lawsuit in which she is a plaintiff. The lawsuit, pending in the SDNY, seeks to enjoin certain provisions of the National Defense Authorization Act (NDAA). On the basis of this and other submissions and Ms. O'Brien's testimony, Judge Forrest found Ms. O'Brien had a "reasonable fear of detention pursuant to § 1021(b)(2)", which permits the indefinite detention, without trial, of anyone suspected of providing "substantial support" to terrorist groups.  (*See* Letter from Alexa O'Brien, at C26); *see also* Docket # 61 in 12 Cv. 331 (KBF), Opinion and Order in by Katherine B. Forrest dated September 12, 2012, pp. 20-25)

Many of the letters we have received describe our client's conduct in the instant case as acts of civil disobedience, and stress that his "hactivism" should be viewed in these terms. Richard Stallman, a noted technologist whose embrace of the word "hacker" is addressed above, wrote that "Jeremy Hammond is a fine example of a socially responsible hacker. He found a clever way to expose the many nefarious deeds that Stratfor was planning and proposing." (*See* C14.)  Maureen Eckert, a Professor in the Department of Philosophy at the University of Massachusetts, noted that that "Jeremy's political activism, often called 'hactivism,' is a new context in which Civil Disobedience has emerged with respect to technology in the 21st century." (*See* Letter from Professor Maureen Eckert, at C19-20.) Noting that the Computer Fraud and Abuse Act ("CFAA") does not make a distinction between "those breaking the law for illegal

profit and those breaking the law without profit as their aim," Professor Eckert reasoned that Mr. Hammond's moral motivations distinguish him from the class of criminals for which the law was enacted, and that for this reason, he should be treated with leniency. (*See Id.*) Others, including Baher Azmy, the Legal Director from the Center for Constitutional Rights, questioned the increasing use of the CFAA "to target socially-conscious activists," like Jeremy Hammond, "who choose to leak sensitive information to media organizations in an effort to highlight corporate or government wrongdoing," and cited recent legislative efforts to reform the CFAA, following the tragic suicide of activist and computer programmer Aaron Swartz. (*See* Letter from Baher Azmy, at C15-16.)

Among the letters seeking leniency on the basis of Mr. Hammond's motivations are two letters from former clients/subscribers of Stratfor – victims of Mr. Hammond's conduct.  In his letter, Anthony C. Arthur, a radio operator living in Canada and former Stratfor subscriber, cites Mr. Hammond's political motivations as a reason he believes the Court should be lenient in this case. He wrote, "[Mr. Hammond's] break-in of the Stratfor computers was clearly a political protest that ultimately showed he had no intent to profit from data uncovered by his actions." (*See* Letter from Anthony C. Arthur, at C21.) Mr. Arthur expressed his opinion that he views the hack as "a catalyst for Stratfor, its customers, including myself to utilize better computer security practices." (*Id.*) Similarly, Nigel Parry, a Stratfor client and freelance journalist and web-designer from St. Paul, Minnesota, asks the Court for leniency. (*See* Letter from Nigel Parry, at C31-39.)

Others praised Mr. Hammond for performing a public service by making information available to the public and sparking dialogue on critical issues. Charles Emmer, a Professor of Philosophy at Emporia State University in Kansas, impressed by Mr. Hammond's motivations and the information revealed by his actions, wrote that Mr.

Hammond's "sentencing should be made in view of his altruistic motives and the great public service he has carried out." (See Letter from Professor Charles Emmer, at C40-41.) After listing some of the information revealed by the Stratfor hack, including spying done for "Dow Chemical, Lockheed Martin, Northrop Grumman, and Raytheon to provide dossiers on their perceived enemies," that included "faculty and student organizations on US campuses," Professor Emmer realized that he, as an academic was "potentially in the crosshairs." In his letter to the Court he writes,

> The fact that bodies of higher education are considered "targets" for surveillance by Stratfor's corporate clients, also raises the important question, how much are US government agencies taking part in this targeting of educational institutions to stifle their discussions? It is thanks to Jeremy Hammond that these important issues can be discussed at all, and that we have at least the basis for pursuing a much-needed public inquiry into these associations.

(*Id.*)

Finally, counsel received letters from Daniel Ellsberg and Jesselyn Radack, whistle blowers who, like Mr. Hammond, made public disclosures at great personal risk. Mr. Ellsberg, "the first person prosecuted in the U.S. for unauthorized disclosure," wrote that he continues to be "a supporter of the need for whistle blowing to maintain a constitutional republic and avoid grave governmental abuses." (*See* Letter from Daniel Ellsberg, at C1.) Mr. Ellsberg likened Mr. Hammond's conduct to his own, writing "My decision to go public with the Pentagon Papers was a difficult one. At my own risk, I released them, just as Jeremy Hammond has done." (*Id.*) Ms. Radack, a former ethics adviser to the Department of Justice, "disclosed that the Federal Bureau of Investigation committed an ethics violation in their interrogation of John Walker Lindh without an attorney".  (*See* Letter from Jesselyn Radack, at C2.) She views Mr. Hammond as "a patriot who only sought to provide transparency and expose the surveillance crimes being perpetrated on the American people."

While neither Ms. Radack nor Mr. Ellsberg is a hacker – each disclosed classified information to which they had access, but no legal right to divulge. They both view Mr. Hammond as part of the same tradition – a person who sought to expose wrongdoing and acted out of a belief that the people in a democracy have a right to information.

### 4. Jeremy's Acceptance of Responsibility and Future Plans

Mr. Hammond takes full responsibility for his actions. He understands that he broke the law, and that he must pay for what he has done with the loss of his liberty; supervised release; restitution of up to $2.5 million dollars; and a possible fine. While Mr. Hammond does not minimize his actions, he maintains that he acted in civil disobedience and that his motivation was always to reveal secrets that he believed and still believes the people in our democracy have a right to know. That said, Mr. Hammond is not without regret.  He sincerely regrets that the private information of innocent parties was released to the public, and any consequences suffered as a result of that breach of privacy.

Since his incarceration at the Metropolitan Correctional Center ("MCC") in March of 2012, Mr. Hammond has maintained his commitment to volunteerism. For over a year, he taught GED classes once a week for 5-10 students and provided individual tutoring sessions two-three times a week.[23] And for six months, he taught guitar classes with guitars provided by the MCC. Because there were only four guitars, there were only three spots available in the course he offered, but all three participants were committed to the class and received certificates for their participation at its conclusion.[24] In addition to the contributions he has made as a teacher, Mr. Hammond has volunteered to

---

23    Mr. Hammond would like to continue to offer GED classes. However, he is prohibited from offering them on his current unit, which does not have classroom space.

24    . Another limitation on this activity was that the guitars were kept in the library, and Mr. Hammond was only permitted to teach during his library hours.

organize group activities (with the permission of correctional staff), setting up a number of chess and spades tournaments.

Going forward, Mr. Hammond is committed to leading a law-abiding life. Through his volunteer efforts, both past and present, he understands that there are lawful ways to "be the change" and to make a contribution to a better world. He is continuing those efforts while incarceration, and once released, Mr. Hammond plans to be a participant, both in his local community and in larger struggles for equal rights and social justice. He plans to continue his community work and will work with his local community center when he is released, and if there is not such a center in the neighborhood in which he lives, he is committed to working with others to create one. He would like to be part of movements to democratize computer access, to work helping disenfranchised communities have equal access to technology, and to teach computers, math and web design. He also wants to help non-profit organizations set up secure internet infrastructures.

**5. Family Support**

As discussed above, we have received over 250 letters of support for Jeremy Hammond. 64 of these letters – over twenty-five percent – come from family, friends and members of Mr. Hammond's community who know him personally.[25] As Mr. Hammond is committed to continuing social justice activism and community work through lawful means, this base of support, which includes many Chicago-based organizers and activists, will clearly help him realize that goal.

Mr. Hammond is also fortunate that he has the support his family, who are committed to remaining in his life and helping him reenter society once he is released.

---

25    We have not included in this total members of Mr. Hammond's Chicago
      community who know him by reputation only.

While not everyone in Jeremy's family shares his political perspective, everyone views him with respect and love. Describing her political perspective as "mostly conservative," Rose Collins, Mr. Hammond's mother, wrote a candid letter in which she explained that although she and her son have different political beliefs and different value systems, they often have very similar goals. (*See* Letter from Rose Collins, at A1-A2.) For instance, Mrs. Collins wrote,

> both of us have done a great deal of volunteering. Jeremy has organized food distribution to the homeless and soup kitchens. As an activist he helped others stand up for what they believe. I volunteer at my church and at my younger kids' schools.

(*Id*.) Mrs. Collins noted that their differences led to "some heated debate," and she related a discussion she once had with Jeremy about the guilty he felt at having more than others:

> We once had a discussion about how he felt guilt that he got paid a lot of money to play around with computers (he was a web designer), while others did heavy manual labor and got less than enough to make ends meet. I tried to explain how I could train him in 5 minutes to clean restrooms, while I couldn't do what he did if I had 10 years training. I think he gave much and probably most of what he earned to others who needed it more. I believe some of us are blessed with abundance so that we can help others. I don't think he sees it that way. But he behaves that way. I am very proud of my son.

(*Id*.) With respect to Jeremy's conduct in this case, Mrs. Collins does "believe that he crossed the line." (*Id*.) She remains supportive of her son, and hopes he will find "a better way to make the world a better place." (*Id*.) Similarly, Mrs. Collin's brother, Jeff Anderson, has also written a letter to the Court. Mr. Anderson does not approve of what his nephew did. But he described Jeremy as a "good person" and "great teacher" who is "more than willing to help anyone in need." (*See* Letter from Jeff Anderson, at  A9.) He writes that the family "will be there to support him when he gets out and will help him see the right road to choose." (*Id*.)

Mr. Hammond's brother Jason wrote a detailed letter about their lives growing up, including the development of Jeremy's political and social consciousness, and his participation, in high school and college, in groups that "met to discuss current events, examine history, and study social justice movements." (*See* Letter from Jason Hammond, at A3-6.)  He also wrote about Jeremy's volunteerism and his commitment to local community groups. (*Id*.) During Jeremy's work with these groups, Jason watched his brother's "youthful idealism" develop into "a well thought-out and genuine desire to work towards a free and equal society." (*Id*.)

Jason Hammond acknowledges that prior to Jeremy's arrest, "no one around him had any idea that he was getting involved in the group called Anonymous." (*Id*.) Since Jeremy's arrest, Jason has come to believe – as many who have written to the Court do – that "Jeremy's actions were a continuation of his belief in the importance of open and informed discussion about political and social issues." (*Id*.) Similarly, Jeremy's father, Jack Hammond, urges the Court to consider his son's motivations, writing that Jeremy's "work, indeed, his entire life has never been about his own profit, self-enrichment, or personal gain," but "for the advancement of moral and human principle, the betterment of an individual's life, human society, and service to the cause of freedom." (*See* Letter from Jack Hammond, at A7-8.)

Jason Hammond closes his letter with a description of both the broad network of support Jeremy has waiting for him in Chicago, as well as the good that he believes his brother can do when he is released:

> Jeremy has a lot going for him out here in Chicago. His friends, his family – we all miss him. He brings with him a hearty spirit of kindness for everyone he meets. Please consider the positive contributions he has made to society when sentencing my brother. In my experience, it is rare to find someone who goes above and beyond, and oftentimes out of their way to help a person. There is much that we can learn from Jeremy in

terms of his technical abilities…he has a spirit which rises to help people, and address suffering and injustice. I know that when Jeremy is released, he will be able to find meaningful employment and positive activities to contribute to society.

(*See* A6.) We also received letters of support from Jeremy's grandparents, Jimmie and Clyde Collins, who love and support him, (*See* Letter from Jimmie and Clyde Collins, at A10) and from Jeremy's girlfriend, Maria Sosa, wrote about the love and support he will receive upon release, which she believes "will guarantee that he not repeat the actions that have put him in Prison." (*See* Letter from Maria Sosa, at A11.) Ms. Sosa, a professional chef, met Jeremy while doing food distribution to the needy.

## CONCLUSION

Every so often, we have a client who, apart from their criminal conduct, is clearly a community asset. In these rare cases, we receive letters attesting to that person's commitment to caring for others and helping them succeed, his or her investment in volunteer efforts, and clear examples of how they have themselves and their abilities to make their community, their country, and community a better place. In these cases, we are normally in a position to set the client's criminal conduct in stark contrast to the good he or she has done, and to cast that conduct as aberrant.

This is not one of those cases. In this case, Mr. Hammond's commitment to humanity and desire to do good and make change in the world includes both lawful conduct that is highlighted and praised in letter after letter, as well as unlawful conduct; his arrests for civil disobedience at demonstrations on the streets of Chicago, and his conduct in this case. It is not lost on counsel, or on Mr. Hammond, that his actions in this case came at great cost – to Stratfor, to the other companies and law enforcement organizations whose websites Mr. Hammond defaced, and in many cases, to individuals whose public information was revealed.  We do not argue that the costs and

consequences of Mr. Hammond's actions are justified by his motivation. But his motivation matters nonetheless, and is a factor this Court should consider in determining the appropriate punishment in this case.

Mr. Hammond is part of a generation of highly skilled technologists who are deeply commitment to social justice. His unlawful conduct in this case was undertaken in the context of growing national and international concerns about privacy in this new era of surveillance technologies. According to the Electronic Freedom Foundation,

> The reach of these technologies is astonishingly broad: governments can listen in on cell phone calls, use voice recognition to scan mobile networks, read emails and text messages, censor web pages, track a citizen's every movement using GPS, and can even change email contents while en route to a recipient. Some tools are installed using the same type of malicious malware and spyware used by online criminals to steal credit card and banking information. They can secretly turn on webcams built into personal laptops and microphones in cell phones not being used. And all of this information is filtered and organized on such a massive scale that it can be used to spy on every person in an entire country.[26]

Mr. Hammond is concerned with both transparency and privacy –how the government and private corporations are using these technologies, and how individual rights are potentially being violated by their uses. As a person with considerable technological skill, he felt a responsibility to use his abilities to potentially unmask unlawful surveillance and intelligence-gathering efforts and seek out hidden truths.

Mr. Hammond deeply regrets that his actions trampled on privacy rights, revealed personal data, and caused individual harm. He accepts full responsibility for what he did, and understands that there must be consequences. He accepted those consequences the minute he sat down at his computer, and made the decision to take the actions he took. But after two prosecutions and two terms of incarceration for hacking-related activities, these are consequences that Mr. Hammond hopes to never face again. His

---

[26]  See https://www.eff.org/issues/mass-surveillance-technologies

experience in prison has taught him that he can be productive sharing his skills lawfully. He is committed to continuing his efforts as a community organizer and activist, to giving of his time and his abilities to underprivileged people and organizations working towards meaningful social change. Mr. Hammond has tremendous capacity to do good as well as the desire to do it.  The letters we received are a testament to his dedication to making a difference.

At the time of his sentence, Mr. Hammond will have spent over 20 months incarcerated.  We submit that a sentence of time served is "sufficient, but not greater than necessary" to accomplish the goals of sentencing.

Dated: Brooklyn, New York
        November 1, 2013

Respectfully submitted,

Susan G. Kellman

Sarah Kunstler

*Attorneys for Jeremy Hammond*
25 Eighth Avenue
Brooklyn, New York 11217
(718) 783-8200
kellmanesq@aol.com

cc:   AUSA Rosemary Nidiry
      AUSA Thomas Brown
      Susan P. Matthews, USPO

      Jeremy Hammond